No. 25-10038-B

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

Cecile Jackson, *Pro Se*,
*Plaintiff-Appellant*

v.

Troy E. Meinck, Secretary of the United States Air Force,
*Defendant–Appellees.*

On Appeal from the United States District Court
for the Northern District of Florida, Pensacola Division

No. 3:23-cv-03881-MCR-HTC
Hon. M. Casey Rodgers, United States District Judge

---

## PLAINTIFF-APPELLANT'S CORRECTED OPENING BRIEF

---

Submitted by:

Cecile Jackson
Plaintiff, *Pro Se*
2551 Salamanca Street
Navarre, FL 32566
email: jacksonLegalCase@gmail.com
Telephone: (850) 341-9285

January 13, 2026

**Jackson *v.* Sec'y, USAF, No. 25-10038-B**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Under Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the undersigned Plaintiff-Appellant, ***Pro Se***, hereby submits this Certificate of Interested Persons and Corporate Disclosure Statement. The following is a complete list of all persons, associations, firms, partnerships, or corporations that have an interest in the outcome of this case:

- Ashworth, Gary A. (Former Acting Secretary, United States Department of the Air Force, Defendant-Appellee)

- Cannon, Hope T. (United States Magistrate Judge, Northern District of Florida)

- Coody, Jason R. (Former United States Attorney, Current Chief of Criminal Cases, Northern District of Florida)

- Couch, Mary Ann (Assistant United States Attorney; Attorney for Defendant-Appellee, TERMINATED)

- Grogan, Andrew J. (Assistant United States Attorney; Attorney for Defendant-Appellee)

- Heeken, John "Jack" P. (United States Attorney, Northern District of Florida)

- Jackson, Dr. Cecile S. (Pro Se, Plaintiff-Appellant)

- Kendall, Frank (Retired, Secretary, United States Department of Air Force, Defendant-Appellee)

- Marie A. Mattox, P.A. (Corporation; Attorney for Plaintiff Appellant, TERMINATED)

- Mattox, Marie A., Esq. (Attorney for Plaintiff Appellant, TERMINATED)

- Meinck, Dr. Troy E., (Secretary, United States Department of Air Force, Defendant-Appellee)

- Pafford, William (Assistant United States Attorney;  Attorney for Defendant-Appellee, TERMINATED)

- Rodgers, M. Casey (United States District Judge, Northern District of Florida)

- Spaven, Michelle K. (Former Acting United States Attorney; Northern District of Florida)

**AIR FORCE (AF) & EGLIN AIR FORCE BASE JUDGE ADVOCATE GENERAL ATTORNEYS**

- Blauvelt, Michael L. (AF Judge Advocate General Attorney)

- Department of the Air Force, Judge Advocate General's Corps (AF/JAG)

- Frank, Shelly M., Col. (AF Judge Advocate General Attorney)

- Jackson, Daphne L., Lt. Col. (AF Judge Advocate General Attorney)

- Krog, Andrew T. (AF Judge Advocate General Attorney)

- Warnock, Daniel L. (AF General Law Attorney)

- Zapater, Monica S., Maj. (AF Judge Advocate General Attorney)

**INSPECTOR GENERAL PERSONNEL**

- Clark, Paul M. Sr. (AF Inspector General Officer)

- Department of the Air Force, Office of the Inspector General (AF/IG)

- Garrick, William G. (AF Inspector General Officer)

**EEO & CIVILIAN PERSONNEL OFFICES**

- Air Force Personnel Center (AFPC), EEO Division

- Avance, Anthony (EEO Director, Department of the Air Force)

- Department of Defense Human Resource Activity, Diversity Management Operations Center (DODHRA DMOC)

- DSZ (Contract EEO Investigator)

- EEOC Birmingham District Office

- Equal Employment Opportunity Office, Department of the Air Force

- Porter, Eunice (EEO Counselor)

**AFCARO**

- Air Force Civilian Appellate Review Office (AFCARO)

- Naglic, Mark J. (EEO Case Management Specialist)

- SAF/MRBA – Office of the Assistant Secretary of the Air Force for Manpower and Reserve Affairs

**EGLIN AIR FORCE BASE, FLORIDA:  MILITARY OFFICERS, ENLISTED, AND CIVILIANS**

- Atherton, Debra A.

- Bettua, Tracey

- Black, Kenneth, Col.

- Breaux, Terrell

- Buchholz, Trinity, SSgt

- Bunch, Arnold, Brig.  Gen.

- Cain, Scott, General

- Clark, Stephen W., SSgt

- Davis, Scott A.

- Ewert, Kelly L.,   Helping Agency Coordinator

- Hawn, Rene', 2Lt.

- Hill, Lamar

- Howey, Clifford J., MSgt

- Jones, Rick

- Klus, Catherine F., 1st Lt.

- Lee, Jonathan, 1st Lt.

- Mensen, Kurando, Lt. Col.

- Moreno-Rosado, Alexis

- Nelson, Elaine K., 2nd Lt.

- Preble, Carman

- Prophet, Tiffany

- Rowbotham, Brant, SSgt

- Shull, Sarah J., MSgt

- Tasse, Rockey

- Uchima, Kevin Y. G., TSgt

- Weed, Scott A., Lt. Col.

- Wilke, Mark E.

- Willcox, David M.

- Wilson, Lynn

## CERTIFICATE OF SERVICE

Plaintiff-Appellant, *pro se*, hereby certifies that a copy of the foregoing

Certificate of Interested Persons and Corporate Disclosure Statement was

served electronically through the Court's CM/ECF system on all parties of

record.

Respectfully submitted,

January 13, 2026      */s/ Cecile Jackson*
Cecile Jackson
Plaintiff, *Pro Se*
2551 Salamanca Street
Navarre, FL 32566
email: jacksonLegalCase@gmail.com
Telephone: (850) 341-9285

## STATEMENT OF ORAL ARGUMENT

Oral argument is warranted because this appeal presents a fact pattern involving coordinated actions between IG, JAG, EEO, command officials, and the supervisor named in the EEO complaint, all occurring within hours of Dr. Jackson's protected activity—conduct that proceeded despite the undisputed absence of any allegations or admissible evidence predating her EEO filing. The inclusion of the named harasser in same-day coordination, as well as LtCol Weed's statement of "crowd-sourcing" agency officials, raises questions that cannot be fully evaluated on the written briefs alone.

Oral argument will materially assist the Court in addressing (1) the EEO Director's repeated disclosures of information about the complaint and his impact on initiating same-day, multi-agency coordination; (2) the complete absence of contemporaneous evidence predating the protected activity; (3) how the involvement of the individual named in the EEO claim planning communications intersects with causation, pretext, and federal-sector Title VII standards, as well as the constitutional and statutory claims

raised in this appeal; and (4) the incorporation of altered, fabricated, and procedurally defective materials—including statements from the named supervisor in the EEO complaint, the opinion-only informal inquiry that lacked evidence, and the unsigned CDI—into the administrative and district court record as if admissible under Federal rules of Evidence. Given the complexity of the 285-day sequence and the significance of the legal questions presented, oral argument will aid the Court in achieving a clear and accurate resolution.

# TABLE OF CONTENTS

No. 25-10038-B ................................................................................... 1

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ............................................................... 2

CERTIFICATE OF SERVICE ................................................................ 6

STATEMENT OF ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ............................................................... xiii

JURIDISTIONAL STATEMENT ....................................................... xviii

STATEMENT OF ISSUES .................................................................. xix

STATEMENT OF CASE ......................................................................... 2

    I.    Nature of the Case .................................................................... 2

        A.    Procedural posture and disposition .......................... 2

        B.    Citations and Evidentiary Guides .............................. 3

        C.    Pro Se Leniency ........................................................ 5

    II.    District Court Proceedings ....................................................... 5

STATEMENT OF FACTS ...................................................................... 7

I.    Professional Background ...................................................... 7

      A.    Pre-EEO Claim Details ................................................11

      B.    Supervisory Involvement and Animus ...................................12

II.   APRIL 23, 2021: Same Day Retaliation ...............................16

III.  Alterations and Contradictions .........................................20

      A.    NAV Alterations ........................................................20

      B.    Contradictory Sworn Testimony.............................22

IV.   Solicited Statements.  IG's Plan and JAG's Legal Concurrence ......24

V.    Solicited Undated Comment Cards as the Premise for Investigating
Plaintiff.........................................................................27

      A.    Anguish and Pleading Cries for Help .....................................27

      B.    Actual Content (Transcribed Verbatim)..................................28

      C.    Contradicting Content ...............................................30

      D.    The Cards were Solicited After the EEO Claim was Filed .....32

      E.    Formal Rank and Authority Structure for Context.................36

VI.   COVID Protocols and Limited Contact .............................40

      A.    Post-EEO Complaint Evidence Sources ...................................40

      B.    Pre-EEO Complaint Record and COVID ...............................42

      C.    Work Structure and Physical Separation .................................43

      D.    COVID Scheduling Changes ....................................44

E.  COVID Childcare Telework and High-Risk Accommodations 45

VII. EEO Disclosures, Inter-agency Communications, and Expansion of Agency Involvement .................................................46

A.  Early EEO Director Disclosures and Coordination with the Named Subject .................................................46

B.  EEO Mediation.................................................47

C.  EEO Disclosures Preceded Informal Inquiry.........................48

D.  EEO Director's Involvement in CDI .........................48

E.  May 13, 2021 Cross-Agency Expansion and "Crowd-Sourcing" of Action .................................................50

VIII. The Initial Chaplain's Email (Helping Agency).................................52

IX.  Division and Suicide Threat.................................................54

A.  Plaintiff's Mid-term and Military/Civilian Divide Narrative 54

B.  Subsequent Requests to Separate Military and Civilian Personnel .................................................56

C.  Progressive Counseling Process.................................................57

D.  May 27, 2021: Suicide Threat and Reporting Chain.................58

E.  June 2021: Transfer Requests and Command Actions.................61

X.  Racial and Retaliatory Animus.................................................63

A.  Pre-EEO Performance Record .................................................64

B.  Post-EEO Characterization Shift .................................................65

C.     The DEIA Training Reversal .......................................................66

D.     Post-EEO Statements, Defamation, and Reputational Harm .68

E.     No-Win Environment Against Plaintiff ....................................70

F.     Statements Entered into the Official Record ...........................71

G.     Documented Reputational Harm .............................................76

XI.   Allegation Shifting: From Intimidation to Criminal Allegations ....78

XII.  Informal Inquiry: June 23, 2021 Initiation and Results ...................80

A.     June 23, 2021 Appointment Memorandum ............................83

B.     Allegations and Scope of the Informal Inquiry ......................84

C.     IO Selection Neutrality .............................................................86

D.     Command Influence ...................................................................88

E.     Interviews and Materials Claimed vs. File Produced .............89

F.     Sworn Depositions Contradicts Informal Inquiry Opinion ...91

XIII. CDI Investigation: September 13, 2021, Initiation and Results .......94

A.     Chronology and IG Complaints ...............................................94

B.     IG Complaints Referenced in the CDI ROI ............................96

C.     CDI Allegations .........................................................................96

D.     CDI Regulatory Framework and Scope ...................................97

E.     CDI File Signatures and Documentation ..............................100

XIV. Chain-of-Record Creation and Consumption .................................102

A.     Solicited Undated Comment Cards > Informal Inquiry Opinion ................................................................. 102

B.     Informal Inquiry Opinion → CDI Report ............................ 103

C.     CDI ROI → EEO ROI Overlap ................................................ 104

D.     EEO ROI → DOJ → District Court Summary Judgment ...... 106

XV. FMLA Interference, Constructive Discharge, and Health Impacts 111

A.     Written Notification and Safety Concerns ............................ 111

B.     Contacts During FMLA Leave ................................................ 112

C.     Resignation During FMLA Leave ........................................... 114

XVI. Returning from FMLA and Out-Processing .................................. 118

A.     Out-Processing ......................................................................... 120

B.     Harassment after Resignation ................................................ 122

C.     Others Compelled to Leave .................................................... 124

XVII.   Health Impacts .......................................................................... 125

XVIII.  District Court's Cost Award ..................................................... 125

STANDARD OF REVIEW ............................................................................... 127

GOVERNING LEGAL STANDARDS (GLS) ................................................ 130

I.   Appellate Review Standards ............................................................ 130

A.     De Novo Review. ...................................................................... 130

B.     Pure Questions of Law [Used in: Argument 4 - Wrong Causation Standard]. ........................................................130

C.     Summary judgment....................................................130

D.     Viewing the Evidence. ..............................................131

E.     Inadmissible Evidence. .............................................131

II.    Title VII Retaliation Standards .........................................132

A.     Prima Facie Case.......................................................132

B.     Materially Adverse Actions.......................................132

C.     Causation - Direct Evidence. ...................................132

D.     Causation - Temporal Proximity..............................133

E.     Causation - Multi-Actor Institutional Retaliation. ................133

F.     Federal-Sector Causation Standard Liability (The "Untainted" Standard).....................................................134

G.     Pretext and Rule 56 Inquiry....................................134

H.     Consciousness of Guilt Standards. .........................136

I.     Employment Defamation and Evidence Fabrication. .............136

J.     Hostile Work Environment.......................................137

K.     Cumulative Analysis................................................138

L.     Pattern Discrimination and Disparate Treatment. ................139

M.     Continuing Violation and Constructive Discharge..............139

III.   EEO Regulatory Framework.............................................140

A. Confidentiality and Separation Requirements. .....................140

B. EEO Director Responsibilities. .................................................141

IV. FMLA Interference and Retaliation ................................................141

V. Constitutional and Statutory Claims Independent of Title VII.....142

A. Fifth Amendment Due Process "Stigma-Plus" Claims..........142

B. Privacy Act (5 U.S.C. § 552a). ...................................................142

C. Constitutional Remedies Beyond Title VII Limitations........143

VI. Procedural and Evidentiary Standards ..........................................144

A. Accardi Principle. ....................................................................144

B. Administrative Exhaustion.....................................................145

C. Spoliation and Material Alteration of Evidence: Sanctions, Adverse Inference, and Rule 37(e). .................................................145

VII. District Courts Obligations and Appellate Remedies....................146

A. Obligation to Adjudicate All Properly Raised Claims..........147

B. Reversal and Render Authority. ...........................................147

C. Convergence Standard for Reversal and Render .................147

D. Futility Prohibiting Remand...................................................148

ARGUMENT SUMMARY..............................................................................150

ARGUMENTS ...............................................................................................152

I.    Argument 1. Whether the District Court Erred in Granting Summary Judgment Despite Direct Evidence and Uncontroverted Causation That Establish Multi-Agency Retaliation as a Matter of Law ........................153

    A.    The Dispositive Chronology.....................................................153

    B.    The EEO Director's Dual Role Constitutes an Accardi Violation Rendering All Derivative Proceedings Void..................158

    C.    Retaliation Liability Established as a Matter of Law (Prima Facie) ....................................................................................168

    D.    The District Court's Compartmentalized Analysis Obscured the Structural Reality ........................................................................178

    E.    Exhaustion Is Excused............................................................179

    F.    Remand Would Be Futile.........................................................180

    G.    Conclusion..............................................................................182

II.   Argument 2. Whether the District Court Erred in Granting Summary Judgment by Failing to Apply the Required Cumulative Analysis to Plaintiff's Interrelated Claims, Despite Evidence Establishing a Sustained Pattern of Coordinated Retaliation as a Matter of Law .........................183

    A.    Element 1 - Protected Class. ...................................................184

    B.    Element 2 - Unwelcome Harassment ......................................184

    C.    Element 3 - Based on Protected Characteristic ......................186

    D.    Element 4 – Severe or Pervasive Harassment Altering the Terms and Conditions of Employment ...........................................188

    E.    Element 5 – Employer Liability...............................................202

F.    The District Court Ignored the Common Origin of the
      Harassment: the EEO Director's Unauthorized Disclosure...........204

G.    Conclusion...............................................................................205

III.  Argument 3: Whether the District Court Erred in Granting Summary
Judgment by Accepting Employer Justifications That Are Conclusively
Contradicted by Record Evidence, Where Such Contradiction Mandates
Judgment as a Matter of Law.................................................................206

A.    Baseless Investigation.............................................................207

B.    Procedurally Defective Investigatory Products.....................212

C.    Exaggerated Characterizations and Temporal Impossibility
      216

D.    Altered Evidence ....................................................................219

E.    Conclusion...............................................................................220

IV.   Argument 4. Whether the District Court Erred in Applying the
Wrong Causation Standard to Plaintiff's Federal Claims, Where the
Current Standard and Undisputed Evidence Require Judgment as a
Matter of Law ........................................................................................221

A.    The Court Acknowledged and Failed to Apply *Babb v. Wilkie*
      223

B.    Court Disposed of Claims on Legally Foreclosed Ground ..226

C.    Misapplied Burlington Northern Retaliation Standard........229

D.    Misapplication of Additional Controlling Standards ...........231

E.    Improper Fact-Weighing at Summary Judgment..................234

F.    CONCLUSION .......................................................................235

V.   Argument 5.   Whether the District Court Erred by Failing to Adjudicate Plaintiff's Preserved Constitutional and Statutory Claims, Where the Undisputed Record Supports Judgment on Those Independent Causes of Action as a Matter of Law ...............................237

    A.   Stigma-Plus (Fifth Amendment Due Process).......................238

    B.   Privacy Act (5 U.S.C. § 552a) ...................................................240

    C.   FMLA Interference (29 U.S.C. §§ 2615, 2617)........................241

    D.   Constructive Discharge.............................................................243

    E.   Conclusion..................................................................................244

VI.   Argument 6.   Whether the District Court Erred in Failing to Recognize That Fundamental Procedural Violations Rendered the Administrative Process Void, Making Remand Futile and Requiring Judgment as a Matter of Law...................................................................245

    A.   Foundational Judicial Error: Reliance on a Tainted Process 245

    B.   Consequence of the Error: Remand Is Futile .........................246

    C.   The Record Permits Only One Outcome.................................247

    D.   Conclusion..................................................................................248

CONCLUSION.................................................................................................249

CERTIFICATE OF COMPLIANCE ...............................................................250

CERTIFICATE OF SERVICE...........................................................................252

# TABLE OF AUTHORITIES

## **Cases**

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ...........................239

*Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11th Cir. 2014) ............137, 138

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........ 131, 167, 206, 233, 234

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ........................142

*Bradley Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269 (11th Cir. 2002)* ....137

*Buckley v. Secretary of the Army, No. 21-1233 (11th Cir. Mar. 28, 2024)*.........137

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014) 131, 141, 142

*Cannon v. City of West Pm Beach*, 250 F.3d 1299 (11th Cir. 2001) ..................142

*Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000) (en banc). ....127, 131, 246

*Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001)........................132, 176

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) .....................142

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189 (11th Cir. 2004 142, 147, 180, 181, 204, 220, 243, 247

*Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999)   147

*Edison v. Dep't of the Army*, 672 F.2d 840 (11th Cir. 1982)....................143, 239

*Green v. Brennan*, 578 U.S. 547 (2016)......................................................139, 242

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17...................................... 137, 138, 183, 195

*Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001)..................139

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ..................................139

*Ismael v. Roundtree*, No. 25-10604, slip op. (11th Cir. Dec. 5, 2025).............134

*Lauderdale v. Texas Dep't of Criminal Justice,* 512 F.3d 157, 164 (5th Cir. 2007)
..................................................................................................................138

*Martin v. Brevard County Public Schools*, 543 F.3d 1261 (11th Cir. 2008)......141, 240

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .................139, 231, 232

*Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997)... 132, 167, 173, 174

*Mincey v. U.S. Postal Serv.*, 879 F. Supp. 2d 1330 (D.D.C. 2012)..144, 148, 178, 179, 181, 182, 204, 220, 243, 247

*Morton v. Ruiz*, 415 U.S. 199 (1974) .................................................144, 178, 206

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) 138, 167, 188, 201, 204

*Paul v. Davis*, 424 U.S. 693 (1976) ..........................................................141, 238

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004...................139, 195

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. (2001)...............................150

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982).....................222, 226, 228, 233

*Raad v. Fairbanks North Star Borough School District*, 323 F.3d 1185 (9th Cir. 2003) ................................................................................219

*Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133 (2000).....131, 135, 150, 177, 206, 214, 215, 218, 244, 246

*Scott v. Harris*, 550 U.S. 372 (2007) .........................................................206, 214

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).....................139

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).....................................................133

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199 (11th Cir. 2001).........141

*Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280 .........................130

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)..144, 156, 157, 160, 161, 166, 171, 178, 179, 181, 182, 204, 206, 215, 220, 245, 243, 246, 247

*United States v. Caldwell, 776 F.3d 1330 (11th Cir. 2015)* ..........................21, 169

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*.................................................133, 168, 235

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000)...147, 180, 181, 204, 206, 220, 222, 226, 228, 237, 243, 244, 247

*Zaklama v. Mount Sinai Med. Ctr.*, 842 F.2d (11th Cir. 1988) ................133, 176

**Statutes**

29 C.F.R. § 1614.102(c) .....................................................................140

29 C.F.R. § 1614.105(g) ............................................................139, 140, 239

29 U.S.C. § 2615(a)(1) ......................................................................141

29 U.S.C. § 2617(a)(1) ......................................................................141

5 U.S.C. § 552a ...............................................................................142

5 U.S.C. § 552a(e)(5) .......................................................................142

5 U.S.C. § 552a(g)(4).........................................................................143

**Other Authorities**

Air Force Handbook 36-2618, *The Enlisted Force Structure*, Jul. 5, 2018.........38

Air Force Instruction 36-2406, *Officer and Enlisted Evaluations Systems*, Nov. 14, 2019 ...........................................................................................33

Air Force Instruction 36-2710, *Equal Opporunity Program*, Jun. 18, 2020.......82

Air Force Instruction 90-301, *Inspector General Complaints Resolution*, Aug. 27, 2015 ................................................................................27, 82, 102

Department of Air Force Manual 1-101, *Commanders Directed Investigations (CDI)*, Apr. 9, 2021............. 82, 83, 84, 85, 86, 98, 99, 100, 101, 102, 104

Department of the Air Force Instruction 34-1201, *Protocol*, Aug. 24, 2018 ..37, 40

Department of the Air Force Instruction 51-110, *Professional Responsibility Program*, Feb. 27, 2018 .........................................................................19

Department of the Air Force, Office of the Inspector General, *Commander Directed Investigation (CDI) Guide*, Jun. 1, 2018 ...................84, 99, 100

## **Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................130

Fed. R. Civ. P. 56(c)(2)......................................................................................131

Fed. R. Evid. 901 ...............................................................................................131

## JURISDICTION STATEMENT

The district court had original jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3 because this action arises under Title VII of the Civil Rights Act of 1964. The district court also exercised supplemental jurisdiction over related constitutional and statutory claims pursuant to 28 U.S.C. § 1367. The district court entered final judgment granting summary judgment and closing the case on September 30, 2024. A timely motion to alter or amend the judgment was filed under Federal Rule of Civil Procedure 59(e), tolling the time for appeal. The district court denied reconsideration on November 6, 2024. A timely notice of appeal was filed on January 6, 2025. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 2107.

# STATEMENT OF ISSUES

1.  Whether the district court erred in granting summary judgment despite direct evidence and uncontroverted causation that establishes multi-agency retaliation as a matter of law.

2.  Whether the district court erred in granting summary judgment by failing to apply the required cumulative analysis to Plaintiff's interrelated claims, despite evidence establishing a sustained pattern of coordinated retaliation as a matter of law.

3.  Whether the district court erred in granting summary judgment by accepting employer justifications that are conclusively contradicted by record evidence, where such contradiction mandates judgment as a matter of law.

4.  Whether the district court erred in applying the wrong causation standard to Plaintiff's federal claims, where the current standard and undisputed evidence require judgment as a matter of law.

5.  Whether the district court erred by failing to adjudicate Plaintiff's preserved constitutional and statutory claims, where the undisputed

record supports judgment on those independent causes of action as a matter of law.

6. Whether the district court erred in failing to recognize that fundamental procedural violations rendered the administrative process void, making remand futile and requiring judgment as a matter of law.

**STATEMENT OF CASE**

## I.    Nature of the Case

This is a federal-sector Title VII retaliation action by a senior civilian

Branch Chief against the Department of the Air Force. The central question

is whether a federal employee who engages in protected EEO activity may

be subjected, within hours, to retaliation coordinated across multiple

agencies—EEO, IG, JAG, command leadership, helping agencies, and

subordinates—despite the absence of any allegations, and whether the

district court erred in granting summary judgment despite

contemporaneous documentary evidence showing post-EEO fabrication

and retroactive justification. Plaintiff asks this Court to reverse the district

court's summary judgment and render judgment for Plaintiff on liability.

### A.  Procedural posture and disposition.

The district court granted summary judgment for Defendant, adopting the

agency's administrative submissions as the operative factual record and

denying Plaintiff's Rule 59(e) motion. Plaintiff timely appealed. The district

court's summary judgment rests on post-EEO materials generated during

the 285-day period following Plaintiff's April 23, 2021, filing. The administrative and district court records show that every adverse document the agency relied upon—including memoranda, undated comment cards, the informal inquiry, and the unsigned CDI—originated after the protected activity and formed a single 285-day retaliation sequence the court treated as isolated events. Viewed chronologically, the retaliatory through-line is undisputed. Because the district court evaluated these post-EEO materials without recognizing the coordinated 285-day continuum of retaliation, the proper disposition is reversal and rendering of judgment on liability.

## B. Citations and Evidentiary Guides

The Appendix leads with an **"Appendix Table of Contents and Evidentiary Guide"**, which provides four navigational tools to assist the Court in reviewing the multi-volume record:

- **Volume-Level Appendix List** identifying each Appendix volume.

- **Detailed Appendix List** providing an itemized listing of all

  Appendix materials; Appendix citations in this brief appear as Appx.

  [Volume] at [Page].

- **Chronological Timeline Chart**, organizing key events in

  chronological order identifying periods of close proximity; Timeline

  citations are to the row numbers and appear as TLR:#.

- **Cross-Investigation Solicitation Chart,** identifying  evidence

  solicitation and involvement across investigations; chart citations are

  cited as CLR:#.

All entries in the Chronological Timeline Chart and Cross-Investigation

Solicitation Chart are derived exclusively from record evidence. Only facts

in the record are included.  As pro se, SOC and SOF[1] and Argument

citations appear in footnotes following general Bluebook principles and in

---

[1] Statement of Case (SOC) and Statement of Facts (SOF)

accordance with Eleventh Circuit Rules, which do not prohibit footnote

citation to the record.

### C. Pro Se Leniency

Plaintiff respectfully requests that the Court consider her pro se status in

evaluating this motion. Courts have consistently recognized that pro se

litigants are entitled to leniency and that their pleadings must be liberally

construed to ensure a fair adjudication of their claims. See *Haines v. Kerner*,

404 U.S. 519, 520 (1972) (holding that pro se pleadings are to be held to less

stringent standards than those drafted by attorneys); *Tannenbaum v. United

States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (noting that pro se pleadings are

liberally construed). While Plaintiff has made every effort to comply with

procedural rules and legal standards, she respectfully asks the Court to

exercise its discretion in construing this motion liberally and in the interest

of justice.

### II. District Court Proceedings

This action was filed on February 10, 2023, asserting Title VII claims for race and sex discrimination, hostile work environment, retaliation, and constructive discharge. The district court granted summary judgment for the defendant on September 30, 2024. Six days later, counsel withdrew, leaving the plaintiff to proceed pro se. A timely Rule 59(e) motion was filed, preserving Title VII claims and additional constitutional and statutory claims under the Fifth Amendment, the Privacy Act, and the FMLA. The district court denied reconsideration on November 6, 2024, without addressing those claims.

# STATEMENT OF FACTS

Dr. Jackson's case presents a documented sequence of coordinated retaliation. The pre-EEO record reflects nearly three decades of exemplary service and documents the discriminatory treatment that led her first EEO complaint on April 23, 2021. Within hours of the EEO filing, contemporaneous communications and internal memoranda were generated by multiple offices: EEO, IG, JAG, command leadership, and helping agencies.

## I.    Professional Background[2]

For nearly three decades, Dr. Cecile Jackson served the nation with distinction—first as a Navy service member and later as a senior federal civilian leader. Her federal career culminated at the 96th Communications Squadron (96CS) at Eglin Air Force Base, where she served from November

---

[2] This extended background provides evidentiary grounding for upcoming details and arguments.

2016 through February 2022. As Branch Chief of the Client Services Center

(SCOS), the largest branch within the squadron, Dr. Jackson led a complex

operational unit supporting a fluctuating workforce of approximately 35 to

70 military and civilian personnel. She was the only African-American

female leader among more than 300 personnel within the 96CS.

Dr. Jackson holds a Bachelor of Science and Master of Science in

Computer Science, as well as a Doctor of Business Administration in

Leadership.[3]

Throughout the relevant period, Dr. Jackson's performance record

reflected sustained excellence under the Air Force's most rigorous

appraisal system. Her 2020 CCAS Salary Appraisal—the final full appraisal

preceding her EEO activity—rated her at the highest levels across all

performance factors, including Job Achievement, Communication and

Teamwork, and Mission Support. She earned a perfect raw score average of

---

[3] Pl  Jackson Rebuttal (Oct. 12, 2021), App'x 15 at 3423, paras 1 - 3

5.0, a categorical rating of 3H, and an Overall Contribution Score exceeding

the expected benchmark for her broadband level. Supervisors formally

documented that her contributions "went above and beyond," exceeded

expectations, and materially advanced mission readiness and compliance.[4]

As Branch Chief, Dr. Jackson managed one of the most operationally

significant technical portfolios at Eglin Air Force Base. Her responsibilities

supported more than 21,000 users across eight Major Commands,

interfaced with four military service branches, and delivered

mission-critical communications solutions to senior military officers and

executive leadership. Her portfolio encompassed oversight of mission

assets valued in excess of $17 billion and included device encryption

programs, executive communications, air crash investigation board

support, search-and-rescue operations, FEMA disaster response

communications, and leadership of four base-wide technical programs. The

---

[4] Pl Appraisal Form and Assessment  (DEIA, Holmes, Davis, Black) (Jan. 01, 2020),
App'x 8 at 1488-1496

systems under her supervision required continuous, high-judgment operational oversight.[5,6]

Her technical leadership also brought Eglin AFB into full compliance with Local Registration Authority requirements. Dr. Jackson identified and remediated unauthorized software installations shielding the government from more than $2 million in potential fines.

Dr. Jackson's contributions earned repeated recognition. She was named Civilian of the Year (2019), selected multiple times as Civilian of the Quarter, and personally commended by senior commanders for leadership, integrity, and mission impact, and "altruistic" leadership. Her performance evaluations consistently praised her judgment, initiative, and ability to lead through complexity—assessments that remained uniform and unqualified through the period immediately preceding her EEO activity,

---

[5] *Id.* at 1491-1496

[6] Pl Jackson Declaration (Aug. 28, 2021), App'x 12 at 2650-2651, Q2-Q3

Before filing her EEO complaint, Dr. Jackson's personnel record reflected sustained, formally documented excellence, with no disciplinary actions, adverse findings, or performance deficiencies of any kind.

## A. Pre-EEO Claim Details

The pre-EEO record reflects a sustained pattern of structural marginalization and undermining of Dr. Jackson's authority. Beginning in 2018, she was required to "re-apply" for the very branch-chief role she already occupied—an action not imposed on any comparator. Key components of her branch were restructured or removed while she remained responsible for the same or increased workload, creating persistent personnel and supervisory shortfalls. This pattern included: (a) branch restructuring that eliminated subordinate units while leaving her responsible for the workload; (b) a disproportionate workload[7] resulting from additional assigned tasks that those from other branches; **(c)** routine

_____

[7] *Id.* at 2674, section 3

exclusion from operational, budgetary, and CIPS meetings that other branch chiefs attended unless she specifically requested inclusion; **(d)** repeated bypassing of her supervisory authority over leave, evaluations, and enlisted performance reports, with her authority over standard supervisory functions routinely overridden; **(e)** directives to newly assigned personnel instructing them not to report to Dr. Jackson but to report directly to her supervisors instead, thereby eroding her supervisory role; and **(f)** interference with branch rosters and assignments, coupled with the diversion of credit for her branch's work to others.

### B.   Supervisory Involvement and Animus

In September 2019 Dr. Jackson reported disrespectful and condescending behavior by then-peer Scott Davis in the presence of their supervisor, Larry Holmes. Dr. Jackson's September 30, 2019, EEO intake records the incident, including Davis's remark, "See, I told you she was a

problem,''[8] and Holmes's failure to intervene but instead laughed with him. Several months later from around February 2020 – March 2021, the 96CS was in COVID telework with little in-person interaction. When Holmes announced his retirement in late 2020, LtCol Weed nonetheless selected Davis to succeed him without competition[9]; thereby, becoming Dr. Jackson's first-level supervisor; the selection became official in January 2021 despite documented concerns about Davis's conduct.

After Davis assumed the first-level supervisor role, Davis and SMSgt Terrell Breaux repeatedly directed Dr. Jackson's subordinates to bypass her, instructed others to ''fix'' her branch, routed newly assigned personnel away from her supervision, and circulated inaccurate information about Dr. Jackson and her branch that eroded her supervisory authority. These

---

[8] EEO Intake Form: Davis and Holmes "Problem" (Sep. 30, 2019), App'x 6 at 1194

[9] Weed Select Davis (Nov. 30, 2020), App'x 9 at 1872, para 2-3

actions are documented in Dr. Jackson's sworn declarations and related submissions.[10, 11, 12]

In February 2021, Breaux yelled at Dr. Jackson in Davis's presence, he took no corrective action. That same month, Dr. Jackson visited the EEO office to inquire about filing a claim, but—hoping the situation could still be resolved internally—hesitated.  The conduct by both Davis and Breaux intensified instead.

On March 3, 2021, during a virtual TEAMs meeting, her newly appointed supervisor, Scott Davis, told Dr. Jackson to "tone yourself down," "stop thinking about being Black," her "presence was too strong,"

---

[10] App'x 12 at 2648

[11] Pl Jackson, Supplemental Declaration (Sep. 04, 2021), App'x 13 at 2793

[12] Motion to Reconsider 59E (Oct. 28, 2024), App'x 4 at 687

"she was intimidating," "people feared her" and that she should "giggle and cut up" so they would feel more comfortable around her.[13, 14, 15, 16]

April 16, 2021, Plaintiff, Dr. Jackson, submitted an EEO claim for the first time, identifying Davis, Breaux, and others as subjects of discriminatory conduct. EEO Counselor Eunice Porter requested to alter the official filing date, shifting it from April 16 to April 23, 2021. [17, 18]

_____

[13] EEO Counselor's Report with Claim (Dtd. Jul. 6; Signed Jun. 30, 2021), Row 168:Appx. at 2087, 2089-2090 § G;

[14] Pl Jackson's Decl. (Aug. 28, 2021), Row 257:Appx. at 2699-2702 at Q29.

[15] Davis Declaration (Sep. 13, 2021), App'x 13 at 2858-2861, Q30-33.

[16] Davis Decl. (Apr. 25, 2022), Row 325:Appx. at 3884-3885, A2.

[17] EEO Counselor's Report (dtd. Jul. 6; Signed Jun. 30, 2021), App'x 10 at 2087, 2089–2090 § G

[18] First EEO Claim Submitted Confirmed (Apr. 23, 2021), App'x 10 at 2125

At 6:53 a.m. on April 23, 2021, Dr. Jackson filed her first informal EEO complaint.

What followed—within hours—became the center of this appeal.

## II.    APRIL 23, 2021: Same Day Retaliation

On **April 23, 2021, at 6:53 a.m**., Dr. Jackson filed her first informal EEO complaint identifying Scott Davis as one of named harassers. EEO Counselor, Eunice Porter confirmed receipt at **7:24 a.m.** [19, 20,] Despite confidentiality protocols, the EEO Director disclosed the complaint within hours, and Scott Davis was copied on a multi-agency email thread involving command officials (Lt Col Scott Weed), EEO, the Inspector General, and JAG attorneys discussing how to proceed.

---

[19] App'x 10 at 2087, 2089-2090 § G

[20] The initial list of remedies and informal claims were submitted on Apr. 16, 2021, with the initial informal-EEO claim, and included a remedy request for a detailed training program for unconscious biases and leadership, EEO rejected the initial claim; Plaintiff resubmitted.

**Before 11:11 a.m. the same morning,** EEO Director Anthony Avance

notified LtCol Scott Weed, Dr. Jackson's second-level supervisor, that she

filed an informal EEO claim.[21]  Official notification was set to occur three

days later, April 26, 2021.[22],[23]

Shortly after the early disclosure, LtCol Weed informed Scott Davis,

who was named in the EEO complaint. In sworn declaration, Davis

admitted:

> On Friday morning, April 23, 2021, I made a phone call to the EO
> Director, Mr. Anthony Avance for guidance…Mr. Avance and I
> talked about how I would **document the issues raised in these
> complaints in her mid-term performance feedback**.[24]

At **11:11 am**, about 4 hours later**,** LtCol Weed emailed ("Need a Vector"

(NAV-1)), Inspector General Paul M. Clark, Sr., JAG Attorney Col. Shelly

---

[21] EEO Director Avance Sworn Depo., (Nov. 27, 2023), App'x 20 at 4531-4532, lines 21-17

[22] EEO, RMO Notified (Apr. 26, 2021), App'x 10 at 2139

[23] App'x 10 at 2089-2090 last para

[24] Davis Declaration (Apr. 25, 2022), App'x 17 at 3882 Q3 para 3

M. Frank, EEO Director Anthony Avance, and copied Scott Davis (named

harasser) accusing Plaintiff of "overbearing control, lack of

trust/empowerment, potential racial discrimination and…restriction

[ongoing over the] last months", and inquiring about "follow-on

supervisor/command action."[25]

At **12:20 p.m., IG official Paul Clark replied** to all, including Davis,

and expanded the recipients to include multiple JAG Attorneys and

Inspector Generals, detailing a plan for Weed to solicit documents after the

fact "from which [LtCol Weed] could take appropriate administrative or

disciplinary action."[26] Inspector General's Clark's plan is further detailed in

*infra* § <u>IV.</u>

The NAV-1 emails shows at **2:48 p.m.,** Weed admitted:

> I was able to link up with Tony [EEO Dir. Avance] separately…
> We first have to sort out an unrelated(?) EO issue… we'll see…

---

[25] NAV-1 (Apr. 23, 2021), App'x 10 at 2131

[26] *Id.* at 2130-2131

on Mon. … thanks to the IG/EO/JA team. You all move mountains [27]

See *infra* III.   At **2:00 PM**, JAG Attorney Frank Shelly provided early legal concurrence while confirming allegations did not exist, stating:

> While you can always initiate a CDI, I don't always recommend it for **broad, undefined situations** like this. If the climate assessment reveals something more specific... then we might discuss a CDI. But for now, I concur with what they've proposed.[28,29]

**Table 1**. April 23, 2021, **NAV-1** Recipients

| Name | Title/Role on April 23, 2021 |
|---|---|
| LtCol Scott A. Weed | Plaintiff's 2nd-level Supervisor; Commander, 96CS |
| Scott A. Davis | Plaintiff's 1st-level supervisor |
| Anthony A. Avance, Sr. | EEO Director 96 TW/DEH |

---

[27] *Id.* at 2129–2130

[28] *Id.* at 2129

[29] Note: AFI 51-110, Dec. 11, 2018, Law, Professional Responsibility, ¶ 7.1.2, requires legal neutrality, and ABA Rule 8.4(e), prohibits attorneys from facilitating improper investigations.

| Paul M. Clark, Sr | Inspector General (IG), 96 TW/IG |
|---|---|
| William G. Garrick | IG Investigations Division (IGQ), 96 TW/IGQ |
| Col Shelly M. Frank | Staff Judge Advocate (Attorney), 96 TW/JA |
| Maj. Monica S. Zapater | Deputy Staff Judge Advocate (Attorney), 96 TW/JA |
| Michael L. Blauvelt | Attorney, 96 TW/JA |

## III.   Alterations and Contradictions

### A.  NAV Alterations

As indicated in *supra* II. after receiving early notice of the EEO claim,  LtCol

Weed, Weed initiated the NAV-1 email thread, which shows a technical

impossibility of 2:48 p.m. appearing **before** 2:00 p.m.[30,] See **Table 2**, column

(A).   Also, the record shows LtCol Weed created another NAV email

version.  On **April 15, 2022**, nearly a year later, while assigned to the U.S.

Air War College, in Washington, D.C. — LtCol. Weed drafted a declaration

for Plaintiff's EEO investigation. On the same day, Weed forwarded the

NAV-1 email to himself, modified the 11:11a.m. timestamp to reflect 12:10

p.m., (See **Table 2**, column (B)), deleted key passages including the

---

[30] App'x 10 at 2129

reference to "follow-on supervisor/command action[31] and attached the altered version (now identified as NAV-2) to his April 15, 2022, sworn declaration. "Attachment 1a". [32,33, 34, 35,36]

Table 2. Need a Vector Email Version Comparisons

|  | Need-a-Vector Email Details | (A) NAV-1 | (B) NAV-2 |
|---|---|---|---|
| (1) | Weed sends the initial email to JAG, IG, EEO, Scott Davis (named in EEO claim) and others | 11:11 AM | 12:10 PM (Altered) |
| (2) | IG-Clark Clark responds with investigation plan | 12:20 PM | deleted[2] |
| (3) | Weed acknowledges the EEO complaint | **2:48PM[1]** | deleted |
| (4) | JAG Attorney provides early legal concurrence | **2:00 PM** | deleted |
| [1]NAV-1 shows 2:48 p.m. email precedes 2:00pm, a technical impossibility.<br>[2]NAV-2 modifies the timestamp, removes multiple lines, and deletes the reference to "follow-on supervisor command action." | | | |

---

[31] "Follow-on supervisor/command action" reflects Unlawful Command Influence (UCI), what the Court of Military Appeals termed 'the mortal enemy of military justice.' *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986).

[32] App'x 10 at 2131

[33] NAV-2 (ECF 23-44) (Apr. 23, 2021), App'x 10 at 2133

[34] Weed Tampered Email COMPARISON (Apr. 23, 2021), App'x 10 at 2135–2137

[35] Weed Declaration w NAV-2 Attachment (Apr. 15, 2022), App'x 16 at 3749 A2, 3757

[36] Weed Sworn Depo (Nov. 27, 2023), App'x 21 at 4665 lines 8-22

## B. Contradictory Sworn Testimony

Lt. Col. Weed testified under oath that EEO informed him of Dr. Jackson's EEO claim on April 23, 2021, between 2:30 p.m. and 3:30 p.m. In contradiction, during deposition, EEO Director Avance, denied informing LtCol Weed.  Q. [Weed] said that you made a courtesy call to him to advise him that this EEO had been filed. A. No…I wouldn't have done that.[37]

When confronted with the NAV-2 version—bearing the artificially created 12:10 p.m. timestamp—Avance admitted that he informed Weed before 12:10 p.m. that same day.   Q. And do you recall telling him in the conversation that you had before he sent this email ... that she ... had already filed an EEO complaint?  **A. I did**[38]

Since NAV-2 reflects a timestamp LtCol Weed created one year later in Washington, D.C., Avance's admission that he informed Weed before

---

[37] App'x 20 at 4526-4527 lines 25-4

[38] *Id.* at 4631, lines 21-25

"12:10 p.m." confirms the premature disclosure occurred *before* 11:11 a.m. and Weed was fully aware of the EEO claim at time he sent the NAV-1 email to IG, JAG, Scott Davis and others with accusations and requesting guidance on initiating action against Dr. Jackson.

Despite being copied on the April 23, 2021, NAV-1 email with LtCol Weed, Inspector Generals, JAG Attorneys, and EEO Director, Scott Davis (named harasser), swore that he did not learn of Dr. Jackson's EEO complaint until April 26, 2021, contradicted by his statement later in the same declaration.[39]

> That same day, Friday, April 23, Lt Col Weed sent a message ("Need a Vector" Email) to the IG, EO, and Judge Advocate, describing the hostile work environment Cecile was creating…**We** wanted guidance on how to handle it. [40]

---

[39] App'x 17 at 3882-3883, A2

[40] *Id.* at 3882-3883, last two paragraphs

Davis used the word "We" when stating he and LtCol Weed sent the 11:11 a.m. NAV-1 email indicating they were informed of the EEO claim before the email was sent.

## IV.    Solicited Statements.  IG's Plan and JAG's Legal Concurrence

As previously stated, less than six hours after the EEO filing, at 12:20 p.m. on April 23, 2021, Inspector General Paul Clark responded to Weed's NAV-1 email outlining a plan:

> 1. Determine if EO can conduct a climate 'inquiry'… **absent a formal complaint**… without attempting to target a specific individual as a 'subject' accused of a specific framed allegation.

> 2. If EO is unable to execute #1, ask those junior folks **you have talked to** if they would be willing to share their concerns with IG;… Once we gather and **drill down** into what is being reported… we would work with SJA [JAG Attorneys] to address possible 'allegations' worth inquiring into."[41]

Clark continued

> We would strongly recommend that a Command Directed *Climate Inquiry* be conducted and **NOT** a Command Directed

---

[41] App'x 10 at 2130

*Investigation*, as that (CDI) kicks in the mandatory compliance from the AFMAN. [42]

Clark then added that, once "allegations" were identified, an investigating officer (IO) would be appointed, provide a report, which would undergo "**legal review for sufficiency**", enabling command to take "appropriate administrative or disciplinary action."[43]

Later that same day, at 2:00 p.m., JAG Col. Shelly Frank concurred with the plan, stating that while a CDI could always be initiated, it is not recommended for "broad, undefined situations," but endorsed IG's plan as "absolutely appropriate for the situation."[44]

Inspector General Clark's 12:20 p.m. guidance instructed Lt. Col. Weed to "ask those junior folks… if they would be willing to share their

---

[42] *Id.* at 2130.

[43] *Id.* at 2130-31

[44] *Id.* at 2129

concerns," they would "drill down into."[45]

In Summary Judgment, the Defense stated, it was "speculation" that Plaintiff's subordinates "collaborated to collect false and negative statements… after she filed her informal complaint."[46]

Beginning four days after the EEO filing, between April 27 and June twenty-one documents were solicited and submitted: eighteen MFR statements and three undated comment cards.  The contributors:  2d Lt. Elaine Nelson, MSgt. Sarah Shull, TSgt. Kevin Uchima, SSgt. Trinity Buchholz, SSgt. Stephen Clark, and SSgt. Brant Rowbotham. :[47]

- **April 27, 2021:** Six (6) MFRs
- **April 29, 2021**: Two (2) MFRs
- **May 3 - June 17, 2021**: Ten (10) MFRs .[48]

---

[45] *Id.* at 2130

[46] Defendant's Motion for Summary Judgment (Jan. 26, 2024), App'x 1 at 206 para 15

[47] Motion to Reconsider 59(e) (Oct. 28, 2024), Row 53:Appx. at 702 § N, 713 ¶ 3;

[48] MFR Statements, Appx. 10 at 2146-2165; 2176-2196; 2294-2305; 2317-2325; Appx. 11 at 2460-2472

- *After* **April 29, 2021**: Three (3) undated comment cards[49]

These statements were solicited under Lt Col Weed's direction, carried out by MSgt. Shull and 2d Lt. Nelson, neither of whom held investigative authority under AFI 90-301. Notably, all six individuals who submitted statements were newly arrived military personnel, having joined the branch between February 2020 and March 2021, during COVID-19 minimal manning protocols and social distancing requirements. See *infra* section VI.

The same evidence-solicitation produced three undated comment cards, LtCol Weed later claimed as the impetus requesting investigating Plaintiff.

## V.    Solicited Undated Comment Cards as the Premise for Investigating Plaintiff

### A.   Anguish and Pleading Cries for Help

LtCol Scott Weed asserted that he received three undated "comment cards"

---

[49] Undated Comment Cards, Appx. 10 at 2167-2174

that, in his view, demanded immediate action. He described the cards as follows:

> The **specificity and anguish** … **fear of retribution**, is not something I've seen before…p**leading cries for help** from the military members under her purview, seeking unit leadership's help and expressing **concerns for the mental health** of those within the branch.[50]

The Defense adopted this characterization, stating in its summary judgment motion: "LtCol Weed received undated comment cards full of anguish and claims against Plaintiff. These cards warranted and justified Weed initiating an investigation against Plaintiff."[51] The following section contains the actual content of the cards transcribed in full.

## B.   Actual Content (Transcribed Verbatim)

### 1.      Comment Card #1 - Buccholz

Dr. Jackson in SCOS does not want A̲irman going to TSgt Shull for anything instead we are expected to go through Civ leads if we need something from her. this is taking away from NCO

---

[50] Weed Declaration w Date Correction (Aug. 18, 2021), App'x 12 at 2605-2606 ¶11b

[51] App'x 1 at 198-199, #14 paras 2, 221

mentorship as I see her as a mentor and good leader. -Trinity Buchholz[52]


### 2. Comment Card #2 - Clark

Dr. Jackson has displayed a lack of trust in her uniformed members. Her NCOs were briefed that we are NOT allowed to make operational decisions. Furthermore, we were told that we are not to speak with our Section Chief unless we have first spoken to our civilian section leads. Finally, we have been instructed to support civilians around base that are not members of our support roster. Furthermore when we reached out to those individuals we were told not to ask them questions in email in regards to their Comm issues. Instead, we are only allowed to ask for a time to meet them and then resolve the issue ourselves...Sgt Stephen W Clark II [53]

### 3. Comment Card #3 - Rowbotham

Dr. Jackson time and time again has made it clear she does not care about military members. She stated civilians are [???] due to her concern over their health.

She also had it briefed that section leads cannot make operational changes without her approval. I feel as a NCO I should be empowered and I have been empowered by

my OIC to make changes as I see fit, but am now being told I cannot. I am miserable coming to work when she is there I have

---

[52] Undated Comment Card - SSgt Buchholz (Apr. 29, 2021), App'x 10 at 2167-2168

[53] Undated Comment Card - SSgt Clark (Apr. 29, 2021), App'x 10 at 2170-2171

zero confidence she trusts me or even cares about me or the Airmen. I do not trust her and I fear if I bring up issues I will be punished or targeted by her.

We are told to not directly speak to our Section Chief(military member) that we have to talk to our civilian leads for them to engage with her. - Sgt [E-5] Brant Rowbotham[54]

## C. Contradicting Content

Weed stated the above undated comment cards contained specificity and anguish, fear of retribution, pleading cries for help, and concerns for …mental health.  In contrast, **First**, SSgt Buchholz complained about being expected to go through civilian leads. The "civ leads" mentioned were her actual supervisors, Mr. Alexis Moreno-Rosado and Mr. Lamar Hill. Buchholz wanted to skip her supervisors and take directions from MSgt Shull who is  similarly positioned as others across the rest of the 96CS, held no supervisory position.  Even SMSgt Breaux who was similarly situated at

---

[54] Undated Comment Card - SSgt Rowbotham (Apr. 29, 2021), App'x 10 at 2173-2174

the flight level confirmed he was not a supervisory: "I did not have any direct reports," describing his role as administrative.[55]

**Second**, SSgt Clark and SSgt Rowbotham, both E-5s at the workcenter level in Plaintiff's Branch (SCOS),[56] expressed dissatisfaction with not being able to make "operational decisions." In contrast, in contemporaneous documentation, on June 21, 2021, at 8:00 a.m. Dr. Jackson explicitly informed 2Lt Nelson:

> "Over the past several months, I have reiterated on multiple occasions that the workcenter leads are empowered to make decisions at the **workcenter level**. Changing the on-call … support is a **branch decision that impacts all of Eglin AFB** – this decision is outside of workcenter scope of responsibility."[57]

Dr. Jackson oversaw a mission portfolio supporting more than 19,000 users, across eight Major Commands, and supported mission assets valued

---

[55] Breaux Declaration (Defense Exhibit 18-6) (Sep. 10, 2021), App'x 13 at 2830, Q3

[56] 96CS Org Chart and Branches (May 13, 2021), App'x 11 at 2243

[57] Email Trail, Plaintiff and Nelson Boundaries_Empowerment (Jun. 21, 2021), App'x 12 at 2482

over $17 billion. Personnel at the E-5 grade did not hold authority to make operational decisions impacting this scope, See *supra* I. Professional Background. Nevertheless, LtCol Weed characterized Dr. Jackson's adherence to established authority lines, limiting junior enlisted to workcenter-level responsibilities versus operational decision-making as a "overbearing control, lack of trust/empowerment, potential racial discrimination."[58]

### D.  The Cards were Solicited After the EEO Claim was Filed

Record testimony confirms the cards were solicited and submitted *after* April 23, 2021—the day Plaintiff filed her EEO complaint—contrary to LtCol Weed's assertion that the undated cards existed beforehand and prompted immediate investigative action.

### 1.    Sworn Testimony Establishes Post-EEO Submission

---

[58]App'x 10 at 2131 at 11:11AM

SSgt Trinity Buchholz testified during sworn deposition, that she submitted

her card following statements and solicitation by MSgt Sarah Shull.

Buchholz stated Shull told her Dr. Jackson called her a "toxic leader" and

threatened her Enlisted Performance Report (EPR)[59]. Similar statements

were made about SSgts Brant Rowbotham and Stephen Clark—authors of

the other undated cards.[60] When asked to place the timing of her

submission by using her April 29, 2021 MFR submission as the date anchor

(*supra* SOF § IV. ), Buchholz testified:

> I wouldn't say the same day, but around the same time period…
> a couple of months, I would say. Because it all, like, I left for
> deployment in July so everything happened before July.[61]

Buchholz continued:  "…that's why I put that commander's comment card

---

[59] An Enlisted Performance Report (EPR) is an annual appraisal used to evaluate the
performance of enlisted personnel, serving as an official record for promotion eligibility,
career progression, and personnel actions. (See Officer and Enlisted Evaluation Systems,
AFI 36-2406, Nov. 14, 2019, Row 98: Appx. at 1211, ch. 1, § 1.1.)

[60] Buchholz Sworn Depo (Nov. 27, 2023), App'x 21 at 4754-4755, lines 14-2

[61] *Id.* at 4741, lines 5-13.

in."[62]  Also, MSgt Catherine Klus corroborated the cards were solicited: "it was recommended that these Airmen write anonymous comment cards to Lt Col Weed."[63]

### 2.    Contemporaneous EEO Report Omits the Comment Cards

The EEO Counselor's Report, dated July 6, 2021 (signed June 30), includes statements from SMSgt Terrell Breaux and Scott Davis—yet neither mentioned the undated comment cards. Although Breaux submitted twenty-eight pages of attachments[64], none contained the cards that Lt. Col. Weed later described as prompting him to act and investigate Dr. Jackson.

### 3.    Timeline Pushes the Card Submissions into May 2021

Additional contemporaneous documents further place the cards into **May– June 2021**. The branch's first interaction with Chaplain Lee occurred during

---

[62] *Id.* at 4732, lines 4-5

[63] Klus Declaration (Apr. 22, 2022), App'x 17 at 3842, A2, lines 4-5

[64] App'x 10 at 2091-2123

the week of May 10–13, 2021, as confirmed by 2d Lt Nelson's

contemporaneous email: "We had the pleasure of meeting our awesome

Chaplain Lee this week"[65]

This reference aligns with Rowbotham's statement in the informal inquiry

summary, which described a "morale day" held *after* Chaplain Lee's visit,

during which Shull and Nelson stated that allegedly Dr. Jackson labeled

him a "toxic leader":  (Inquiry Rpt., Aug. 30, 2021, at 11 ¶ J,K).

> After a morale day that I personally funded, due to the Chaplain having to deal with a crisis on base, I was pulled aside by Lt Nelson and MSgt Shull, where they told me that Dr. Jackson wanted me counseled for being a toxic leader.[66]

The preceding record establishes the undated comment cards—cited as the

basis for immediate investigative action—were submitted after Plaintiff's

---

[65] Chaplain, Double-Edge Sword - (1st) (May 13, 2021), App'x 11 at 2276

[66] Informal Inquiry Summary Report by IO Lynn Wilson (Aug. 30, 2021), App'x 13 at 2741-2742 para. k

April 23, 2021 EEO complaint, not before and reflected disagreement with chain-of-command and making operational decisions.

### E.   Formal Rank and Authority Structure for Context

The Air Force maintains a defined chain-of-command. Weed, as the 96CS Commander, was senior in position and title.  Under AFI 34-1201[67] (Attachments 8–9), Dr. Jackson (GS-13/NH-03) and LtCol Scott Weed (O-5) hold equivalent commissioned officer rank.  Given the rank structure, and due to COVID-distancing then in effect (see *infra* VI. ), Plaintiff, similar to LtCol Weed,  did not have routine or meaningful engagement with junior personnel.

---

[67] AFI 34-1201, Services Protocol, August 18, 2020. https://files-backend.assets.thrillshare.com/documents/asset/uploaded_file/2760/Shs/ac003d14-7f29-4378-b6a6-0363477ad4ef/afi34-1201_Protocols_Flag.pdf?disposition=inline

Table 3, illustrates this equivalency and shows that the individuals who authored or solicited the undated comment cards were situated far below the Plaintiff's leadership level.

- Mr. Lamar Hill and Mr. Alexis Moreno-Rosado, civilian supervisors of the E-5 junior enlisted authors,[68] held **GS-12 / O-4–equivalent** roles, one level below Dr. Jackson and LtCol Weed.

- 2Lt Elaine Nelson **(O-1)**, who participated in soliciting statements, was a **junior officer** four officer grades below the O-5 level.

- MSgt Sarah Shull (**E-7**),[69] another individual involved in soliciting statements, is a senior enlisted who falls outside of the commissioned officer rank structure.

---

[68] "Supervisors of enlisted Air Force members, whether officer, civilian or enlisted have a specific responsibility to ensure assigned enlisted members comply with standards explained in this guidance and correct them when they deviate," (AFH 36-2618, pg 9, ¶ 4.2)

[69] MSgts are technical experts who "promote responsible behaviors within all Airmen. Readily detect and correct unsafe or irresponsible behaviors that impact unit or individual readiness," (Id. at 13 ¶ 4.6.8). [MSgts] who fail to monitor, correct and advise subordinates and leaders … have not executed their responsibility," (Id. at 13 ¶ 4.6.9; AFPD-1, Air Force Culture).

- SSgt Buchholz, Rowbotham, and Clark (E-5) ,[70] the authors of the undated comment cards—are **junior enlisted** subordinate to their civilian supervisors, Hill and Moreno-Rosado, positions well-below the O-5/GS-13 level, with no authority of Dr. Jackson's SCOS branch operational decisions.

---

[70] Staff Sergeants are primarily highly skilled technicians with supervisory and training responsibilities… They must continuously strive to further their development as technicians, supervisors, and leaders… They are responsible for their subordinates' development and the effective accomplishment of all assigned tasks. They must ensure proper and effective use of all resources under their control to ensure the mission is effectively and efficiently accomplished, (Id. at 7, ¶ 3.1.2.1).

Table 3. Military and Civilian Equivalency Chart and Chain of Command

| Rank | Air Force Rank Titles | Civilian Equivalency | Personnel Related to Case | # |
|---|---|---|---|---|
| 0-10 | General | | | |
| 0-9 | Lt General | SES Levels | | |
| 0-8 | Major General | SES Levels | | |
| 0-7 | Brig. General | SES Levels | | |
| 0-6 | Colonel | GS-15 | | |
| 0-5 | Lt. Col/Colonel | GS-13/GS-14 | LtCol Weed │ **Dr. Cecile Jackson** | **1** |
| 0-4 | Lt Colonel | GS-12 | **Civilian Supervisors** Mr. Hill │ Mr. Moreno-Rosado | **2** |
| 0-3 | Lieutenant (Lt) | GS-10/GS-11 | | 3 |
| 0-2 | First Lieutenant | GS-8/GS-9 | | 4 |
| 0-1 | Second Lieutenant | GS-7 | 2Lt Elaine Nelson | **5** |
| E-10 | Chief Master Sergeant of the Air Force | | | 6 |
| E-9 | Chief Master Sergeant | | | 7 |
| E-8 | Senior Master Sergeant | | | 8 |
| E-7 | Master Sergeant | GS-5 | MSgt Sarah Shull | **9** |
| E-6 | Technical Sergeant | | TSgt Uchima (MFR Author) | 10 |
| E-5 | Staff Sergeant | | **Undated Comment Card Authors** SSgt Buchholz │ SSgt Rowbotham │ SSgt Clark | **11** |
| E-4 | Senior Airman | | | |
| E-3 | Airman First Class | | | |
| E-2 | Airman | | | |
| E-1 | Airman Basic | | | |

*Notes:* 1) The "Rank" Column is the military rank structure with E1 the lowest rank and 0-10 the highest rank, 2) "Air Force Rank Titles," 3) "Civilian Equivalency" column is the civilian equivalent to military rank, 4) "Personnel Related to Case" column includes the names of the individuals by rank, and 5) "#" is for referencing purposes.
**Source:** AFI 34-1201, August 18, 2020, pgs. 94 - 97, attachments 8 and 9.

## VI.  COVID Protocols and Limited Contact

From March 2020 through March 2021, Eglin Air Force Base operated

under COVID-19 minimum manning protocols, including maximum

telework, mandatory mask-wearing, six-foot social distancing, and

restricted in-person contact. Pursuant to Brigadier General Cain's March

31, 2021 memorandum, these protocols continued into 2021.[71]  In response,

the SCOS Branch implemented four rotating telework teams to sustain

mission operations while complying with COVID requirements

### A.  Post-EEO Complaint Evidence Sources

The SCOS Branch consisted of approximately sixty (60) military and

civilian personnel during the relevant period.[72]  Prior to Dr. Jackson's April

23, 2021 EEO complaint, the record contains no allegations of bullying,

---

[71] COVID Posture Change (Mar. 21, 2021), App'x 10 at 1982-1983

[72] SCOS Branch Workload Tracking PPT (Jul. 08, 2021), App'x 12 at 2531, 2535

harassment, timecard fraud, abuse of authority, or similar misconduct against her.

Following the April 23, 2021 EEO complaint, all MFR-statements and undated comment cards originated from six individuals. Each of those six transferred into the SCOS Branch during peak COVID-19 restrictions between February 2020 and March 2021: SSgt Rowbotham (Feb 2020),[73] SSgt Clark (Feb 2020), [74] TSgt Uchima (June 16, 2020),[75] SSgt Buchholz (August 2020),[76] MSgt Shull (January 6, 2021),[77] and 2Lt Nelson (March 22, 2021).[78]

---

[73] Rowbotham Declaration (Apr. 18, 2022), App'x 16 at 3798, Q8

[74] Clark Declaration (Apr. 19, 2022), App'x 17 at 386, Q6

[75] Uchima Declaration Full (Apr. 25, 2022), App'x 17 at 3891-3892, last Question

[76] App'x 21 at 4727-4728, lines 23-3

[77] Shull Declaration (Sep. 30, 2021), App'x 13 at 2944, Q3

[78] Nelson Declaration (Apr. 22, 2022), App'x 17 at 3847, Q5

Shull and Nelson, were in the SCOS branch about 4 and 2 months when the EEO claim was filed. Of the remaining 54 personnel, many of whom served in SCOS before, during, and after this period—made any such allegations either before or after the EEO filing.

### B. Pre-EEO Complaint Record and COVID

Dr. Jackson's annual performance evaluations only showed excellent and team-building. Dr. Jackson's 2020 appraisal, drafted by Larry Holmes, submitted by Scott Davis (named harasser), and approved by Colonel Black, evaluated her performance during the COVID-19 stating:

> During COVID-19, Cecile's contributions went far beyond that expected. She dedicated hours outside of the normal day to provide support and be available for all individuals in her branch. During COVID-19, she established a regular training program where each member of her branch developed and presented a training topic that increased mission support and boosted overall morale. She implemented regular virtual branch meetings that not allowed for team collaboration but fostered team cohesion. When supplies were low at the onsite of COVID-19, Cecile initiated cross-family support for item sharing and item exchanging for those without essential personal items and cleaning supplies.

Additionally, during the early stages of COVID-19, the Cecile initiated social distancing floor markers, ensured all personnel abided by hygiene rules, and made/provided hand-sewn facial masks for Airmen in need. Cecile implemented 4 10-member team rotations during these events, enhanced remote CST support, maintained branch morale, and sustained CST functions, customer support, and base operations while minimally manned. Her team received multiple awards and recognition from the 96CS Commander, 96TW Commander, Union Presidents, and numerous customers on the quality of support and handling of COVID-19 in creating a positive and safe environment concerned with the health of customers and the CSTs.[79]

The social distancing protocols Dr. Jackson initiated and enforced—were awarded and recognized by 96CS Commander, 96TW Commander, and Union Presidents and were the same protocols mandated by Brigadier General Cain.

### C.  Work Structure and Physical Separation

COVID-19 protocols required mask-wearing, minimal face-to-face interaction, team separation, and six-foot distancing. Dr. Jackson worked a

---

[79] App'x 8 at 1488-1496

separate schedule in a private office, often with the door closed, in compliance with these requirements. Junior enlisted personnel were dispersed across multiple areas in cubicles within Building 1354 (2,228 sqft) and did not work in close proximity to Dr. Jackson.

In accordance with Air Force chain-of-command structure, junior enlisted personnel communicated through GS-12 supervisors, who managed telework schedules and tasking. As a GS-13/14 Branch Chief with O-5-equivalent authority, Dr. Jackson did not engage in routine daily interaction with E-5-level personnel.

### D. COVID Scheduling Changes

During the COVID-19 period, Eglin AFB adjusted onsite requirements multiple times. On February 25, 2021, CMSgt Compton ordered all E-6 and above to return to work full-time March 1, 2021, from a previous 3 – 6 day onsite telework schedule.[80]  On March 21, 2021, General Cain reaffirmed

---

[80] Email, Mil E6 Up Return Onsite, COVID (Mar. 01, 2021), App'x 9 at 1964-1965

maximum telework, face masks, and 6ft social distancing across the installation.[81]  On May 7, 2021, Scott Davis increased all junior E-5 personnel to onsite  3 days a week from the previous about 3-6 days a month schedule. Civilians were required to return from 100% telework to 3 days a week onsite.[82]

### E.   COVID Childcare Telework and High-Risk Accommodations

The Under Secretary of Defense Memorandum, *Extension of Maximum Telework Flexibilities*, November 20, 2020, extended an exception to policy through June 30, 2021, that enabled civilian employees to telework during an emergency, such as COVID, with a child at home.  On March 1, 2022, the policy was extended through September 30, 2022.

---

[81] App'x 10 at 1982-1983

[82] COVID Civs Transition on-site (Klus Admits Mil_Civ divide Flight) (May 07, 2021), App'x 10 at 2202-2203

Separately, 96CS implemented local requirements allowing personnel designated as high-risk to remain on maximum telework unless mission-essential.[83], [84]

## VII. EEO Disclosures, Inter-agency Communications, and Expansion of Agency Involvement

### A. Early EEO Director Disclosures and Coordination with the Named Subject

As established in *supra* § III.E.5, on the morning Dr. Jackson filed her informal EEO complaint, EEO Director Anthony Avance disclosed the complaint to Lt Col Weed and coordinated with Dr. Jackson's supervisor, Scott Davis—despite Davis being explicitly identified in the complaint. Avance's involvement extended beyond this initial disclosure.

EEO Director Avance later testified regarding:

---

[83] COVID, Max Telework (Nov. 04, 2020), App'x 9 at 1826-1828

[84] App'x 10 at 1982-1983

My job is informing commanders of what's going on. I did inform him there is a possibility that this could be perceived as reprisal.[85]

Avance further explained: "I'm the director chief of EO, and him being a commander, I talk to commanders about that stuff all the time".[86]

Following these disclosures, Avance remained an active participant on NAV-1 email communications, which included Weed, Davis, Dr. Jackson's assigned EEO Counselor Eunice Porter, and other installation officials. His continued presence on these communications, along with the named harasser, preceded discussions of initiating inquiry procedures against Dr. Jackson.

## B. EEO Mediation

In July 2021, at Dr. Jackson's request, EEO office scheduled mediation. LtCol Weed—the commander who orchestrated the retaliation—was

---

[85] App'x 20 at 4539, lines 16-18

[86] *Id.* at 4558 lines 17-19

assigned as mediation authority. Weed testified he "dedicated several hours in [his] final days of command with Dr. Jackson, Civilian Personnel, and EEO, in a goodwill attempt to mediate some kind of remedy to Dr. Jackson's perceived issues."[87]

### C. EEO Disclosures Preceded Informal Inquiry

Weed explained that he did not begin discussing a CDI or informal inquiry until after EEO Officials informed him that Dr. Jackson's EEO complaint had moved to higher levels:

> Once [EEO Director and EEO Counselor] said it [the EEO investigation request] had gone up all of the local base actions and it was up to the higher echelons, past Eglin, that's when we made the decision that we could start the conversations about the CDI, informal Inquiry.[88]

### D. EEO Director's Involvement in CDI

---

[87] App'x 16 at 3757, Q1

[88] App'x 21 at 4674, lines 6-12

Following the EEO disclosures that enabled "CDI, informal inquiry"

discussions (*supra* § III.H.2), EEO Director Avance testified his office

provided subject matter expert review on the CDI, testifying:

> The only thing my office is required to do is provide a subject
> matter expert [SME] review on that CDI. We will review the CDI
> and say, did the IO accurately **address the allegations**? That's
> the only process that we have in that CDI. And then it goes to
> legal because legal runs that whole CDI process.[89]

At the time Avance, the EEO Director, confirmed the allegations

through his CDI SME review, the record shows Avance was fully aware 1)

IG confirmed no confirmed no allegations existed and proposed soliciting

statements, "drilling down" to find allegations, 2) JAG Attorney described

the situation as "undefined." *See supra* §§ III.C.5, III.C.7, III.F.1. 3) cards and

statements were solicited to support the allegations to conduct the informal

inquiry and CDI over which Avance operated as SME and submitted to

legal [JAG Attorneys] for legal review. The CDI was incorporated into the

---

[89] App'x 20 at 4540 liines 20-25

EEO ROI that Avance's office supervised. *See infra* §§ III.N, III.O. The EEO

ROI was submitted to District Court.

### E.   May 13, 2021 Cross-Agency Expansion and "Crowd-Sourcing" of Action

On May 13, 2021, Weed contacted Kelly Ewert, the Executive Director of

Helping Agencies, stating: "I've been **crowd-sourcing** possible approaches

with IG and EO, and after talking with Tony [EEO Director Avance]… he

thought there might be a chance that your team could help us out".[90]

---

[90] App'x 10 at 2128, 3:53 p.m. email

Later that day, at 1:59 PM, Ewert responded—**copying Avance (EEO Director), Dr. Jackson's EEO Counselor (Porter), and Scott Davis (the named harasser)**—and confirmed a meeting with EO.  She wrote:

 and development of "a potential course of action." She wrote:

> I met with Tony [EEO Director Anthony Avance]  at EO this morning and we had a great discussion about potential course of action for you and your unit. We would like to meet with D&I…Looking forward to assisting you and your folks, and want to make sure we are helping in the best possible forward action. Please contact me or Tony [Avance] if you have any questions in the interim. [91]

Lt Col Weed responded with appreciation for the group's coordination:

> I want to ensure that whatever we do at the unit level has full buy-in and advocacy across the key agencies, so that we maximize our chances … Thanks again for everyone **piling onto this one**. [92]

---

[91] *Id.* at 2128, May 13, 2021 at 1:59 PM

[92] *Id.* at 2127

In deposition, Weed clarified that "piling onto this one" referred to "the JAG, IG, EEO, and now Kelly [Helping Agencies]."[93]   As shown in *supra* Table 1, the NAV-1 email, initiated on the same day as the EEO claim, included, just as Weed confirmed, shows JAG Attorneys, Inspector Generals, EEO Office, and Helping Agencies actively involved or complicatedly silent, in the NAV-1 email that included, Scott Davis, the named harasser.

## VIII.  The Initial Chaplain's Email (Helping Agency)

That same day, May 13, 2021, the first of 18 Chaplain emails were sent from 2Lt Nelson on behalf of the Chaplain to Plaintiff's branch "96CS/SCOS" only.[94]   Plaintiff testified she had never met the chaplain before filing the EEO claim and peer Branch Chief, Brett Barker stated "I do

---

[93] App'x 21 at 4672-4673, lines 19-5

[94] Each message bore the signature block of **Jonathan Lee, 1st Lt, USAF, Chaplain, 96 TW/HC, Eglin AFB**, reflecting assignment to the 96 Test Wing level Chaplain Corps rather than to the subordinate 96th Communications Squadron.

not know who Capt. [Chaplain] Jonathan Lee is."[95] 2Lt Nelson stated: "I

forwarded emails to only SCOS Branch personnel."[96]

The first email, "Double-Edge Sword," arrived on May 13, 2021, the

same day Weed solicited the Helping Agencies and one day after Dr

Jackson complained to Scott Davis about subordinate misconduct. The

third email, "Wolf Pack," was sent June 3, 2021, coinciding with a

subordinate's suicide threat that Nelson and Shull failed to report. Further

emails reflected key events, including the completion of the informal

inquiry (August 30, 2021); Dr Jackson's FMLA leave, constructive

discharge/resignation, and final day (October 13, 2021, and January 24

2022).

---

[95] Brett Barker Declaration (May 17, 2022), App'x 11 at 2308, Q5

[96] App'x 17 at 3854, Q4

## IX. Division and Suicide Threat

Following Dr. Jackson's EEO filing, the agency's handling of subordinate misconduct and its treatment of Dr. Jackson diverged sharply.

### A. Plaintiff's Mid-term and Military/Civilian Divide Narrative

On April 23, 2021, while Dr. Jackson's midterm performance review was in progress, Davis collaborated with the EEO Director to add the following statement:

> I would like Dr. Jackson to work on building a more cohesive team. There is some **division between the SCOS civilian and military** workforce. I recommend using the branch triad of the **NCOIC, OIC**, and the Branch Chief to help solve the situation.[97]

The record contains no indication of any such division within SCOS before this midterm entry. The broader military–civilian delineation within the 96th Communications Squadron predated Dr. Jackson's arrival in 2016 and had been the subject of focus groups led by outside agencies to address the

---

[97] MidTerm Input (Davis, Weed), See Apr. 23, 2021 EEO Dir. and Davis Collab (May 05, 2021), App'x 10 at 2200

ongoing issues.[98], [99]   Upon her hire in November 2016, Dr. Jackson initiated

efforts to strengthen cohesion within SCOS, including purchasing "One

Team, One Fight" banners with personal funds, hosting team-building

activities, and conducting teamwork trainings. The MSG Commander

coined and repeatedly complimented Dr. Jackson for her innovation in her

work center cohesiveness and unity.[100, 101, 102,103, 104, 105, 106]

[98] Focus Group Mil Civ Divide etc (Dec. 13, 2017), App'x 5 at 963

[99] Email, Pl to Davis Banners, Mil_Civ Divide, Morale (Aug. 09, 2021), App'x 12 at 2584-2588

[100] Email, Pl to Bates Morale Day (Apr. 09, 2018), App'x 5 at 1021

[101] SCOS Morale Fund (Aug. 02, 2019), App'x 6 at 1186

[102] App'x 8 at 1493, para 2 "During COVID..."

[103] Teambuilding Day (Mar. 12, 2019), App'x 6 at 1178

[104] Teambuilding Day (Oct. 11, 2019), App'x 6 at 1198-1199

[105] SCOS OneTeam, One Fight, CFP SCOS Teambuilding (Jan. 16, 2020), App'x 8 at 1514 - 1516

[106] Pl Appraisal Assessment (Jan. 01, 2018), App'x 5 at 967, "Communication and Teamwork" last sentence

Within the same midterm document, Davis acknowledged that Dr.

Jackson "encouraged the personal/professional growth of both military and

civilians."[107]

## B.   Subsequent Requests to Separate Military and Civilian Personnel

Davis's midterm statement recommended that Dr. Jackson work with

"the NCOIC, OIC, and the Branch Chief" to address the alleged division.

At that time, the NCOIC was MSgt Shull and the OIC was 2Lt Nelson.  On

May 7, 2021, Lt Nelson submitted a second request to separate military and

civilian personnel within SCOS. On May 11, 2021, Dr. Jackson rejected the

proposal in writing: "There seems to be a strong drive for dividing the

branch into military and civilians... SCOS shall remain consistent."[108]

---

[107]App'x 10 at 2199, Communications and Teamwork Section

[108] Email, Mil_Civ Divide to Davis (Increase Promotion Potential) (May 11, 2021), App'x 10 at 2207, para 4

On June 21, 2021, Dr. Jackson emailed Davis expressing concern that Shull and Nelson were creating separation within SCOS, bypassing her authority, and marginalizing civilian staff: "MSG Shull has created a further divide between military and civilians in SCOS... My decisions are disregarded and changes made without my awareness".[109] Davis did not respond. MSgt Klus, was the temporary acting SCO Chief alongside Davis, noted that the military–civilian delineation was "very apparent across the flight," which included five other branches, yet the divide had not been attributed to those sections.[110]

### C. Progressive Counseling Process

Davis's supervisory process required three steps before issuing negative appraisal comments: (1) counseling and discussion, (2) documented

---

[109] Email, Pl to Davis, Shull Creating Military_Civilian Divide, Transfer Sooner No Turnover (Jun. 21, 2021), App'x 12 at 2479

[110]App'x 10 at 2203.

offenses, and (3) progressive written warnings. [111]  The record contains no indication that any of these steps occurred. Nevertheless, Davis inserted negative statements into Dr. Jackson's midterm, and her end-of-year appraisal—previously comprised of "5" PAQL ratings[112]— was reduced to all "3" PAQL ratings."[113]

### D.  May 27, 2021: Suicide Threat and Reporting Chain

On May 27, 2021, while Dr. Jackson was away from the office, MSgt Shull and Lt Nelson counseled an Airman for nearly two hours regarding his living arrangements, then directed him to vacate his residence. According to a contemporaneous memorandum prepared by Mr. Moreno-Rosado, the Airman became distraught and yelled loudly across the small SCOS building three times:

---

[111]Progressive Counseling(Davis) (Nov. 03, 2020), App'x 9 at 1823-1824

[112] App'x 8 at 1489

[113] 2021 - Pl Jackson - Appraisal Assessment (Davis) (Jan. 01, 2021), App'x 22 at 4911

**I'll fix this by putting a barrel in my mouth and pulling the trigger.**[114]

Neither Nelson nor Shull reported the threat or sought such intervention leaving the Airmen vulnerable over a four-day holiday weekend. Dr. Jackson returned to the office around June 3, 2021, was informed of the incident, and elevated the matter to First Sergeant MSgt Clifford Howey. She also formally counseled Nelson and Shull for not reporting the threat, as documented in a June 4, 2021 email.[115]

Records show that on June 3, 2021—the same day Dr. Jackson counseled both individuals—Shull and Nelson filed EEO complaints alleging "bullying and harassment."[116] The same afternoon, at 4:35 p.m.,

---

[114] CDI ROI - Full Version (Oct. 08, 2021), App'x 14, Part 2 at 3341, para 4  (Moreno-Rosado MFR, June 6, 2021).

[115] Email - Pl to Nelson, Shull, and Howey (Dated Jun. 4, 2021) regarding Suicide Threat (Jun. 03, 2021), App'x 11 at 2404-2405

[116] Shull Declaration (Apr. 24, 2022), App'x 17 at 3863, A1; A3

Nelson sent a third Chaplain's email only to Dr. Jackson's branch (SCOS), stating:

> For the strength of the Pack of the Wolf, and the strength of the Wolf is the Pack…there is strength in numbers…know that you squadron is your pack…you got this![117]

This was the only Chaplain message where those listed in Plaintiff's EEO filings were copied—Davis, Hawn, Klus, Howey, Chaplain Lee, and Shull.

Rowbotham filed an EEO complaint, "around 15 June 2021…I was also brought in by my commander [LtCol Weed]…and was told the command's way forward was a CDI due to my EO complaint."[118] Similar to MSgt Shull, Rowbotham alleged being "harassed and bullied by Dr. Jackson, I went to Equal Opportunity office and filed an informal complaint against her, which then caused…a Commander's Directed Investigation."[119]

---

[117] Chaplain, Wolf Pack (all cc'd) (3rd) (Jun. 03, 2021), App'x 11 at 2402

[118] App'x 16 at 3799, Q4

[119] *Id.* at 3800, Q6

### E.  June 2021: Transfer Requests and Command Actions

On June 4, 2021, the day after Dr. Jackson elevated the safety incident, she scheduled a meeting with Weed to request Shull's removal from the branch. Weed was unavailable until **June 10**, ultimately the request was denied.[120]

The next day, **June 11, 2021**, the record shows Shull approached Weed in tears and requested a transfer—approved immediately.  Defense counsel later argued that Shull had requested transfer because of harassment by Dr. Jackson, and the transfer occurred in response to a later request by Plaintiff.[121] However, the Weed acknowledged: "This was originally a request from Cecile,"[122]

On June 15, 2021, Shull's transfer was announced but scheduled for between July 5 and July 19. Weed and Davis stated that Shull required

_____

[120] App'x 12 at 2620-2621, 57.b

[121] App'x 1 at 194-195 para 2

[122]App'x 12 at 2620-2621, 57.b; App'x 16 at 3747, A1

removal for mental-health reasons but remained in the same workspace for an additional several weeks.[123]  Dr. Jackson made multiple requests to expedite the transfer; the record indicates those requests were denied, and the mid-July timeline was reaffirmed.[124, 125]

On June 28, 2021, after Dr, Jackson's additional request to expedite Shull's transfer, Weed wrote: "We're lucky enough to have an ability to laterally move her without an impact to her career, **or I probably wouldn't have supported the move**… we have to avoid any appearance that MSgt Shull was fired (which she was not) or that there's strife in leadership (which there is)".[126]  Following the transfer decision, Shull continued

---

[123] See Pl. Decl. – Hiring, May 16, 2022, Row 424, Appx. at 5054, Q.4; Davis Decl., Sept. 13, 2021, Row 345, Appx. at 3794; Weed Decl. with NAV-2 Attachment, Apr. 15, 2022, Row 403, Appx. at 4824, Q.1; Shull Decl., May 20, 2022, Row 429, Appx. at 5071)

[124] Email Trail, Pl & Weed, Davis - Shull Disturbing Behavior Patterns (Jun. 28, 2021), App'x 12 at 2506, 2508

[125] App'x 13 at 2803–2806 ¶¶ 4.25–4.29, 4.32

[126] App'x 12 at 2506, 8:39 a.m. para 2

making visits to Dr. Jackson's workspace and conducted more inspections than in prior periods.[127]

On June 21, shortly before the informal inquiry was initiated, Lt Nelson sent another Chaplain message containing imagery of loss and predation:

> Some trees flourish, others die. Some cattle grow strong, others are **taken by wolves**. Some men are born rich enough and dumb enough to enjoy their lives…death of a loved one, accidents that impair…one of life's biggest lies is that we are in control of it.[128]

In July 2021, Nelson was named Officer of the Year and Shull was recognized as Non-Commissioned Officer of the Quarter.[129],[130]

## X.     Racial and Retaliatory Animus

---

[127] Shull Regular SCOS Inspections (3rd Visit) (Sep. 15, 2021), App'x 13 at 2889-2891

[128] Chaplain, Some Trees Flourish, Others Die, Taken by Wolves, Dumb to Enjoy their lives (6th) (Jun. 21, 2021), App'x 12 at 2477

[129] App'x 13 at 2806, para 1 and 4.33

[130] Pl Jackson, Declaration Rebuttal - Hiring (May 16, 2022), App'x 17 at 3936, para 5 "Each of the involved..."

As detailed in *supra* <u>SOF § II.</u>  April 23, 2021, began with Plaintiff's 6:53 AM protected activity and was immediately followed by the Agency's same-day coordinated actions, including the unauthorized EEO disclosure, the 11:11 NAV-1 email, the 12:20 IG admission of "no allegations," the 2:00 JAG concurrence, and Weed's 2:48 acknowledgment. These same-day events formed the predicate for the post-EEO statements and official record entries discussed below.

### A.  Pre-EEO Performance Record

From November 2016 through April 22, 2021, the record contains no accusations against Dr. Jackson for bullying, harassment, hostile environment, misconduct, or similar issues. Instead, her record reflects sustained leadership performance recognized through multiple Civilian of the Quarter awards and the 2019 Civilian of the Year honors.[131]

---

[131] Pl Civ of Qtr Pkg (Jan. 01, 2017), App'x 5 at 953

Performance evaluations from 2018–2020 reflect consistently strong

PAQL ratings:  1) 2018 Appraisal**,** approved by Larry Holmes**,** describing

"altruistic/positive leadership.[132] 2) 2019 Appraisal, approved by LtCol

Weed, acknowledging strong leadership.[133] And 3) 2020 Appraisal,

approved by Davis, Holmes, and Weed, noting her ability to "maintain a

productive and team-oriented environment during COVID" and praising

her "exemplary teamwork"[134]  These records contain no suggestions of

climate concerns, workplace dysfunction, or racial bias.

### B.  Post-EEO Characterization Shift

Following the April 23, 2021 EEO filing, supervisory characterizations

changed abruptly. At 11:11 a.m. on April 23—within hours of the protected

activity—Weed described Dr. Jackson as demonstrating "overbearing

---

[132] App'x 5 at 965-967

[133] Pl Appraisal Assessment (Jan. 01, 2019), App'x 6 at 1166, 1168-1169, 1173-1174

[134] App'x 8 at 1491-1494

control, lack of trust/empowerment, potential racial discrimination," and stated "members are miserable coming to the office."[135]

No comparable statements appear anywhere in the record prior to this date. Dr. Jackson's subsequent 2021 end-of-year appraisal was reduced from a "5" to a "3" in the Communication/Teamwork element—the same element where Davis had inserted the "military/civilian divide" allegation on April 23, 2021. See *supra* § SOF II.

### C. The DEIA Training Reversal

Following the murder of George Floyd (May 25, 2020), Brigadier General Scott Cain, 96th Test Wing Commander, requested Eglin AFB leaders to have conversations on workplace diversity, race issues, and inclusion[136] CMSgt Compton approached Dr. Jackson about leading this difficult

---

[135] App'x 10 at 2131

[136] Email, DEIA Weed Taking Credit for Plaintiff Work (Jun. 17, 2020), App'x 8 at 1556 (last sentence)-1560

conversation within her branch.[137]  Later, June 18, 2020, CMSgt Compton,

directed by LtCol Weed, requested Dr. Jackson to provide DEIA training to

the entire squadron. Compton wrote: "Dr. Jackson…I think you would be

wonderful for us and much needed." [138] Weed confirmed in his April 15,

2022[139] and August 18, 2021, declarations.[140]  Dr. Jackson's DEIA training

materials were positively received. Weed wrote:

> Dr. Jackson was respected and empowered by unit leadership to
> be entrusted with developing and leading Sq-wide [Squadron-
> wide]…session on…very tough topics, of bias, racism, and
> discrimination…the brief became the **gold standard** for the 96
> TW.[141]

One year later—after the protected activity—the same materials were

characterized adversely. In the August 30, 2021 Informal Inquiry Report

---

[137] Pl Jackson, Declaration (Apr. 06, 2022), App'x 16 at 3723, para 1

[138] Email, Compton to Pl, Request Pl Present to Squadron (Jun. 18, 2020), App'x 8 at 1714

[139] App'x 16 at 3752 (second hyphen bullet)

[140] App'x 12 at 2604, #9.a

[141] App'x 16 at 3752, (second hyphen, second sub-bullet)

(*infra* SOF § XII.),  A1C Blount described the training as "White-Shaming.[142]

In his Aug 18, 2021, declaration, Weed stated "In the months prior to my

departure [July 2021], Cecile's conduct was causing rapidly deteriorating

climate issue within her branch."[143]  This shift in interpretation did not

appear in any pre-EEO record.

### D.  Post-EEO Statements, Defamation, and Reputational Harm

As noted *supra* <u>II.</u>, on April 23, 2021, at 11:11 a.m., LtCol Weed emailed

JAG, IG, and EEO accusing Plaintiff of "overbearing control… potential

racial discrimination and … members are miserable."[144] At 12:20 p.m., IG

Clark responded:

> "ask those junior folks...if they are willing to share their concerns
> with the IG…once we gather and drill down… we would work
> with SJA to address possible 'allegations.'[145]

---

[142] App'x 13 at 2738, para e

[143] App'x 12 at 2605, 11.a.

[144] App'x 10 at 2131

[145] *Id.* at (April 23, 2021, 12:20 p.m. CDT) 2130, #2

Four days **after** this email, beginning April 27, 2021, a group of Plaintiff's subordinates submitted MFRs claiming they feared they would be targeted, micromanaged, undermined, they were bullied, experienced mental and physical harms, with one MFR stating the environment was "affecting my mental health, but also my physical health," leading to "tension headaches," "difficulties sleeping," and an ER visit:

- On April 29, 2021, SSgt Rowbotham submitted an MFR retroactively describing April 12 interactions claiming he "feared [he] would be targeted."[146]

- On May 3, 2021, Shull submitted an MFR claiming toxic workplace stress due to Plaintiff.[147]

- On May 3, 2021, Lt Nelson submitted an MFR with complaints about Plaintiff's leadership.[148]

---

[146] MFR, SSgt Brant Rowbotham titled Memorandum for Record (Apr. 29, 2021), App'x 10 at 2160, para 2

[147] MFR, MSgt Sarah Shull titled Running Occurences w Plaintiff and A1C Rosa w Email to SCO (Evidence Collection) (May 03, 2021), App'x 10 at 2191; 2175

[148] MFR, Nelson, 30-Day (May 03, 2021), App'x 10 at 2192

- On Jun. 3, 2021, Shull alleged: "On or around 09 April 2021 to 02 June 2021, Dr. Jackson bullied me when she constantly gave me inconsistent feedback which negatively affected my physical and mental health.  I felt bullied by Dr. Jackson for engaging in this behavior"[149]

### E.   No-Win Environment Against Plaintiff

Subordinates SSgt Rowbotham and SSgt Clark would cut Plaintiff off mid-sentence and walk away as she spoke.  Plaintiff was expected to accept disrespect, submit to subordinate decisions, and simultaneously provide perfect annual appraisals, and failure to do so resulted in the harassers being claimed as victims and Plaintiff recharacterized as aggressive and hostile. During sworn deposition, Plaintiff stated

> Rowbotham started walking around with this anger in his face.... he would just look at me like …he hated me, just hate and disgust in his face. It was just the way he would look at me[150]

> …he's angry, and he looks like he wants to hit someone. And that's how he would look at me and I want it stopped. But I

---

[149] MFR, Shull, SCOS Observations II (Dated May 19;  Signed June 3, 2021) (May 19, 2021), App'x 11 at 2316

[150] Pl Jackson Sworn Depo. (Vol II) (Sep. 11, 2023), App'x 19 at 4199-4200, lines 23-3

couldn't get it stopped because they said that I was singling him out and I was actually harassing him.[151]

From April 23, 2021, and forward Plaintiff was placed in no-win situations:

If she enforced professional standards or discipline, she was accused of

bullying; If she remained silent, dysfunction escalated; If she sought

support from her superiors, her concerns were dismissed while false

allegations against her validated.

### F.  Statements Entered into the Official Record

#### 1.  Informal Inquiry Report (August 30, 2021)

The report stated:

> Dr. Jackson [is] a very smart woman, micromanager, feels…disrespected…has concerns of racial disparity…reputation for changing words to accommodate her needs… Interestingly…all of these members report feeling 'targeted'…[and] identified by Dr. Jackson as being 'cliquish' and toxic leaders.[152]

---

[151] *Id.* at 4200, lines 19-23

[152] App'x 13 at 2750, last para

The Informal Inquiry Summary (Aug. 30, 2021) portrays Dr. Jackson as presiding over an unstable, toxic workplace marked by a widening military–civilian divide; she was described as an intimidating micromanager who tolerated or exhibited bullying, acted vindictively, and showed favoritism toward certain civilians (e.g., Hill, White) while holding the military to different standards, failing to discourage incivility, and allegedly displaying racial bias (including a "white-shaming" diversity meeting and preferential hiring of acquaintances or African-American candidates lacking required certifications).

Witnesses accused her of undercutting military leadership and chain-of-command processes, denying involvement in promotions, directing that civilians' schedules were not "privy" to military leaders), providing unclear or shifting guidance, poor transparency, and targeting or retaliating against those who challenged her (including threats or adverse EPR counseling). Additional claims included public berating of MSgt Shull, mishandling or delayed response to a reported suicidal statement, tolerating suspected timecard abuses and telework inconsistent with duties

(e.g., SIPR work), permitting outside business distractions, and overall

fostering low morale, fear of reprisal, and reduced empowerment of NCOs.
[153]

In April 22, 2022 Declaration, 2Lt Nelson stated, "I have not spread rumors

or disparaged anyone to leadership or subordinates…and did my best to

develop comradery within the workplace."[154] According to Rowbotham,

"Lt. Nelson [and] MSgt Shull were both told to council me on being a

toxic." "I was pulled aside by Lt Nelson…they told me that Dr. Jackson

wanted me counseled for being a toxic leader"[155]

### 2. Col. Kenneth Black Declaration (Oct 13, 2021)

In sworn declarations submitted as part of the Agency's official

proceedings, Col. Kenneth Black, the 96th Mission Support Group

---

[153] *Id.* at 2731-2751

[154] App'x 17 at 3850, Q4, Q5

[155] Defense ECF 18-14, Black Declaration w Inquiry & CDI (Dec. 21, 2023), App'x 22 at 4842, j and k

Commander, attributed to Dr. Jackson serious misconduct and character deficiencies. Black asserted that Dr. Jackson discriminated against employees based on race and gender, that multiple employees feared reprisal from her, and that she engaged in favoritism and unethical hiring practices. He further characterized Dr. Jackson as an authoritarian leader who excluded dissenting views, failed to properly employ senior enlisted leadership, and was the source of a toxic work environment "emanating from the top" of the work center. Black expressly stated, "I took a lot of the comments in that report personally" [156] These statements were made under penalty of perjury, adopted by Black as his own conclusions, and disseminated through formal investigative and EEO channels in connection with adverse employment actions affecting Dr. Jackson's professional standing. [157]

---

[156] Black Declaration (Oct. 13, 2021), App'x 15 at 3433, para 1

[157] *Id.* at 3430-3433, Q10

### 3. A1C Blount Statement (August 30, 2021)

A1C Blount stated, regarding the DEIA training, *infra* X. C: "[Dr. Jackson] basically said, if our beliefs were not aligned with hers, there were actions that would be taken to correct them. She hosted a team's meeting to talk about diversity/inclusion that ultimately turned into a White-Shaming briefing."[158]

### 4. Moreno-Rosado Declaration (April 19, 2022)

In response to a standard inquiry question, Mr. Alexis Moreno-Rosado submitted a declaration containing racially charged personal opinions unrelated to workplace conduct. The agency accepted the declaration into the official record without correction or limitation. His statement included the following assertions:

> After one year of knowing and working with the complaint at I believe that she is full of self-hate, **she hate herself for being born**, as <u>she</u> claims a black woman, that self-hate does not allows her to have normal healthy relations with other humans. She lives in reality in which race is the only defining factor that

---

[158] App'x 13 at 2738, ¶ e

matter in a person and her inability to see beyond other people's race makes the complaint dysfunctional and disturbingly disconnected from reality.

The complainant claimed race is such handicap for herself that she has to blame other for her failures in order to coup with that overwhelming sense of incompetence that comes with her inability to be a regular ordinary human being.

The complainant always a lady, has treat me with respect, compassion and great dignity, for that I'm thankful. However it is my obligation to tell the truth and only that in all my answers above and I also feel compelled to express my opinion in this final question, since I have being invited to this false and alternate reality in which a group of people from different racial, national, religious, linguistic, or cultural origins had alleged gather together to conspired against the complainant.

I have to declare that after living 20 years in 5 states of the US, the only racist person I have meet is Ms. Cecile Jackson, and that is a real shame.[159]

## G.  Documented Reputational Harm

### 1.    Eglin AFB Women's Program Manager

Before Oct 5, 2021, Dr. Jackson stepped down from the Special Emphasis

Women's Program Manager role due to workplace shifts in perception

following the allegations:

---

[159] Moreno-Rosado Declaration (Apr. 19, 2022), App'x 17 at 3826, Q3

> I believe my role in FWP is important to highlight the impact of the false allegations on my reputation.... I began to notice a change in behavior in the **DEI** meetings. Everyone was polite, but I could sense it in the meetings that my presence made many uncomfortable and something changed. Therefore, I decided to step down from my position to avoid any negative impacts on what the program stood for and what we were trying to accomplish.[160]

See *supra* VII. E, on May 13, 2021, Kelly Ewert stated in NAV-1 email, "We would like to meet with D&I..."[161] in regards to Weed's request to expand the agency involvement in retaliation against Dr. Jackson. D&I had oversight of the Special Emphasis Women's Program undermining her continued participation in a program she had previously led with distinction.

### 2.    Workplace Ostracism

Dr. Jackson declared penalty of perjury the impact of the accusations on workplace relationships:

---

[160] DEIA Womens Prgm Stepdown (Oct. 05, 2021), App'x 13 at 2953

[161] App'x 10 at 2128, May 13, 2021 at 1:59 PM

The 96 CS leaders abused their position and authority to disparage my reputation with organizational leaders and other personnel across Eglin AFB in collaboration with my subordinates. Their disparagement quickly turned into social ostracism. People turned against me and treated me rudely, even in my branch. Conversations became abrupt and dismissive, and I was disrespected by many who were previously friendly. I was subjected to stares, whispers, angry body language, and microaggressions. My presence was not wanted in places I was once welcomed.[162]

## XI.   Allegation Shifting: From Intimidation to Criminal Allegations

A review of the documentary record shows a progression in the nature and severity of allegations leveled against Dr. Jackson. What began as subjective statements about leadership style expanded in scope and severity to include accusations of bullying and harassment, then to timecard fraud, classified system misuse, and theft of government property—allegations carrying potential prison sentences, financial ruin, and permanent professional disqualification. The entries summarized

---

[162] App'x 17 at 3929-3955

below reflect how the characterizations documented in the record changed over time. [163]

- Feb 17, 2021 – Initial EEO contact[164]

- Mar. 3, 2021 — Scott Davis (remarks): "intimidating," "people feared her," "too strong," lack of delegation

- **April 23, 2021 – EEO Claim filed**

- Apr. 23, 2021 — Scott Davis (follow-up): fostering a military/civilian divide.

- Apr. 23, 2021 — LtCol Scott Weed (NAV-1 email): "overbearing control," "lack of trust," possible racial discrimination.

- May 5, 2021 — Scott Davis (mid-term appraisal entry): "division between SCOS civilian and military workforce."

- Aug. 18, 2021 — LtCol Weed (declaration): "fostering military/civilian divide," "failing to uphold standards," and "timecard violations."

---

[163] **Investigative Record and Source Materials**, including MFR Statements, Appx. 10 at 2146–2165, 2176–2196, 2294–2305, 2317–2325; App'x 11 at 2460–2472; Undated Comment Cards, App'x 10 at 2167–2174; Informal Inquiry Summary Report (IO Lynn Wilson, Aug. 30, 2021), App'x 13 (TLR-259); CDI Report of Investigation Summary (Oct. 8, 2021), App'x 15 (TLR-290); NAV-1 Email (Apr. 23, 2021), App'x 10 (TLR-170).

[164] Email - EEO Initial Contact (Feb. 17, 2021), App'x 9 at 1942

- Aug. 30, 2021 — Lynn Wilson (informal inquiry notes): "Bullying," "racial bias," "white-shaming," "favoritism," "unethical and discriminatory hiring practices, Racial disparity, military leadership disregarded, NCOs not empowered, Military/Civilian divide, fear of reprisal, favoritism, timecard fraud, failure to report suicide threat, creating a toxic culture, vindictive

- Sep. 13, 2021 — CDI investigatory memorandum: Criminal Allegations: Telework fraud, timecard fraud, unauthorized classified access, abuse of authority, fraud waste and abuse, bullying, harassment, making false and malicious statements,

- Feb. 2, 2022 — 2d Lt Elaine Nelson & David Willcox (post-departure memoranda): theft of government property, threats of residential search (post-separation claims)

- Feb. 3, 2022 — Scott Davis (remarks): continued pejorative characterization (reported as a racial reference). (post-separation remark)

The foregoing entries track a change in the recorded characterization of conduct—from personal perspectives to policy violations and, ultimately, potential criminal matters.

## XII.  Informal Inquiry: June 23, 2021 Initiation and Results

The June 23, 2021, appointment memorandum and related record materials use the terms "informal inquiry," "investigation," "Commander

Directed Investigation (CDI)," and "climate assessment" interchangeably, although Air Force policy distinguishes these processes.  The June 23, 2021 memorandum mirrors CDI template language,[165] while labeling the appointment an "informal inquiry.

- *DAFMAN 1-101* governs CDIs and requires an investigating officer (IO) appointment with framed allegations, prescribed testimonial formats, assembly of a stand-alone Report of Investigation (ROI), and a written legal-sufficiency review.[166]

- *AFI 36-2710* clarifies that command climate assessments (e.g., DEOCS) are organizational prevention/survey tools and "are not to be used as an investigative tool in assessing or clarifying other reported incidents or allegations."

---

[165] DAFMAN 1-101 - Commander Directed Investigations (Apr. 09, 2021), App'x 10 at 2052

[166] *Id.* at 2008

- An **informal inquiry** is a preliminary fact-gathering step for minor issues and does not require sworn statements or legal-sufficiency review; DAFMAN 1-101 provides no definition for an "informal inquiry."

- AFI 90-301 directs that allegations of reprisal and restriction be processed through the Inspector General complaints resolution system rather than investigated outside IG channels. DAFMAN 1-101 further states: "Congress has specifically designated the IG as the appropriate agency to investigate allegations involving reprisal and restriction…Only IGs can investigate reprisal and restriction allegations by military members. A CDI is never appropriate for these allegations."

The June 23 memorandum authorized the Inquiry Officer to "interview personnel, take sworn statements or testimony," directed the Inquiry Officer to "follow the guidance in the DAFMAN 1-101" and to "prepare and submit…a report of investigation in the format it describes," and tasked the Inquiry Officer with identifying "perceptions of reprisal,

retribution, or restriction."  That juxtaposition—use of CDI investigative

procedures combined with a command-level tasking to examine reprisal-

related perceptions—appears within the same appointment memorandum.

### A.  June 23, 2021 Appointment Memorandum

On  June 23, 2021, Col Kenneth Black initiated an informal inquiry

appointing Lynn Wilson as the "Inquiry Officer." The memorandum

entitled "Appointment as Inquiry Officer" states, "You are appointed to

conduct an **informal inquiry**."[167] Further, the memorandum directed the

IO that "in conducting CDI, follow the guidance in the DAFMAN 1-101

Prepare and submit…a report of investigation in the format it describes…"

and designated "Dan Warnock" as the "designated legal advisor for

purposes of this CDI".[168]

---

[167] App'x 22 at 4830, para 1

[168] *Id.* at

**B. Allegations and Scope of the Informal Inquiry**

DAFMAN 1-101 and the CDI Guide state similarly: "Before appointing an

IO, the commander will frame the allegations with assistance from JA

[attorney]. The allegations will be identified in an attachment to the IO

appointment letter. Framing allegations is the **single most important factor**

in the pre-investigative stage."[169]  The DAFMAN 1-101 continues: "A

commander and his or her legal advisor should carefully, clearly, and

concisely identify the specific processes to be reviewed and/or any laws,

rules, or policies that an individual may have violated [and] CDI

allegations should precisely identify **when, who, how (if known), and in**

**violation of what"**[170]

The informal inquiry memorandum attached a broad unit-level scope

tied to general Air Force standards (AFI 1-1, AFPD 1, AFH 36-2618, AFI

36-703) without identifying specific individuals, dates, or discrete acts

---

[169] CDI Guide (Jun. 01, 2018), App'x 5 at 1063, (Chapter 4, Section 4.1).

[170] App'x 10 at 2021, para 4.1

stating: "Identify any major incidents…within [Plaintiff's Branch SCOS]…not limited to a) "Grossly ineffective leadership…" b) "Inconsistent/inequitable/unfair application of standards…," c) **Perceptions of reprisal, retribution, and or restriction**…, and d) any other behaviors that detract from unit readiness, work performance, cohesion, or morale." Before providing early legal concurrence (*supra* SOF § IV), JAG Attorney Shelly Frank advised that inquiries of this type are not recommended for "broad, undefined situations."[171]  During the informal inquiry process the IO  determined "if there were perceptions of reprisal, retribution, or restriction."[172] However, DAFMAN 1-101 clarifies that only IGs can investigate reprisal and restriction and a CDI is never appropriate for these allegations.[173]

---

[171] App'x 10 at 2129, at 2:00 p.m.

[172] App'x 15 at 3430, para. 2

[173] App'x 10 at 2017-2018, para 3.2.2.

## C. IO Selection Neutrality

The Defense stated the selection of the informal inquiry officer, Lynn Wilson was neutral, describing her as "an African American female from the 96th Force Support Squadron."[174] (Defense SJ at 38–39; Black Decl., Dec. 21, 2023, ECF 18-14.)   To this, the Defense submitted three declarations from Col. Black (ECF 18-14, 18-16, 18-21). The first, dated October 13, 2021 (ECF-18-16), states: "I specifically selected a female investigator who was also a minority … because I was previously informed of discrimination concerns that may exist within the toxic environment concerns."[175]

The second declaration (18-21 and 28-1), dated April 14, 2022, addressed related topics concerning the CDI and is largely derivative, reiterative, and confirmatory.[176] Neither the October 2021 nor April 2022 declarations were cited in the Defense's summary judgment filings.

_____

[174] App'x 1 at 200-201, para 3.

[175] App'x 15 at 3429, Q9, para. 2

[176] Black Declaration (Apr. 14, 2022), App'x 16 at 3787

The Defense submitted a third declaration from Col. Black dated December 21, 2023; (ECF 18-14), submitted after discovery[177], which did not discuss Wilson's selection. The Defense relied on the **December 21, 2023, declaration** to support IO selection neutrality, where Col. Black stated, "I chose Lynn Wilson, an African American female, as the investigator." Black's declaration attached the only copies of the informal inquiry summary/opinion and a CDI summary (37 pages) submitted by Defense. When cited in Summary Judgment and Order, the following page ranges apply:

- Pages 1 – 4:  Black's signed declaration dated Dec. 21, 2023
- Pages 5 – 6: Informal Inquiry Appointment and Broad Allegations
- Pages 7 – 29: Informal Inquiry Opinion Report
- Pages 30 – 31: CDI Appointment and Allegations
- Pages 32 – 68: CDI Report Summary **Unsigned**

---

[177] Discover Extended (Dated Nov 21, 2023), Court RR (Nov. 27, 2023), App'x 1 at 145

The full CDI ROI (398 pages) was submitted by Plaintiff's prior attorney.[178]

### D.  Command Influence

Deposition testimony establishes that LtCol Weed met with the IO regarding the informal inquiry, which he names as the CDI, and providing a list of who she should speak with in Plaintiff' branch:

> So the only thing that I actually participated in with the CDI was a very early discussion with Lynn Wilson, investigating officer, just to provide her organizational charts and just the context. But it was -- I didn't even provide her really formal statements, per se. I just gave her the people she should talk to in SCOS.[179]

Scott Davis, the named harasser in Plaintiff's April 23, 2021 EEO complaint, served as Witness #9 in the inquiry investigating Plaintiff.  The IO's witness list overlaps with the same individuals who authored the MFRs and undated comment cards after protected activity: MSgt Shull, Witness # 38; 2Lt Elaine Nelson, witness #30; SSgt Bryant Rowbotham, witness #36; SSgt

---

[178] App'x 14, Part 2 at 2995

[179] App'x 21 at 4675, lines 6-19

Stephen Clark, witness #7; and SSgt Trinity Buchholz, witness #6).[180]  See

CLR columns A, H – L.

Lamar Hill and SSgt Lisa Hood testified that MSgt Shull led a group

of individuals identified as Buchholz, Clark, Rowbotham, Uchima the same

cited in the informal inquiry.[181, 182] Hill stated:

> Like, there was a whole little form of like a group... I even had
> other people come to me saying... she was trying to … find
> information about … Dr. Jackson[183]

### E.   Interviews and Materials Claimed vs. File Produced

Lynn Wilson's, Informal Inquiry Summary, dated August 30, 2021,

expressly states, "Below **is my <u>opinion</u>** based on interviews and statements

---

[180] App'x 22 at 4853-4854

[181] Lamar Hill Sworn Depo. (Nov. 27, 2023), App'x 20 at 4578-4579  lines 22-24; 4591-4592
lines1-1;

[182] Hood Sworn Depo (Nov. 27, 2023), App'x 21 at 4793-4794 lines 22-2; 4797-4798 lines
3-1

[183] App'x 20 at 4593-4595, lines 22-5

provided."[184] During the inquiry 67 were interviewed/48 returned signed statements.[185] The summary mentions 67 interviews/48 signed statements and concludes with narrative passages, specifically about Dr. Jackson, MSgt Shull, and Lt. Nelson.  The record is void of actual witness statements, interview transcripts, or legal-sufficiency review.[186] However, concludes that "MSgt Shull was awesome! She was what I needed when I got there," "This branch was broken and really low, prior to the arrival of MSgt Shull & Lt Nelson," "MSgt Shull was here for 6 months and improved everything," and "MSgt Shull is all about equality, and fairness." [187]

---

[184] App'x 22 at 4832, para 4, last sentence

[185] App'x 13 at 2731, para 3

[186] App'x 22 at 4832-4854

[187] *Id.* at 4847, Q13

While summarizing that Appellant was "racially biased,"[188,189] "white-shaming,"[190] creating "fear of retribution," "threats and intimidation,"[191] and creating a toxic environment.[192] An outcome similar to Weed's 11:11am NAV-1 email with accusations. [193] Several individuals provided contradicting sworn dispositions.

### F.   Sworn Depositions Contradicts Informal Inquiry Opinion

TSgt Hood testified MSgt Shull is "manipulative," "She will try and make everybody believe anything … She's lied to me plenty… she always has to win"[194] Lamar Hill similarly described Shull's arrival as increasingly

---

[188] *Id.* at 4832-4833, para 4.a.

[189] *Id.* at 4839, para e

[190] *Id.* at 4832-4833, para 4.a.

[191] *Id.* at 4852, para 1

[192] *Id.* at 4847-4848, 13.b, 14

[193] App'x 10 at 2131

[194] App'x 21 at 4797-4798 lines 19-3

divided and "segregated," observing conduct that increased separation between military and civilian personnel.[195] SSgt Rosa (Inquiry witness #34) who stood up for Dr. Jackson in her absence, testified Shull "started ruffling feathers and trying to manipulate people against other people and make up claims about them."[196]

By contrast, during deposition, witnesses testified positively about Dr. Jackson with no knowledge bullying, harassment, intimidation, or similar conduct. (SSgt Trinity Buchholz, witness #6; Tiffany Prophet, witness #32; David Westry, witness #44).[197]

Also, LtCol Scott Weed, himself, testified during deposition that Dr. Jackson was always professional, cool, calm collected, and there were **zero**

---

[195] App'x 20 at 4578-4579 lines 19-3

[196] Rosa Sworn Depo (Nov. 19, 2023), App'x 20 at 4414 lines 14-18

[197] Westry Sworn Depo (Nov. 12, 2023), App'x 19 at 4340-4341, lines 12-10; White Sworn Depo (Nov. 12, 2023), App'x 19 at 4376-4377, lines 22-5; Prophet Sworn Depo (Nov. 27, 2023), App'x 21 at 4607-4641; App'x 21 at 4743-4750 lines 2-21; Carmouche Sworn Depo (Nov. 27, 2023), App'x 21 at 4774 lines 10-17; 4775-4778  lines 15-17

**disciplinary actions**, no management actions, and **no conduct he observed**

**that warranted discipline of any kind**. He testified that Dr. Jackson was

consistently professional, calm, and collected in her interactions with him

and that he never observed her raise her voice, act as a bully, intimidate

others, or behave outside the bounds of professional standards. Weed

further testified that none of his firsthand observations indicated bullying,

harassment, or improper conduct by Dr. Jackson, and that any allegations

were **not based on his own observations**, but rather relayed through

others or reflected in comment cards,[198] which *supra* SOF V. D, proves were

**solicited** weeks to months *after* the EEO claim and did not include any

accusations similar to Weed's NAV-1 or the Informal inquiry summary. See

SOF § V.   The District Court Docket cited the informal inquiry summary as

part of the Summary Judgment conclusions. See *infra* §§ XIV. Chain of

Record; XV. Record Comparisons.

---

[198] App'x 21 at 4691- lines 5-24

## XIII. CDI Investigation: September 13, 2021, Initiation and Results

Next, two weeks after the informal climate inquiry was completed, Black ordered a CDI initiating a formal investigation. On September 13, 2021, Col Black issued memorandum entitled "CDI of suspected lack of accountability" assigning Mark Wilke, as the investigating officer (IO) investigating Plaintiff.[199]  On October 8, 2021, the CDI investigation produced an Report of Investigation (ROI) with antecedent background describing the informal inquiry opinion summary results and "this … [CDI] is a more focused follow-up to specially address concerns from IG complaints and concerns **identified in the inquiry**."[200]

### A.  Chronology and IG Complaints

The administrative record contains an anonymous IG complaint only from Dr. Jackson, submitted approximately April–May 2021,  months *before* the

---

[199] App'x 22 at 4855

[200] *Id.* at 4862, para 1, last sentence

June 23, 2021, informal inquiry began. [201],[202]   Col. Black's sworn

statements describe a different chronology. In declaration dated October

13, 2021, Col. Black stated:

> Before the [informal] inquiry was complete, two anonymous
> complaints were submitted to the Inspector General…it became
> clear very clear Dr. Jackson and MSgt Shull was most probably
> (I'm not sure) filed the complaints.[203]

In his April 14, 2022, declaration, Col. Black stated, "the only reason I

conducted the investigation was because there was an IG complaint,"

confirming "The CDI was based on her [Dr. Jackson] and Shull filing a

complaint with IG."[204]  However, MSgt Shull declared, "fil[ing] an informal

equal opportunity complaint."[205]

---

[201] App'x 15 at 3396 para 1, sentence 2

[202] Plaintiff's IG Complaint, App'x 14, Part 2 at 3020-3021

[203] App'x 15 at 3430, para 3

[204] App'x 16 at 3793, A4 - A5

[205] App'x 17 at 3863, Q3

### B. IG Complaints Referenced in the CDI ROI

The record shows Dr. Jackson's anonymous IG contact occurred in April–May 2021 but was not investigated independently but over 5 months later integrated into the September 13, 2021 CDI investigation.[206] The record is absent the Agency's preferred IG complaints; nonetheless the CDI identifies two. **First**, the ROI references "CUI Complainant Narrative FRNO 2021," described as Plaintiff's April/May 2021 IG complaint. **Second**, the ROI references a separate file labeled "CUI AF102 Continued.pdf," described as an anonymous agency complaint. That file appears only as a filename but not included.[207]

### C. CDI Allegations

In an April 14, 2022 declaration, Col. Kenneth Black stated: "The IG complaint had specific allegations and those are the allegations looked

---

[206] App'x 14, Part 2 at 3020-3021

[207] *Id.* at 2993, 3020-3021

into." [208]   The record lacks the agency's IG complaint. Instead, the framed

allegations in the CDI align with informal inquiry conclusions. : telework

and timecard issues and associated fraud, waste, or abuse; disparate

telework, productivity, and implementing different policies  between

civilian and military personnel; and bullying, harassment, false statements,

and abuse of authority.[209] These same subject matters reframed as formal

allegations, attached to the CDI appointment memorandum. [210]

### D.  CDI Regulatory Framework and Scope

The DAFMAN 1-101 provides that before appointing an investigating

officer, a commander and his or her legal advisor should carefully, clearly,

and concisely identify the specific processes to be reviewed and/or any

laws, rules, or policies that an individual may have violated [and] CDI

---

[208] App'x 16 at 3793, A4 - A5

[209] App'x 13 at 2749-2751; Memo, Black to Pl, CDI Investigation Notice w Allegations
(Sep. 13, 2021), App'x 13 at 2873-2874

[210] App'x 22 at 4856-4567

allegations should precisely identify **when, who, how (if known), and in violation of what[211].**

### 1.    Framing Allegations

The September 13, 2021 CDI appointment identifies the subjects, general timeframe ("Between 1 March 2021 and the present"), and governing standards cited for each allegation.  The allegations are posed as conditional questions that do not specify the operative acts of "how (if known)," nor do they specify particular dates or events beyond the stated date range.

### 2.    Abuse-of-Authority (ACID) Predicate

DAFMAN 1-101 and the SAF/IG CDI Guide describe the Allegation Categorization and Investigative Determination (ACID) framework used to define the elements associated with particular allegation types, including abuse-of-authority allegations. Under the ACID framework, abuse-of-

---

[211] App'x 10 at 2021, para 4.1

authority allegations are described in relation to an exercise of authority that results in a documented adverse effect on an individual or a personal gain or advantage to the subject.

Allegation 3 of the CDI addresses bullying, harassment, false statements, or abuse of authority. The September 13, 2021, CDI appointment memorandum and the ROI describe witness perceptions and reactions associated with the alleged conduct, including statements that a witness appeared "visibly shaken." The ROI does not describe a specific adverse personnel action taken against an identified individual, nor does it describe a personal gain or advantage attributed to the subject in connection with the alleged conduct.

### 3. Conflict of Interest

The CDI investigative file includes written statements from Scott Davis, named harasser in the April 23, 2022 EEO claim, and SSgt Shull and 2Lt Nelson, who solicited MFRs and undated comments four days after the

EEO claim was filed. Davis's CDI statement cites and relies on several of

the very MFRs that Shull and Nelson solicited.[212]

### E.   CDI File Signatures and Documentation

Under DAFMAN 1-101 and its implementing SAF/IG CDI Guide, a

completed Commander Directed Investigation (CDI) requires a properly

authenticated Report of Investigation (ROI), including authenticated

witness testimony or summaries and a completed legal sufficiency review.

DAFMAN 1-101 makes compliance with this publication and its

attachments mandatory ( Foreword), prescribes the CDI investigative file

format (¶6.1, "CDI Investigative File Format"), and includes Attachment 15

(Witness Statement Format), Attachment 16 (Summarized Testimony

Format), Attachment 17 (ROI Sample Format), and Attachment 9 (Legal

Review of CDI Case File) as the templates that implement those

requirements. According to DAFMAN 1-101, statements must bear the

---

[212] App'x 14, Part 2 at 3025, bulleted list; 3049-3064; 3067-3080;  TLR:99, 106,121

witness's signature under oath; if summarized, both the witness and IO must sign. The policy also requires obtaining signatures even when statements are prepared or transmitted remotely.[213]

The CDI case file submitted at summary judgment omitted multiple required signatures: the Investigating Officer, Marke Wilke; fifteen of eighteen witness summaries; the legal sufficiency reviewer, JAG Attorney Jed A. Wangsgard; EEO concurrence, EEO Director Anthony Avance - all lacked signatures[214] as DAFMAN mandates.[215]

Despite these authentication defects the District Court relied on the incomplete investigative file. DAFMAN 1-101 and IG/JAG guidance direct that incomplete or administratively insufficient files be returned for rework or accompanied by a legal review explaining why the missing signatures

---

[213] App'x 10 at 2026-2027 para 5.2.4.2, 5.2.5.2, 5.2.5.3, 5.2.5.6

[214] App'x 14, Part 2 at 3002-3007; 3020-3082; 3085-3090;3345-3346, 3349-3352; TLR:92-129; CLR Columns A, N-O

[215] App'x 10 at 2026-2027

do not affect legal sufficiency; neither occurred.(DAFMAN 1-101 ¶7.3–¶7.4;

AFI 90-301 ¶3.59.4 as implemented by JAG guidance).

## XIV. Chain-of-Record Creation and Consumption

This section presents a chronological investigative consumption from April

23, 2021, informal EEO claim into the administrative record for summary

judgment. The administrative record reflects about 4 hours of Plaintiff's

April 23, 2021, EEO filing, the agency undertook same-day, coordination

between IG, JAG Attorneys, IG, and command leadership and began

soliciting investigatory materials—including MFR statements and undated

comment cards—created *after* the protected filing and later relied upon to

initiate the informal inquiry. See *supra* SOF §§

---

EEO Claim Filed → Same-Day Coordination →  Solicited Inputs →
Informal Inquiry → CDI → EEO ROI → DOJ → District Court

---

### A. Solicited Undated Comment Cards > Informal Inquiry Opinion

According to Lt. Col. Weed, the informal inquiry was requested based on

the undated comment cards; however, sworn testimony establishes

comment cards were solicited weeks to months after Plaintiff filed her April 23, 2021, EEO complaint. See SOF §§ II. through XIII. E.

The summary was identified by the investigating officer as an "opinion," the IO was permitted to conduct interviews and collect statements but not include the referenced 48 witness statements, lacked properly framed allegations, and absent a legal sufficiency review.

### B.   Informal Inquiry Opinion → CDI Report

The CDI ROI consumed the undated comment cards[216] and expressly treated the informal inquiry summary as its antecedent, stating: "this investigation is a more focused follow-up to specially address … concerns identified in the inquiry." [217]   The CDI, similar to the informal inquiry, included statements from Scott Davis, named in Plaintiff's April 23, 2021 EEO complaint, as well as the MFR and undated comment card authors.

---

[216] Undated Comment Cards, Appx. 10 at 2167-2174

[217] App'x 22 at 4862

The CDI file lacked mandatory attestations required by DAFMAN 1-101: fifteen of eighteen witness summaries were unsigned; the investigating officer, who drafted the witness summaries, did not sign the summaries or the CDI ROI; the EEO Director's concurrence was unsigned; and the legal sufficiency review was unsigned. DAFMAN 1-101 governs CDI investigations and makes compliance mandatory.

### C. CDI ROI → EEO ROI Overlap

The CDI Report of Investigation (ROI) overlapped with and was consumed into the EEO-1 investigation[218]. During this overlapping period, the EEO investigation was initiated by the EEO Director, who was contemporaneously included on April 23, 2021 NAV-1 emails planning to

---

[218] (cite Defense 18-22 pg. 3 TOC line),

investigate Plaintiff, solicit statements, and conducting an inquiry and CDI without allegations. Figure 1 shows the investigation overlap.

Figure 1. 2021 Investigation Overlap



The agency conducted an informal inquiry from June 23 through August 30, 2021, then initiated a Commander-Directed Investigation on September 13, 2021, which concluded with an ROI dated October 8, 2021. The EEO investigation window—July 15 through November 23, 2021—overlapped both the informal inquiry and the CDI. During the overlap, the CDI

appointment memorandum, framed allegations, and witness statements were placed into the EEO ROI and thereafter circulated as part of the agency's investigatory record.

The same named individuals appearing in the EEO-1 ROI also participated in the April 23, 2021, same-day coordination, submitted memoranda-for-record and undated comment cards solicited between April 27 and June 17, 2021, and provided statements used across the informal inquiry, CDI, and EEO ROI. Those materials—generated after protected activity—were relied upon as evidentiary inputs in the informal inquiry, CDI and the EEO investigation. See CLR columns A-O.

### D. EEO ROI → DOJ → District Court Summary Judgment

The EEO ROI—built on the informal inquiry opinion > CDI ROI > EEO ROI was presented to the District Court (via the DOJ/agency submissions). The informal inquiry summary—initiated based on undated comment cards solicited after the EEO filing, identified by the investigating officer as an opinion, and lacking: framed allegations, supporting statements or

evidence, and a legal sufficiency review—was repeatedly cited by the DOJ and the District Court. The administrative file before the District Court reflects the chain of investigatory consumption, identified above, that was relied upon at summary judgment.

**Workplace Incivility.** For example, the Informal Inquiry alleges Appellant is "a micromanager and known to exhibit bullying behavior…and is racially biased."[219] "There is evidence of workplace incivility."[220]  District Court Order repeats, the informal inquiry shows "evidence of workplace incivility." Similarly, descriptions as a "very smart and a resourceful person" "micromanager" "known to exhibit bullying behavior" and "racial bias."[221]

**Hiring Practices.** The Inquiry characterized Plaintiff as hiring African Americans she knew from the community and referenced "unethical hiring

---

[219] App'x 22 at 4833, para. 1

[220] *Id.* at 4850, last para

[221] District Court Order Granting Summary Judgment (Sep. 30, 2024), App'x 3 at 489

practices.[222]  The District Court showed "Jackson hired employees "as a result of relationships with hiring official [sic], or ethnicity,"[223]

**Toxic Leadership.** The inquiry stated "96 CS/SCOS led by Dr. Cecile Jackson is exhibiting behaviors of a toxic workplace… Members report on the affect the stress is having on their overall well-being and mental health, resulting in seeking medical attention, MFLAC visits, threats of suicide and mental health breaks."[224] "There is a military and civilian divide in the shop."[225] The Court agreed:

> Wilson finished her investigation on August 30, 2021, and concluded there was a "toxic workplace" with some members claiming that the environment affected their mental and physical well-being. Id. at 25. Wilson found certain consistent threads among those she interviewed: a military and civilian divide existed in SCOS; military supervisors do not feel empowered to lead; military leadership is disregarded; there was no clear guidance communicated from command; and she found that

---

[222] App'x 22 at 4839 para 6, 6.a.

[223] App'x 3 at 489, footnote 7

[224] App'x 22 at 4850

[225] *Id.* at 4834, para 5.1.

there was racial disparity in the branch as Jackson apparently favored black employees. Id. at 9–14.31"[226]

**Witness Signed Statements.** The informal inquiry claimed**:** "67 Airmen were interviewed during this inquiry. 48 of those interviewed returned their signed statements; which consisted of 10 civilians, 38 military members."[227]  The district agreed,  "Wilson interviewed '67 airmen' at SCOS; 48 interviewed 'returned signed statements; which consisted of 10 civilians, 38 military members.'" ECF No. 23-19 at 2."[228]

The following entries identify further adoptions beyond those quoted above:

---

[226] App'x 3 at 503

[227] App'x 22 at 4832, para 3

[228] App'x 3 at 489, footnote 6

| Characterization | Informal Inquiry Citation | District Court Order Citation | Description |
|---|---|---|---|
| Mental/physical wellbeing | ECF 23-19 at various | ECF 44 at 18 | Impact allegation |
| Military/civilian divide | ECF 23-19 at 9; 18-14 at 16 | ECF 44 at 18 | Structural issue |
| NCOs not empowered | ECF 23-19 at 11; 18-14 at 18 | ECF 44 at 18 | Leadership complaint |
| Military leadership disregarded | ECF 23-19 at 12; 18-14 at 19 | ECF 44 at 18 | Authority issue |
| No clear guidance | ECF 23-19 at 14; 18-14 at 21 | ECF 44 at 18 | Communication complaint |
| Favoritism toward Anna White | ECF 23-19 at 3, 21; 18-14 at 10, 28 | ECF 44 at 4 n.7 | Specific allegation |
| Comment cards justification | Inquiry premise | ECF 44 at 28 | Investigation basis |

The administrative record submitted to the District Court did not include 48 signed witness statements, lacked framed allegations, a legal sufficiency review was not conducted, and the informal inquiry was cited as an opinion, yet regularly cited and used in District SJ Order.

## XV. FMLA Interference, Constructive Discharge, and Health Impacts

Dr. Cecile Jackson began approved Family and Medical Leave Act (FMLA) leave on October 14, 2021, through January 19, 2021.[229]  The leave followed workplace conditions previously documented in EEO complaints, Informal Inquiry, EEO Declarations, and CDI Investigation.  After the EEO claim was filed, David Willcox served as Deputy Director of the 96th Communications Squadron. Willcox had been newly hired by Lt. Col. Scott Weed prior to Weed's departure in July 2021.

### A.  Written Notification and Safety Concerns

On September 20, 2021—approximately three weeks before beginning FMLA leave—Dr. Jackson emailed Willcox, with Lt. Col. Kurando Mensen copied, expressing concern about the chaplain-quote emails distributed to the SCOS branch.  She wrote, in part:

> Please consider for a moment that the following is true: I am bullied, harassed, taunted, ganged up on, my name disparaged

---

[229] FMLA STARTS (Oct. 14, 2021), App'x 15 at 3439

by those who knowingly and willfully made false official statements and claims against me…

I urge you to please read the attachments [Chaplain emails from Lt Nelson] slowly, carefully, and with thought from my perspective. On the first read, they are innocent. Please reread them and consider that what I have said is true. I am concerned about my safety and the safety of my family.[230]

Dr. Jackson further stated that she felt unsafe at work and requested administrative leave.  The following day, Willcox responded "you should bring those concerns to the attention of local law enforcement".[231] No further action was taken to suspend the emails. The following day,  Sep 21, 2021, Plaintiff's Branch (SCOS) received another chaplain's message: "It's real life. And in real life, you can't always win."[232] The Chaplain's emails continued.

### B.  Contacts During FMLA Leave

---

[230] Innuendo, Plaintiff to Deputy Director David Willcox w Reponse (Sep. 20, 2021), App'x 13 at 2904

[231] *Id.* at 2903

[232] Email, Chap Real Life (Only Multi-page) (12th) (Sep. 21, 2021), App'x 13 at 2923

During the twelve-week FMLA period, Willcox initiated work-related calls and emails to Dr. Jackson. She also received regular hang-up calls.[233] Throughout her FMLA, Willcox required Dr. Jackson to respond to emails and provide input on performance evaluations.[234]  When checking emails during this period, the chaplain messages continued to be distributed to SCOS only:

- October 13, 2021: The day before FMLA started, "Only as Good as your last battle"[235];

- November 4, 2021: Doubt Your Value[236]; and

- December 6, 2021: Learn to Listen[237]

---

[233] App'x 4 at 692, #12

[234] Additionally, during her FMLA leave, Plaintiff was required to respond to EEO investigators, prepare legal declarations, and handle ongoing investigation matters related to the case that formed the basis for her medical leave. Plaintiff also experienced persistent hang-up phone calls during this period.

[235] Chaplain, Only as Good as Your Last Battle (13th) (Oct. 13, 2021), App'x 15 at 3436

[236] Chaplain, Doubt Your Value (14th) (Nov. 04, 2021), App'x 15 at 3482

[237] Chaplain, Learn to Listen (15th) (Dec. 06, 2021), App'x 15 at 3523

On December 13, 2021 at 9:06 am, Dr. Jackson re-signed and submitted an EEO Claim concerning CDI allegations, harassment, and cyber-bullying emails from 2Lt Nelson and Chaplain Lee.[238] Later that day, at 1:06 pm, Willcox emailed:, "I've tried calling you several times but the line just rings busy,"[239] and requested her signature on 2Lt. Nelson's Officer Performance Report (OPR), with a two-day turnaround so he could "get this closed out" before the holidays.[240]

The same 2Lt Nelson who continued sending the Chaplain's emails to Plaintiff branch.

## C. Resignation During FMLA Leave

On December 16, 2021, in response to Willcox's email about Nelson's OPR, Dr Jackson wrote:

---

[238] EEO Claim -CDI Chaplain Defamation RE-SIGNED (Dec. 13, 2021), App'x 15 at 3525

[239] Email, Willcox and Pl. about Signing Nelson's Appraisal (FMLA) (Dec. 13 - 16, 2021 Chain) w Nelson Attachments (Dec. 13, 2021), App'x 15 at 3530, para 2

[240] *Id.* at 3529

As a rater, one is expected to provide constructive feedback to a ratee about their performance. However, this is one of several tasks that I can no longer carry out because of the environment. …sometimes, you encounter individuals who bend the truth or lie outright. This is one of the most challenging managerial situations to face.

For example, a member of my team [MSgt Shull] was showing behaviors that were not consistent with basic collegial and professional expectations. To constructively manage the member's performance …verbal counseling was conducted, which the member did not appreciate...

This member took advantage of the discriminatory environment in which I work and made false accusations of beratement, claims of reprisal, and more. Leadership accepted her claims as truth and, worse, exacerbated the issue with false rumors and gossip. My supervisory input was unsolicited and deemed irrelevant, and I was automatically assumed at fault. These toxic behaviors have become supported norms directed toward me. Similar has occurred with OPR/EPR signatures.

On one earlier occasion…my options were to sign the OPR fully aware that the contents were inflated and undeserved, update the document to reflect the actual performance, knowing I would be falsely accused of reprisal, or refuse to sign and be subjected to additional toxic behaviors and attacks on my character. …

If I sign, it's wrong, but I am falsely accused if I don't sign. These are examples of what has become my norm.

Regarding Lt Nelson's OPR, the document includes a recommendation for "PDE & Flight/CC ASAP."[241] Please see the attached ACA and related email.[242] I cannot concur with this recommendation based on witnessed behaviors, but I also fear false claims of reprisal.

… It's a no-win situation for me.

It is mentally distressing to be subjected to relentless bullying, and worse when leadership supports such actions…It seems the organization has a high tolerance for such misbehaviors when they are directed at me.[243]

While still on FMLA, Dec. 16, 2021, Dr. Jackson submitted a letter of resignation[244] effective Feb. 2, 2022. She documented approximately fourteen Chaplain's emails containing innuendo, including phrases such as "Black Hawk down,"[245] "Some trees flourish…others are taken by

---

[241] …recommending 'PDE & Flight/CC ASAP' (i.e., immediate Professional Development Education and rapid advancement to Flight Commander).

[242] App'x 15 at 3532 - 3536

[243] *Id.* at 3527-3529

[244] Email, Pl Letter of Resignation (Dec. 16, 2021), App'x 15 at 3538-3541

[245] Chaplain, Black Hawk Down from Nelson (2nd) (May 19, 2021), App'x 11 at 2315; Chaplain, Black Hawk Down from Shull (2nd) (May 20, 2021), App'x 11 at 2327

wolves,"[246] "for the strength of the Pack is the Wolf,"[and] "your Squadron is your pack"[247] and "It's real life. And in real life, you can't always win."[248]

Dr. Jackson continued that she was "forced to resign due to the behaviors mentioned above and the smear attacks against [her] character" and that she experienced "collusive retaliation after filing [her] EEO complaint" and described the circumstances as having become "overwhelming."[249]

The letter detailed the hostile work environment involving disparate treatment, harassment, bullying, and discrimination based on race and sex. Dr. Jackson also referenced statements made by her immediate supervisor Scott Davis, "stop thinking about being black" and to "giggle and cut up to make others feel more comfortable."

_____

[246] App'x 12 at 2477

[247] App'x 11 at 2402

[248] App'x 15 at 3540, para. 3

[249] *Id.* at 3538-3541

She further stated, following the April 23, 2021, EEO complaint, she was accused of several allegations including "telework fraud, timecard fraud, bullying, harassment, making false statements, abuse of authority, [and] discriminatory hiring practices," which she described as a smear campaign damaging her professional reputation. In the resignation letter, Dr. Jackson stated that her "health [was] negatively affected by conditions of bullying, discrimination, harassment, and reprisal, all based on her race and sex.

She requested "no contact" with MSgt Sarah Shull and asked that the chaplain emails cease during her final weeks.[250] Nonetheless, the Chaplain's emails continued through Dr. Jackson out-processing, and Shull was in her branch when she returned.

## XVI.  Returning from FMLA and Out-Processing

---

[250] *Id.* at 3539-3541

January 19, 2022, Dr. Jackson returned from FMLA to out-process. On

January 24, 2022, another chaplain email distributed to SCOS only:

> There's a scene in the final climax in the movie, The Gladiator, where after the main character is stabbed in his ribs, he was expected to fight to the death with an evil emperor. The Gladiator had everything against him. He lost his wife, his son, his position of power, his wealth, and his respect.[251]

Dr. Jackson immediately forwarded the email to Willcox and Lt. Col.

Mensen, writing:

> These do not seem like appropriate emails and regardless of the interpretation of others, I see innuendoes. Stabbed in the ribs, fight to the death, loss of position, power, and respect. When does this end? It seems the Chaplain would release his own emails. This is too much and my concerns seem irrelevant…. This all seems to be taken as a joke."[252]

---

[251] Chaplain, Outprocessing, Final Climax, Stabbed in Ribs, Fight to Death Evil Emporer, Lost Spouse, Son, Power Respect Pl. to Willcox - A Joke (17th) (Jan. 24, 2022), App'x 15 at 3556

[252] *Id.* at 3555

This was the final Chaplain's email. The Chaplain's emails started May 13, 2021, three weeks after the first EEO claim was filed and stopped immediately before Dr. Jackson's last day, February 2, 2022.

## A. Out-Processing

Dr. Jackson's out-processing required several in-person visits. On January 28, 2022, while completing required out-processing in Building 1425, Dr. Jackson reported that MSgt Howey—whom she had previously encountered without incident—"began to loudly address" her "several times" in a manner she perceived as drawing attention to her presence in the building. Upon exiting, she encountered Howey again standing with Breaux—who was named in her EEO complaint—and others in the entryway, where Howey again "loudly greeted" her.[253]

In an email dated January 29, 2022, Dr. Jackson described the experience as "embarrassing" and wrote that it occurred while she was

---

[253] Email, Pl to Willcox - Outprocessing, Peace, Howey, Embarrassing (Feb. 01, 2022), App'x 16 at

already dealing with "false allegations and gossip that I was fired for timecard fraud, bullying my team, etc." In that email, she asked Willcox to "please help me to out-process in peace," specifying her request for "no contact with MSG Shull and no emails from Lt Nelson," and stating that she would "greatly appreciate the absence of loud introductions from MSG Howey or others as I enter and exit buildings." She emphasized, "Your efforts are appreciated, but please help me to out-process in peace."[254]

In a response dated January 31, 2022, Willcox stated that he did not believe "MSgt Howey intended to taunt you in any way," noting that "He is loud normally," and added that "without prior coordination of some sort we cannot control who is where in the building when you're passing thru and who you may pass by in the hallways." Willcox further stated that Dr. Jackson had "declined every offer of assistance," including virtual out-processing options and his offers to accompany her or coordinate

---

[254] *Id.* at 3704-3706

appointments. On February 1, 2022, Dr. Jackson clarified her request, explaining that "please help me to out-process in peace" meant "to out-process just as other individuals who requested quiet exits."[255] She explained that much of her out-processing was conducted virtually and that her in-person presence was required only where wet signatures were mandated, such as turning in her government travel card and witnessing its destruction. She wrote:

> It is an unfortunate fact that, accompanied or not, the gossip and ridicule will occur. I am struggling to with deal with the worriment of it all, but nonetheless, I must – I have no choice.

Dr. Jackson completed her out-processing on February 2, 2022, concluding nearly thirty years of combined, exemplary military and civilian federal service.[256]

## B. Harassment after Resignation

---

[255] *Id.* at 3704-3705

[256] *Id.* at 3704

Following her departure, Dr. Jackson documented additional events occurring after her separation from employment as contributing to ongoing stress following her separation from employment.

On February 17, 2022—approximately fifteen days after her final day—Scott Davis, a supervisor named in her EEO complaint, referred to her as a "dark cloud," and 2Lt. Nelson and David Willcox, the Deputy Director, accused her of stealing government property and referenced the possibility of search of her home.[257]

On April 16, 2022, three months after Dr. Jackson's final day, Dr. Jackson received USPS letter from Col Black, dated April 11, 2022. Col. Black contacted her regarding the October 8, 2021, CDI investigation.[258] In response, Jackson emailed and copied Brig General Scott Cane and General Arnold Bunch:

---

[257] EEO Claim - Resignation, DarkCloud, Govt Equip (Feb. 17, 2022), App'x 16 at 3710

[258] Col Black, USPS Letter to Plaintiff w CDI Results - 2 Months After Resignation (Apr. 11, 2022), App'x 16 at 3741

"…after nearly 30 years of federal service, I resigned from the federal government due to the ongoing harassment and reprisal over the past year after filing my EEO complaints – two of which list you as Responsible Management Official…

you requested … additional information for your use in reconsideration. …however, based on prior written statements, the submission of further evidence seems moot as the investigation itself and its results appear discriminatory, retaliatory, and pretextual. Unfortunately, due to the conflict of interest, gross misrepresentations, loss of trust, seemingly ongoing lack of impartiality, and the connection of the CDI to my EEO claims, submission of information shall occur through [alternate] channels…[259]

## C. Others Compelled to Leave

After Dr. Jackson's last day, several others left employment under the 96

CS. Rikyle Wilson stated:

> I recently resigned…during my exit interview leadership showed me a paper displaying 22+ available positions at the 96 CS. This individual even went as far as to say please do not discourage any one from the 96 CS. The people at the 96 CS need no discouraging. There is nothing I or anyone could say that would make things worse than what leadership has already made it. He went on…about the 96 CS failing me…The 96 CS is very aware of the issues and one may even say they are in

---

[259] Plaintiff Response to Black w Black, Bunch, Cain about CDI (Dated April 11, 2022) (Apr. 11, 2022), App'x 16 at 3743

collusion with each other to keep the culture how it is. The culture being very oppressive and discriminatory. Dr. Jackson was never the problem….I would never go back.[260]

## XVII.        Health Impacts

Dr. Jackson later testified that she was diagnosed with Graves' disease in 2022, following the events described above.[261] She further testified that her medical providers associated the condition with prolonged stress. In August 2025, Dr. Jackson was diagnosed with a pheochromocytoma, a rare adrenal tumor. Medical records indicated that her last clean scan occurred in 2018, with the tumor developing sometime thereafter during her employment period. Extreme stress can activate such tumors and Dr. Jackson underwent surgical removal.

## XVIII.        District Court's Cost Award

---

[260] Rikyle Wilson Letter (Apr. 28, 2022), App'x 17 at 3903

[261] App'x 19 at

On October 15, 2024, the district court taxed costs against Dr. Jackson in the amount of $3,162.85 under Federal Rule of Civil Procedure 54(d). The taxed costs are primarily for deposition transcripts of **Lt Col Avance (the EEO Director who disclosed her confidential complaint in violation of MD-110)**, Lt Col Weed (who coordinated same-day retaliation and altered documents), the very individuals whose coordinated retaliatory actions are established throughout this brief. *See supra* SOF §§ III.C (same-day coordination after Avance's unauthorized disclosure), III.D (Weed's document alteration). The effect of the court's order is that Dr. Jackson is required to pay $3,162.85 to create a record of sworn testimony from the officials who violated federal EEO regulations to retaliate against her for filing an EEO complaint.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment **de novo**, applying the same legal standards as the district court and viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56. *McCreight v. AuburnBank*, 88 F.4th 939, 946–47 (11th Cir. 2022). Questions of law—including whether the district court applied the correct legal standard—are reviewed **de novo**. *United States v. Caldwell*, 776 F.3d 1350, 1357 (11th Cir. 2015). A district court's failure to adjudicate properly raised and preserved claims constitutes reversible error. *Danley v. Allen*, 540 F.3d 1298, 1304–05 (11th Cir. 2008).

### Federal-Sector Title VII Causation

Claims arising under Title VII's federal-sector provision, 42 U.S.C. § 2000e-16(a), are governed by the causation standard articulated in *Babb v. Wilkie*,

140 S. Ct. 1168 (2020). Under *Babb*, federal personnel actions must be "untainted by any discrimination," and unlawful considerations that play **any part** in the decision-making process are legally significant. Id. at 1171–74. Whether the district court applied the correct causation standard is a pure question of law reviewed **de novo**.

**Retaliation and Hostile Work Environment**

Retaliation claims, including retaliatory hostile work environment claims, are evaluated under Title VII's cumulative-effects framework and the materially adverse standard articulated in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The district court's application of that standard at summary judgment—including whether it improperly fragmented interrelated conduct rather than assessing the totality of contemporaneous events—is reviewed **de novo**. *Monaghan v. Worldpay U.S., Inc.*, 955 F.3d 855, 861–63 (11th Cir. 2020).

**Constitutional and Statutory Claims**

Non-Title VII claims—including procedural due process stigma-plus claims, Privacy Act claims, and FMLA claims—present mixed questions of

law and fact. The legal elements of such claims, including the applicable statutory or constitutional standards, are reviewed **de novo** at summary judgment, while any genuine disputes of material fact are governed by Rule 56. *Behrens v. Regier*, 422 F.3d 1255, 1260–62 (11th Cir. 2005); *Tanner v. Stryker Corp.*, 46 F.4th 1292, 1300–01 (11th Cir. 2022).

**Authority to Reverse and Render**

Where the governing legal standard is clear, the district court misapplied that standard, and the material facts relevant to the legal question are established in the record without the need for credibility determinations, this Court may reverse and render judgment as a matter of law. *McCreight*, 88 F.4th at 949–50; *Danley*, 540 F.3d at 1314.

# GOVERNING LEGAL STANDARDS (GLS)

## I.     Appellate Review Standards

**A.  De Novo Review.**  An appellate court reviews a district court's

grant of summary judgment de novo, applying the same legal standards as

the district court. *Tolar v. Bradley Arant Boult Commings, LLP,* 997 F.3d 1280,

1289 (11th Cir. 2021).

### B.  Pure Questions of Law

The district court's application of wrong causation standards to federal-

sector claims constitutes pure legal error reviewed de novo without

deference. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th

Cir. 2016); *Dixon v. Hallmark Cos*., 627 F.3d 849, 858 (11th Cir. 2010). Pure

legal questions require no factual development and warrant reversal when

courts misapply controlling statutory standards.

**C.  Summary judgment**  is appropriate only where there is no

genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts must view all

evidence and draw all reasonable inferences in favor of the non-moving party, consider all material evidence—including evidence contradicting the moving party's position—and may not weigh credibility or resolve factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

**D. Viewing the Evidence.** In reviewing a grant of summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). The court must not make credibility determinations or weigh the evidence. *Reeves,* 530 U.S. at 150.

**E. Inadmissible Evidence.** Evidence that is inadmissible, such as unauthenticated documents or conclusory statements lacking a basis in personal knowledge, cannot be considered for summary judgment. *See* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 901; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1101 (11th Cir. 2014).

## II.  Title VII Retaliation Standards

**A.  Prima Facie Case.**  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *See, e.g., Adams v. Austal*, *U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014).

**B.  Materially Adverse Actions.**  For a Title VII retaliation claim, an action is "materially adverse" if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern. Co. v. White*, 548 U.S. 53, 68 (2006).

**C.  Causation - Direct Evidence.**  Direct evidence of retaliation satisfies causation as a matter of law and requires no inferential analysis. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).

**D.  Causation - Temporal Proximity.**  Close temporal proximity between protected activity and adverse action supports a retaliatory inference. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

**E.  Causation - Multi-Actor Institutional Retaliation.**  Coordinated retaliatory action spanning multiple actors or organizational levels, particularly when occurring in close temporal proximity to protected activity, is probative of retaliation. *Zaklama v. Mount Sinai Med. Ctr.*, 842 F.2d 291, 294-95 (11th Cir. 1988). Under the subordinate-bias ("cat's-paw") theory, an employer is liable where a biased subordinate, acting with retaliatory animus, performs an act intended to cause—and that proximately causes—an adverse employment action; the biased act need only be a causal factor, not the sole cause. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-22 (2011). In private-sector Title VII retaliation claims, ultimate liability requires but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

**F. Federal-Sector Causation Standard Liability (The "Untainted" Standard).** Under 42 U.S.C. § 2000e-16 (federal personnel actions must "be made free from any discrimination." Liability attaches if retaliation plays *any part* in the decision-making process. The inquiry is whether the process was "tainted," not whether retaliation was the but-for cause of the ultimate outcome. Federal personnel actions must be "untainted by discrimination." *Babb v. Wilkie, 140 S. Ct.* 1168 (2020). *Babb v. Sec'y, Dept. of Veterans Affairs*, 992 F.3d 1193, 1205 (11th Cir. 2021) (extending *Babb* to Title VII retaliation). Remedies (The "But-For" Standard): Although a federal employee can establish liability by showing "taint," they must still prove **but-for causation** to obtain "ultimate" remedies such as back pay and compensatory damages.

**G. Pretext and Rule 56 Inquiry**

At summary judgment, courts must assess the record as a whole and may not distort the Rule 56 inquiry by reducing the analysis to whether the plaintiff has disproved the employer's stated reason. Pretext is relevant but not dispositive; the proper inquiry considers the entire evidentiary

picture. *Ismael v. Roundtree*, No. 25-10604, slip op. at 7–8 (11th Cir. Dec. 5, 2025). A plaintiff is not required at summary judgment to negate the employer's explanation, as doing so is unnecessary for success at trial and improperly narrows the inquiry. *Ismael*, No. 25-10604, slip op. at 8–9.

Evidence that an employer's justification is unworthy of credence— including falsity, internal inconsistency, shifting explanations, or procedural irregularities—constitutes circumstantial evidence from which unlawful intent may be inferred and must be assessed alongside all other evidence. *Ismael*, No. 25-10604, slip op. at 9–11. Where the justification rests on an investigation, significant procedural defects in that investigation support an inference of pretext. *Ismael*, No. 25-10604, slip op. at 9–12. Summary judgment must be denied where the totality of the evidence forms a convincing mosaic of discrimination or retaliation. *Ismael*, No. 25-10604, slip op. at 12; *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023).

**H.  Consciousness of Guilt Standards.**  Courts must consider evidence of systematic document alteration or false testimony as indicative of a "consciousness of guilt" supporting a retaliation claim. *Reeves*, 530 U.S. at 147; *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Efforts like back-dating documents after a complaint, providing false sworn statements, concealing timelines, or creating falsified records post hoc all demonstrate culpability. Courts must grant judgment for the plaintiff when an employer's explanation is "conclusively contradicted" by objective evidence. *EEOC v. Neptune Orient Lines, Ltd.*, 834 F.3d 1263, 1273–74 (11th Cir. 2016).

**I.  Employment Defamation and Evidence Fabrication.**  To establish a hostile work environment claim, a plaintiff must show membership in a protected class, unwelcome harassment based on that protected characteristic, harassment sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment, and a basis for employer liability. *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21–23 (1993); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Employment defamation encompasses false statements regarding professional competence or conduct, publication through official employment channels, resulting reputational harm, and a nexus to discriminatory or retaliatory motive. When such statements are systematically manufactured or coordinated to support predetermined disciplinary or investigative outcomes, they may independently support hostile work environment and constructive discharge claims.

**J. Hostile Work Environment.** To establish a hostile work environment claim, a plaintiff must show membership in a protected class, unwelcome harassment based on that protected characteristic, harassment sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment, and a basis for employer liability. *Bradley Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); see also *Buckley v. Secretary of the Army, No. 21-12332, at 23 (11th Cir. Mar. 28, 2024)* (reaffirming the five elements and citing *Miller*

and *Adams*). Only conduct of which the plaintiff was aware during employment may be considered. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014).   In assessing severity or pervasiveness, courts apply a totality-of-the-circumstances analysis. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21–23 (1993).

**K.  Cumulative Analysis.**  Courts evaluate Title VII hostile work environment and constructive discharge claims under a totality-of-the-circumstances framework, considering the frequency, severity, threatening or humiliating nature of the conduct, and its interference with work performance, rather than viewing incidents in isolation. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Within this cumulative analysis, false statements damaging professional reputation and coordinated fabrication of misconduct may contribute to a hostile work environment. *Lauderdale v. Texas Dep't of*

*Criminal Justice,* 512 F.3d 157, 164 (5th Cir. 2007); *Burlington Northern. Co. v. White*, 548 U.S. 53, 57 (2006).

**L.  Pattern Discrimination and Disparate Treatment.**  Title VII discrimination claims require cumulative analysis when discrimination manifests through sustained patterns. Courts must examine whether similarly situated employees received more favorable treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

**M. Continuing Violation and Constructive Discharge.**  Courts must consider the entire scope of continuing violations, not discrete components. *Green v. Brennan*, 578 U.S. 547, 556 (2016). Constructive discharge occurs when "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). Continuing violation criteria include acts related by discriminatory or retaliatory

motive, occurring over a reasonable period, demonstrating continuing pattern frequency, and escalating in severity. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001).

## III.  EEO Regulatory Framework

**A.  Confidentiality and Separation Requirements.**  MD-110 and 29 C.F.R. § 1614.105(g) require strict confidentiality of EEO pre-complaint counseling and a clear structural separation between the agency's EEO complaints program and its defensive, personnel, or management functions. This separation—often described as a "firewall"—is a foundational requirement of a fair and impartial EEO process, ensuring that protected activity is not disclosed to, or used by, officials involved in employment decision-making or agency defense.[262]

---

[262] EEOC, Equal Employment Opportunity Management Directive (MD-110), §D at 33 (Aug. 5, 2015)

https://www.eeoc.gov/sites/default/files/migrated_files/federal/directives/MD110110.pdf.

**B. EEO Director Responsibilities.** The EEO Director is responsible for ensuring fair and impartial investigations and for avoiding conflicts or the appearance of conflict. 29 C.F.R. § 1614.102(c); MD-110, ch. 6. The pre-complaint counseling regulation bars disclosure of the aggrieved employee's identity absent consent or formal complaint. 29 C.F.R. § 1614.105(g).

## IV. FMLA Interference and Retaliation

The FMLA prohibits interference with FMLA rights, including harassment during protected leave. 29 U.S.C. § 2615(a)(1). FMLA interference includes continued work demands, contact, or harassment that undermines the statute's restorative purpose, even where leave is formally approved. *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008). To establish FMLA interference, a plaintiff must show: (1) entitlement to FMLA leave; (2) employer knowledge; and (3) denial, restraint, or interference. No showing of employer intent is required. *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1208 (11th Cir. 2001). FMLA mandates recovery of lost compensation, interest, and liquidated damages equal to

actual damages unless the employer proves good faith. 29 U.S.C. §

2617(a)(1)(A)(iii).

## V. Constitutional and Statutory Claims Independent of Title VII

**A. Fifth Amendment Due Process "Stigma-Plus" Claims.** Federal

employees possess a constitutionally protected liberty interest against

government defamation that results in tangible alteration of legal status or

employment conditions. *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Cannon v.

City of West Pm Beach*, 250 F.3d 1299, 1302-03 (11th Cir. 2001). A stigma-plus

claim requires: (1) false statements by government actors; (2) publication in

official context damaging professional competence or integrity; (3)

reputational harm; and (4) a concurrent alteration of legal rights or status,

including constructive discharge. *Cleveland Bd. of Educ. v. Loudermill*, 470

U.S. 532, 541 (1985); *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972).

**B. Privacy Act (5 U.S.C. § 552a).** The Privacy Act imposes

mandatory obligations on federal agencies to protect the confidentiality

and accuracy of personnel records maintained in a system of records.

Agencies may not disclose any record without the individual's written consent, absent a statutory exception. 5 U.S.C. § 552a(b). Agencies must maintain records with accuracy, relevance, timeliness, and completeness reasonably necessary to assure fairness in personnel determinations. 5 U.S.C. § 552a(e)(5). To establish a Privacy Act violation, a plaintiff must show: (1) unauthorized disclosure or inaccurate record maintenance; (2) the record was in a system of records; (3) intentional or willful agency conduct; and (4) adverse effect. *Edison v. Dep't of the Army*, 672 F.2d 840, 846-47 (11th Cir. 1982). The Privacy Act authorizes actual damages without statutory cap, plus attorney's fees. 5 U.S.C. § 552a(g)(4).

### C. Constitutional Remedies Beyond Title VII Limitations

When systematic institutional violations encompass constitutional defamation, Privacy Act breaches, and statutory interference, enhanced remedies beyond Title VII's statutory limitations are required. Constitutional violations warrant uncapped damages under 42 U.S.C. § 1983, actual damages under 5 U.S.C. § 552a(g)(4), and liquidated damages

under 29 U.S.C. § 2617. *Monroe v. Pape*, 365 U.S. 167, 187 (1961); *Edison v. Department of Army*, 672 F.2d 840, 846-47 (11th Cir. 1982). Enhanced remedy criteria include systematic institutional misconduct transcending individual violations; constitutional rights violations requiring deterrent effect; statutory violations with independent damages frameworks; and Title VII limitations inadequate to address scope of institutional violations.

## VI.   Procedural and Evidentiary Standards

**A.  Accardi Principle.**  Federal agencies are required to follow their own mandatory procedural regulations, and agency action taken in violation of those rules is invalid. *United States ex rel. Cardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); 5 U.S.C. § 706(2). Where the administrative process is structurally compromised by such violations, administrative exhaustion may be excused as futile and remand is inappropriate. *Mincey v. U.S. Postal Service*, 206 F. App'x 872, 875-76 (11th Cir. 2006).

**B.  Administrative Exhaustion.**  Under Eleventh Circuit precedent, administrative exhaustion requirements are excused when procedural irregularities in the EEO process make a remedy impossible. *Mincey v. U.S. Postal Serv.*, 206 F. App'x 872, 875–76 (11th Cir. 2006). Futility likewise excuses exhaustion where "the agency has predetermined the issue." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012). In short, a federal employee need not pursue the EEO process to conclude if that process was irreparably tainted by the agency's own misconduct.

**C.  Spoliation and Material Alteration of Evidence: Sanctions, Adverse Inference, and Rule 37(e).**

Spoliation is defined as the destruction of evidence or the significant and meaningful alteration of a document or record and may warrant the imposition of sanctions. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) . Federal law governs spoliation sanctions in the Eleventh Circuit, and courts evaluate spoliation by considering prejudice, the importance of the evidence, the ability to cure any prejudice, and the spoliating party's

degree of culpability. *Flury v. DaimlerChrysler Corp,.*427 F.3d 939, 945 (11th Cir. 2005.

An adverse inference based on spoliation does not require proof of malice, though mere negligence is insufficient *Flury v. DaimlerChrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005).

An adverse inference based on spoliation does not require proof of malice, though mere negligence is insufficient. *Id.* Where electronically stored information is at issue, Federal Rule of Civil Procedure 37(e) provides the governing sanctions framework, including curative measures, adverse-inference instructions, or dispositive sanctions upon the requisite findings. Where the record reflects significant alteration of investigative materials, withholding of underlying source evidence, or preservation of incomplete or misleading records, courts must apply the spoliation framework rather than crediting the resulting investigation as a reliable basis for summary judgment.

## VII.   District Courts Obligations and Appellate Remedies

**A. Obligation to Adjudicate All Properly Raised Claims.** District courts have a mandatory obligation to adjudicate every claim that is properly raised and preserved. Failure to do so constitutes reversible legal error. *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008). This obligation applies with particular force where omitted claims arise under legal authorities independent of Title VII, assert distinct theories of liability, or authorize remedies not coextensive with Title VII's statutory scheme.

**B. Reversal and Render Authority.** The authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the verdict. *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000). When legal errors are corrected and the remaining record supports only one conclusion, judgment should be entered without remand. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

**C. Convergence Standard for Reversal and Render**

The Eleventh Circuit must reverse and render when multiple,

independently reversible errors converge to demonstrate systemic

breakdowns in both agency procedure and judicial adjudication. *Cleveland*

*v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004);

*Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004).

Convergence occurs when errors across distinct legal theories transform

isolated administrative defects into proof of structural unreliability and

due process failure requiring judgment as matter of law. Convergence

criteria include direct evidence establishing liability without inference;

institutional coordination satisfying systematic retaliation standards;

conclusive contradictions destroying fabricated defenses; pure legal errors

in statutory interpretation; constitutional violations providing independent

remedies; and systematic procedural violations affecting administrative

processes.

## D.  Futility Prohibiting Remand

Remand is inappropriate when the same agency or judicial mechanism that created the legal error would be responsible for correction. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012); *Mincey v. U.S. Postal Serv.*, 206, 875-76 (11th Cir. 2006). Futility exists where the administrative process is structurally compromised, including through breaches of confidentiality, coordination with alleged retaliators, fabrication or falsification of the record, failure to adjudicate preserved claims, or persistence of the same decisionmakers or framework on remand. As emphasized in *Elgin*, 567 U.S. at 23, futility arises where "the agency has predetermined the issue." 567 U.S. at 23.

## ARGUMENT SUMMARY

This appeal arises from a systemic failure of constitutionally and statutorily required safeguards at both the agency and judicial levels. The record reflects not isolated acts of retaliation, but a breakdown in administrative process followed by judicial acceptance of a materially distorted evidentiary record. The agency relied on investigations and justifications that post-dated protected activity, and the district court credited those outcomes at summary judgment without confronting the undisputed chronology or applying the governing legal standards.

That failure produced predictable consequences. Investigations proceeded without contemporaneous factual support, evidentiary records were supplemented or reframed after the fact, and administrative findings rested on explanations that emerged only after protected activity occurred. The summary-judgment ruling adopted those conclusions without addressing undisputed evidence of timing inconsistencies, procedural violations, and record unreliability.

The record contains multiple, time-sequenced indicators of post hoc justification, including same-day EEO intake and command notification, deposition admissions confirming pre-NAV disclosures, evidence of altered timestamps and redactions, and later-created materials that sworn testimony establishes could not have existed before April 23. Taken together, these undisputed facts demonstrate procedural defects and evidentiary unreliability that render the agency's explanations legally insufficient at summary judgment.

These defects require reversal with judgment for Appellant. Remand would serve no legitimate purpose, as returning the case to the same flawed process would merely invite further rationalization. Courts do not remand to allow an employer or agency to rehabilitate defective justifications. *See Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147-48 (2000); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852 (2001). The appropriate remedy is reversal with judgment for Appellant.

## ARGUMENTS

At summary judgment, the district court erred in multiple respects: accepting the Defense's timeline, treating post-EEO materials as predating protected activity, and relying on the inaccurate sequence to negate causation. Compounding these errors, the court applied private-sector regulations to a federal-sector case. The record further reflects: (1) procedurally defective investigations treated as neutral evidence; (2) altered documents accepted as authentic; and (3) wholesale adoption of those materials by the court.

## I. Argument 1. Whether the District Court Erred in Granting Summary Judgment Despite Direct Evidence and Uncontroverted Causation That Establish Multi-Agency Retaliation as a Matter of Law

Undisputed facts establish the EEO Director's immediate disclosure of Dr. Jackson's protected activity entered the command stream and triggered a same-day, multi-agency response. [263], [264] See *Supra* SOF § II. Also, see TLR:1-187 and CLR columns A – O. The court adopted the agency's revision, recasting the disclosure as downstream, rather than catalytic.[265]

### A. The Dispositive Chronology

The record establishes the following sequence:  At 6:53 a.m. on April 23, 2021, Dr. Jackson filed an informal EEO claim naming Scott Davis, et al.[266,]

---

[263] App'x 20 at 4631, lines 21-25

[264] App'x 17 at 3882 Q3 para 3

[265] App'x 3 at 486-521

[266] App'x 10 at 2087, 2089-2090 § G

[267] EEO Director Anthony Avance bypassed the mandatory confidentiality firewall EEO-MD-110 establishes as "the essential underpinning of a fair and impartial EEO complaints process."[268] Within hours of the claim, EEO Director Avance alerted Dr. Jackson's second-level supervisor, LtCol Weed[269]. Weed in turn informed Scott Davis, Jackson's first-level supervisor, named in the EEO claim. [270] Davis stated,

> That same day, Friday, April 23, Lt Col Weed sent a message ("Need a Vector" Email) to the IG, EO, and Judge Advocate, describing the hostile work environment Cecile was creating…**We** wanted guidance on how to handle it. [271]

---

[267] App'x 10 at 2125

[268] EEOC, Equal Employment Opportunity Management Directive (MD-110), §D at 33 (Aug. 5, 2015)
https://www.eeoc.gov/sites/default/files/migrated_files/federal/directives/MD110110.pdf.

[269] App'x 20 at 4531-4532, lines 21-17

[270] App'x 17 at 3882 Q3 para 3

[271] *Id.* at 3882-3883, last two paragraphs

Due to Avance's admittance that Weed was informed before the 11:11am NAV-1, Davis's use of "**we** wanted guidance" confirms Davis was also aware before the email was released. Further, despite being copied in the April 23, 2021 NAV-1 email thread, [272] Davis declared, he "was notified on 26 April 2021."[273],[274] See *Supra* § II. *Same-Day.*

Armed with early, unauthorized knowledge of Dr. Jackson's EEO complaint, Weed and Scott Davis acted immediately. Within hours, Davis and EEO Avance collaborated on inserting false statements into Dr. Jackson's upcoming mid-term. In sworn declaration, Davis admitted:

> On Friday morning, April 23, 2021, I made a phone call to the EO Director, Mr. Anthony Avance for guidance…Mr. Avance and I talked about how I would document the issues raised in these complaints in her mid-term performance feedback.[275]

See *supra* SOF § II. APRIL 23, 2021: Same Day Retaliation.

---

[272] App'x 10 at 2127-2131

[273] App'x 17 at 3882-3883, A2

[274] App'x 10 at 2127-2131

[275] App'x 17 at 3882 Q3 para 3

With unauthorized knowledge, at 11:11 a.m.—approximately four hours the EEO filing—Weed informed Scott Davis, (named in the EEO claim) initiated multi-agency coordination via email entitled Need a Vector (NAV-1), to Inspector General Clark, JAG Attorney Shelly, the EEO Director, and Scott Davis, the harasser identified in the informal-EEO claim[276] with accusations later relied upon as alleged concerns.[277]

EEO Counselor, Eunice Porter documented LtCol Weed was informed three days later on April 26, 2021.[278] On May 18, 2021, Porter was included on Weed's NAV-1 email thread revealing earlier notification than documented in EEO records. EEO violated EEO-EEO-MD-110, Chapter 6, which states "Section 1614.108(b) of Title 29 C.F.R. requires that "the agency shall develop an impartial and appropriate factual record upon which to make findings on the claims raised by the written complaint."

---

[276] *Id.* at 3882-3883, last two paragraphs

[277] App'x 10 at 2131

[278] App'x 10 at 2090, para 1; App'x 10 at 2139

Further, after several denials, EEO-Avance admitted under oath that he informed Weed the same day the claim was filed, April 23, 2021, before Weed sent the 11:11am NAV-1 email. When questioned during deposition: "Q. And do you recall telling him in the conversation that you had before he sent this email ... that she ... had already filed an EEO complaint? A. I did. [279] Weed denied awareness before sending NAV-1, however, the contradiction shows Weed knew of Plaintiff's protected activity at the time of the NAV-1 email release. This contradiction is further corroborated by an altered version of Weed's NAV-1 email. A year later, Weed deliberately altered the email (referred to as NAV-2) from 11:11 AM to reflect 12:10 PM —an attempt to conceal the link between Plaintiff's EEO complaint and his retaliatory inquiry.

These facts are established by sworn admissions and contemporaneous documentary evidence, including native, time-stamped

---

[279] App'x 20 at 4631, lines 21-25

NAV-1 and NAV-2 emails that copied the named harasser. that same-day coordination, EEO Director. Under *Accardi v. Shaughnessy*, agency action taken in violation of binding procedural safeguards lacks legal force. But for that disclosure, the NAV-1 coordination, altered documentation, and subsequent adverse actions would not have occurred, satisfying *Babb v. Wilkie*'s causation standard as a matter of law.

**B. The EEO Director's Dual Role Constitutes an Accardi Violation Rendering All Derivative Proceedings Void**

Any one of these violations independently voids the proceeding under *Accardi*; together, they establish structural invalidity beyond cure. Under the *Accardi* doctrine, an agency's failure to follow its own binding procedural rules renders any resulting actions void. See *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954). When an agency promulgates rules designed to ensure procedural fairness—such as EEO Management Directive 110 (MD-110)—it is bound to follow them. Violations of these mandatory internal rules are not mere technicalities; they constitute structural defects that vitiate the integrity of the proceeding.

MD-110 requires a strict separation between EEO function and agency's

defensive roles:

> There must be a firewall between the EEO function and the agency's defensive function… Ensuring a clear separation between the agency's EEO complaint program and the agency's defensive function is thus the essential underpinning of a fair and impartial EEO complaints process" (MD-110, Ch. 1, § II)

### 1. Continual EEO Conflict of Interest

As previously shown, EEO regularly violated MD-110 . Altering the official

filing date from April 16 to 23, 2021, violating EEO-EEO-MD-110, Chapter 6

and Section 1614.108(b) of Title 29 C.F.R; disclosing the existence and

contents of Dr. Jackson's complaint to her supervisory chain of command

prior to official notification violated 29 C.F.R. § 1614.108(b) and MD-110,

Ch. 1 § 4(A)(1). See *supra* SOF § II – III, and VII.

### 2. EEO Ongoing Violations.

The EEO violations furthered in severity: In direct violation of AFI

36-2710 ¶ 4.12 and 29 C.F.R. § 1614.108(b), the EEO office actively

participated in strategy development with command officials, including the

harasser named in the complaint.  NAV-1 email thread demonstrates

ongoing and improper coordination between the EEO and agency defense functions of IG, JAG, and command leadership; thereby acting as agency defense versus EEO advocacy.

On May 13, 2021, Lt Col Weed contacted Kelly Ewert, Executive Director of Helping Agencies, stating he was "crowd sourcing possible approaches with IG and EO," and referenced a conversation with Director Avance about involving Ewert's office. Later that day, Ewert confirmed she had met with Avance and discussed a "potential course of action," noting that parties could reach out to either herself or Avance.[280] See TLR:29-30. This contemporaneous documentation confirms that Director Avance continued to coordinate with command personnel during the pendency of Dr. Jackson's complaint.

In follow-up communication, Lt Col Weed thanked participants for "piling onto this one." [281] (See TLR:31). During deposition, he explained

---

[280] App'x 10 at 2128; 3:53 pm

[281] *Id.* at 2127

that this phrase included the coordinated involvement of the JAG, IG, EEO, and Helping Agencies—all engaged before any impartial process had been initiated. These facts establish a clear and repeated breach of the MD-110 firewall.

### 3. Same-Day Collaboration (Accardi Violation and Independent Retaliation)

On the same day Dr. Jackson filed her EEO complaint, the EEO Director abandoned his neutral role and affirmatively collaborated with the named harasser to generate adverse personnel documentation. See *supra* SOF § II. Scott Davis admitted:

> On Friday morning, April 23, 2021, I made a phone call to the EO Director, Mr. Anthony Avance for guidance…Mr. Avance and I talked about how I would **document the issues raised in these complaints in her mid-term performance feedback**.[282]

---

[282] App'x 17 at 3882 Q3 para 3

Based on the  collaboration, Davis inserted a new allegation that Dr.

Jackson caused a "military–civilian divide" within SCOS.[283],[284] See *Supra*

SOF § IX. A   This contemporaneous, EEO-assisted collaboration with the

named harasser to insert stigmatizing allegations into Dr. Jackson's mid-

term appraisal violated MD-110's mandatory neutrality and firewall

requirements, constituting an *Accardi* **violation** and an **independent**

**retaliatory personnel action** by placing adverse material into her official

record immediately after protected activity. The downstream use of this

manufactured narrative—by the same EEO-advised actors and

accompanied by tangible personnel consequences—also implicates a

cognizable **stigma-plus** violation, addressed *infra* Arguments 3 and 5. .

### 4.    Mediation Violation.

---

[283] App'x 22 at 4917

[284] App'x 10 at 2200

Director Avance also violated procedural safeguards by assigning Lt Col

Weed as the EEO mediation authority for Dr. Jackson's claim. This

appointment contravenes 29 C.F.R. § 1614.105(f), which requires that

mediation be conducted by a neutral party with no conflicts of interest.

The Office of Special Counsel (OSC) determined that appointing conflicted

individuals to serve in mediation constitutes sanctionable misconduct. See

*OSC News Release 21-07 (Apr. 2021)* (Hill Air Force Base investigation).[285]  By

placing an interested party in a position of apparent neutrality, the EEO

office compromised the legitimacy of the entire mediation process.

### 5.    Parallel Proceedings  and Chain-of-Consumption

Director Avance remained on the NAV-1 email trail, aware of IG's plan of

soliciting evidence after-the-fact[286] and JAG's early legal concurrence, while

---

[285] U.S. Office of Special Counsel https://osc.gov/News/Pages/21-07-EEO-Director-Removed-Sexual-Harassment-Allegations.aspx bullet #4.

[286] App'x 10 at 2130

both admitted no allegations existed.[287] See *supra* SOF § IV.  In response to

Weed's request to investigate Plaintiff and IG's plan of solicitation,

statements gathering began 4 days after the EEO claim, April 27 – June 17,

2021, *supra* SOF §§ IV. and V. TLR:10-53.

Once again, Avance disclosed the status of Dr. Jackson's EEO claim to

LtCol Weed.  Avance shared when the claim was elevated.  Armed o'er with

EEO knowledge, Weed stated: "that's when we made the decision that we

could start the conversations about the CDI, informal Inquiry."[288] See *supra*

SOF § 0. EEO Disclosures Preceded…

Six days after solicitation ended, the informal inquiry began, June 23,

2021 – August 30, 2021. [289],[290]  See *supra* SOF § XII. and TLR:58, 82. About

---

[287] *Id.* at 2129

[288] App'x 21 at 4674, lines 6-12

[289] App'x 22 at 4830, para 1

[290] App'x 13 at 2731-2751

two weeks later the CDI started on September 13 - October 8, 2021.[291] (See *supra* SOF XIII. ; TLR:92,123; and SCR:1-57 columns H, I, J, and N). The preceding acts intervened and overlapped with the investigation of Dr. Jackson's EEO claims. Avance was fully aware of the preceding/following events by way of NAV-1 and through position authority as the EEO Director:

1. There were no allegations against Dr. Jackson

2. The named harasser, Scott Davis, submitted statements into the informal inquiry and CDI.

3. JAG described the situation as "broad" and "undefined" but provided legal concurrence.

4. Statements were solicited after-the-fact and "drilled down" into searching for allegations.[292] showing overlapping informal Inquiry, EEO

---

[291] CDI Appointment w Allegations submitted into EEO-1 Investigation (8I1M2100371) (Sep. 13, 2021), App'x 13 at 2847-2848; App'x 14, Part 2 at 2955-3352

[292] App'x 14, Part 2 at 3345; Unsigned

investigation, and CDI investigations. The solicited statements founded the Informal inquiry > the informal inquiry was consumed by the CDI, to which, Avance concurred as EEO "subject matter expert." [293] See *supra* SOF § VII. D and TLR: 69-131; 129. The CDI ROI was consumed into the EEO ROI, and the EEO ROI submitted to District Court for summary judgment ruling. See *supra* SOF §§ XIV. Chain-of-Record Creation and Consumption.

Based on the record comprised of EEO ROI tainted materials, the district court concluded: "Jackson did not suffer an adverse employment action even under the more lenient retaliation standard." [294]

Continuing…

> Jackson has not shown how either the climate inquiry or the CDI could be considered an adverse employment action. Under Eleventh Circuit case law, an employer investigation that did not cause any negative job consequences cannot be considered an adverse action for a retaliation claim.[295]

---

[293] App'x 20 at 4540 liines 20-25

[294] App'x 3 at 519

[295] *Id.* at 520

The agency's use of overlapping inquiries—the Informal Inquiry, CDI, and EEO investigation—arising from the same protected activity and directed by the same officials violated EEO-MD-110's mandatory neutrality and independence requirements. The record shows that EEO Director Avance both disclosed the complaint and later provided subject-matter expertise to a CDI initiated by officials named in that complaint, creating a structural conflict that voids all derivative proceedings under *Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954).

Administrative proceedings are likewise invalid where agency decisions are tainted by new and material information that the employee had no opportunity to address. As the Eleventh Circuit held in *Stone v. FDIC*, 179 F.3d 1368, 1376 (Fed. Cir. 1999), such contamination constitutes a due process violation—precisely what occurred here, where allegations were generated through improperly initiated inquiries outside the EEO process and then fed back into the adjudicatory record.

This foundational breach tainted the evidentiary basis upon which the district court relied and infected the legal analysis that followed. The

prima facie elements are therefore established as a matter of law: undisputed protected activity, retaliatory knowledge, materially adverse coordination, and but-for causation. The following section addresses each element and the district court's reversible errors.

## C. Retaliation Liability Established as a Matter of Law (Prima Facie)

By accepting the agency's post-EEO materials as legitimate evidence, the district court committed reversible legal error at every stage of the analysis. Specifically, the court: **(1)** failed to credit direct evidence as required by *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997); **(2)** improperly compartmentalized coordinated conduct instead of evaluating the record cumulatively, contrary to *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993), and *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002); **(3)** drew inferences against the non-movant in violation of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and *Tolan v. Cotton*, 572 U.S. 650, 657–60 (2014); and **(4)** applied a private-sector but-for causation standard under *University of Texas Southwestern Medical Center v.*

*Nassar*, 570 U.S. 338 (2013), rather than the federal-sector "any-part" causation standard mandated by *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–74 (2020).

### 1.    Element 1: Protected Activity

Dr. Jackson filed an informal EEO intake on April 23, 2021 at 6:53 a.m., naming Scott Davis as her harasser and alleging race and sex discrimination. (EEO Intake, Appx. 2125.) This is undisputed protected activity under Title VII. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014).

### 2.    Element 2: Material Adversity (*Burlington Northern* Standard)

An action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

As previously detailed, in *supra* § B. EEO Dual Role…about four hours of Dr. Jackson's EEO activity established in element 1, LtCol Weed

sent NAV-1 email—marked "**Importance:** High"[296]—to IG, JAG, EEO

Director Avance, and **Scott Davis himself**, initiating multi-agency

coordination. [297] See *supra* SOF § II. Weed requested "follow-on

supervisor/command action"[298] against Dr. Jackson. The contemporaneous

emails confirmed no allegations. Yet, IG Clark instructed LtCol Weed to

solicit information from "junior folks," explaining: "Once we gather and

drill down into what is being reported, we would work with SJA to

address possible 'allegations' worth inquiring into," to address possible

allegations. JAG then characterized the matter as "broad" and "undefined,"

yet concurred: "I concur with what they've proposed… Please let us know

if we can help"—thereby aligning JAG legal office with IG's plan to

---

[296] App'x 10 at 2131. 11:11am

[297] *Id.* at 2127-2137

[298] "Follow-on supervisor/command action" reflects Unlawful Command Influence
(UCI), what the Court of Military Appeals termed 'the mortal enemy of military justice.'
*United States v. Thomas, 22 M.J.* 388, 393 (C.M.A. 1986).

develop allegations after "drilling down" to support conducting a climate "inquiry" [informal inquiry]. See *supra* SOF §§ II.

The EEO Director, the Inspector General, JAG Attorneys, first-, second-, and third- level supervisors, Helping Agencies which included the Chaplain and Mental Health services, all collaborating with the complainant's named harasser hours after filing—is materially adverse as a matter of law. The acts would plainly "dissuade a reasonable worker from making a charge of discrimination." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008). No reasonable worker would file an EEO complaint knowing the institutional response would be to coordinate with the named harasser within hours to plan an investigation of the complainant, then permit the harasser to submit statements in the investigations against the accuser.[299] See *supra* SOF § XII. ; TLR:93; SCR:11, Columns F, J, K, and N.

---

[299] App'x 14, Part 2 at 2849; App'x 22 at 4836,4846, 4853 (Witness #9)

Weed's own characterization confirms the nature of this alignment: "crowd-sourcing possible approaches with IG and EO" seeking "full buy-in and advocacy across the key agencies," "thanks to the IG/EO/JA team" for "piling onto this one."[300]

The district court failed to address NAV-1's inclusion of the named harasser, Weed's admissions of "crowd-sourcing" and "piling onto this one," and the significance of same-day coordination, instead isolating only later formal mechanisms—the Informal Inquiry and CDI—as potential adverse actions. That approach misapplies *Burlington Northern*'s totality-of-the-circumstances standard and disregards *Accardi*, where agency action taken in violation of mandatory procedures cannot be credited.

The court disregarded the EEO Director violated EEO Management Directive 110 (MD-110) and 29 C.F.R. § 1614.108(b) mandating strict adherence to procedural integrity, including confidentiality, impartiality,

―――――――――――――――――

[300] App'x 10 at 2126-2131

172

and the prohibition of retaliation. IG and JAG compounded the issues, *supra* Argument 1.

Under Rule 56, the undisputed record establishes that same-day, multi-agency coordination—explicitly involving the named harasser and initiated within hours of protected activity, in the acknowledged absence of any allegations—constitutes materially adverse action as a matter of law. The district court's contrary conclusion reflects legal error and requires reversal with entry of judgment for Dr. Jackson.

### 3. Element 3: Causation Under *Babb*'s Federal-Sector Standard

Although *Babb v. Wilkie* arose in the age-discrimination context, its holding rests on the federal-sector statutory requirement that personnel actions be made "free from" prohibited considerations. That process-based causation standard applies equally to federal-sector retaliation claims arising from protected EEO activity. Liability attaches where retaliation played **any part** in the personnel process, regardless of whether the ultimate outcome would have differed. See *Babb v. Wilke*, 140 S. Ct. at 1173–77.

**a. *Protected Activity → Premature Disclosure.***

EEO counseling is statutorily protected activity. Direct admissions that the filing entered the decision stream constitute direct evidence of retaliatory causation and must be credited at summary judgment. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11th Cir. 2014); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997).

*Building on Element 1:* The protected activity triggered an immediate, unauthorized response. See *supra* §S I. A Dispositive… and B. EEO Director's Dual…. EEO Director Avance's sworn deposition establishes unauthorized disclosure of Dr. Jackson's EEO filing to LtCol Weed *before* the 11:11 a.m. NAV-1 coordination email—three days prior to official notification date.[301] (Avance Dep. at 13-14.) Avance explicitly warned Weed that proceeding "could be perceived as reprisal" because "these things were

---

[301] App'x 10 at 2139

going on at the same time." [302] An admission that a contemplated response "could be perceived as reprisal" because of contemporaneous EEO activity constitutes direct evidence of retaliatory causation and requires no inference as to motive. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189. Under the federal-sector standard, Avance's warning was immediately followed by coordinated action establishes that protected activity "played any part" in the decision-making process. *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020).

The district court erred when stating: "Avance told Weed that Jackson filed an EEO complaint, so Weed decided to hold off on conducting a CDI at that time."[303] Disregarding the intermediate statements and undated comment card solicitations from April 27 – June 17, 2021, after

---

[302] App'x 20 at 4539:17-20

[303] App'x 3 at 488, 502

the EEO claim.[304, 305]  Also, the district court adopted the agency's asserted

chronology by treating the informal inquiry as "in direct response" to

subordinate comment cards,[306] thereby accepting—at summary

judgment—the agency's claim the cards pre-dated Plaintiff's April 23 EEO

filing.[307] See *infra* III. C *Exaggerated Characterizations and Temporal*

*Impossibility*. The ruling resolved a timing question in the agency's favor

and foreclosed consideration of documentary and testimonial evidence

placing solicitation of those materials weeks after protected activity, [308]

disregarding direct evidence to the contrary. See *supra* SOF §§ IV. and V.

### b. *Premature Disclosure → Same-Day Multi-Actor Coordination*

———————————

[304] MFR Statements, Appx. 10 at 2146-2165; 2176-2196; 2294-2305; 2317-2325; Appx. 11 at 2460-2472

[305] Undated Comment Cards, Appx. 10 at 2167-2174

[306] App'x 21 at 4754-4755, lines 14-2

[307] App'x 3 at 513

[308] App'x 21 at 4754-4755, lines 14-2

Close temporal proximity plus contemporaneous, cross-office coordination

is probative of retaliatory causation; contemporaneous documentary

evidence (native email metadata) is highly probative at Rule 56. *Clark*

*County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001); *Zaklama v. Mount Sinai Med.*

*Ctr.*, 842 F.2d 291 (11th Cir. 1988).

The NAV-1 email serves as the contemporaneous documentary proof

of the institutional alignment triggered by the disclosure established in

*supra* § Step 1, § I. C.1 and Argument 1 §§ I. A  ; I. B. This multi-agency

coordination, occurring the same day as the protected activity, is direct

evidence of a retaliatory causal chain. *Clark County Sch. Dist. v. Breeden*, 532

U.S. 268 (2001); *Zaklama v. Mount Sinai Med. Ctr.*, 842 F.2d 291 (11th Cir.

1988). By integrating the accused harasser into the multi-agency response

at the exact moment protected activity entered the decision-stream. The

district court's compartmentalization contradicted the Rule 56 obligation in

the non-movant's favor.

The undisputed record establishes but-for causation for remedies.

*Babb v. Wilkie*, 140 S. Ct. 1168, 1177–78 (2020). Prior to the 6:53 a.m. April 23

EEO filing, no allegations existed, as confirmed by the NAV-1 email;

without that disclosure, the ensuing coordination, solicitation,

investigations, and adverse findings would not have occurred. This follows

directly from the timeline. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176

(2009).

### D.  The District Court's Compartmentalized Analysis Obscured the Structural Reality

The district court acknowledged Avance's disclosure.[309] Yet fragmented the

agency's actions into isolated incidents, analyzing each stage without

examining Avance's continuous involvement or the derivative nature of

each subsequent proceeding. This compartmental treatment violated the

court's obligation to view the record holistically and draw inferences for

the non-movant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

(2000).  Once the EEO Director breached mandatory confidentiality on

April 23, 2021, every downstream step—the Informal Inquiry, the CDI, and

---

[309] App'x 3 at 488

the EEO ROI—rested on a procedurally defective foundation. Under

*Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954), agency action taken after a

violation of mandatory procedures is void as a matter of law.

### E.   Exhaustion Is Excused

The district court dismissed Appellant's constructive-discharge claim for

failure to exhaust administrative remedies. [310] The dismissal is legal error:

exhaustion does not apply where the agency corrupts the administrative

process. An agency may not invoke procedural prerequisites after violating

mandatory safeguards governing neutrality and process integrity. *Accardi*

*v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235

(1974). Consistent with those principles, the Eleventh Circuit excuses

exhaustion where the administrative process is compromised or rendered

unreliable. *Mincey v. U.S. Postal Serv.*, 206 F. App'x 872, 875–76 (11th Cir.

2006); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012).

---

[310]  *id.* at 515–18.

As detailed *supra Argument 1. EEO's Dual Role*, the EEO director's

unauthorized disclosure, compounded by IG and JAG violations,

contaminated the administrative process at inception. The same

institutional actors responsible for safeguarding neutrality instead initiated

and supervised the tainted sequence. Exhaustion is therefore excused as a

matter of law, and remand to that same process would merely recycle the

defects. *Accardi*, 347 U.S. at 267; *Mincey*, 206 F. App'x at 875–76; *Elgin*, 567

U.S. at 23.

### F.   Remand Would Be Futile

Remand would serve no lawful purpose. Once evidence derived from the

April 23 procedural breach is excised under *Accardi*, the agency is left with

no admissible, non-retaliatory justification to support summary

judgment.[311,] [312, 313] An appellate court may direct entry of judgment as a matter of law where, after removing erroneously credited evidence, the remaining record permits only one conclusion. *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189 (11th Cir. 2004).

The causal chain is undisputed and unbroken. Same-day disclosure of the EEO complaint triggered coordinated action; post-hoc materials were solicited to justify that response; a procedurally defective Informal Inquiry was consumed by an unsigned CDI; the CDI was incorporated into the EEO ROI; and that tainted record was relied upon at summary judgment. At no point was the process "made free from" retaliatory considerations, as required by *Babb v. Wilke*. Before April 23, 2021, Dr. Jackson's personnel file

---

[311] App'x 10 at 2127-2131; App'x 13 at 2731-2751; App'x 14, Part 2 at 2956-3352

[312] MFR Statements, Appx. 10 at 2146-2165; 2176-2196; 2294-2305; 2317-2325; Appx. 11 at 2460-2472

[313] Undated Comment Cards, Appx. 10 at 2167-2174

reflected only excellence. But-for the EEO Director's April 23, 2021

unauthorized disclosure, the NAV-1 coordination, post-hoc solicitation of

allegations, Informal Inquiry, Command-Directed Investigation, adverse

findings, and constructive discharge would not have occurred, satisfying

*Babb v. Wilkie's* but-for requirement for remedies.

## G. Conclusion

For the reasons set forth above, the undisputed record establishes

retaliation as a matter of law, and the Court should reverse the district

court's judgment and render judgment in Appellant's favor, with relief to

follow under the governing constitutional and statutory frameworks. *See*

*Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000); *Babb v. Wilkie*, 140 S. Ct.

1168, 1178 (2020); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189,

1194 (11th Cir. 2004).

## II. Argument 2. Whether the District Court Erred in Granting Summary Judgment by Failing to Apply the Required Cumulative Analysis to Plaintiff's Interrelated Claims, Despite Evidence Establishing a Sustained Pattern of Coordinated Retaliation as a Matter of Law

All facts, violations, and evidentiary standards established in Argument 1 are incorporated by reference, including the cited record evidence demonstrating the EEO Director's MD-110 violations enabling same-day coordination; multi-agency alignment within hours of protected activity; sworn admissions constituting direct evidence; temporal impossibility and document alteration; procedurally defective investigatory products under *Accardi* and Rule 901; process taint under *Babb*; and structural futility under *Mincey*. See *supra* Argument 1.

Rather than analyzing this coordinated campaign as an integrated course of conduct, the district court improperly segmented and isolated events. This fragmented approach is contrary to controlling precedent requiring a cumulative analysis of harassment or retaliation that occurs over time. See *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269 (11th Cir.

2002); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

This argument applies the five-element hostile work environment framework articulated in *Miller*, with *Harris* governing severity and *Adams* supplying the standard for employer knowledge. See *Miller*, 277 F.3d at 1275; *Harris*, 510 U.S. at 23; *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014). When properly aggregated, the undisputed record satisfies each *Miller* element as a matter of law.

## A. Element 1 - Protected Class.

Dr. Jackson is a Black woman, satisfying the protected-class requirement as a matter of law. *Miller*, 277 F.3d at 1275.

## B. Element 2 - Unwelcome Harassment

Harassment must be unwelcome. *Miller*, 277 F.3d at 1275. EEO complaints constitute explicit notice conduct is unwelcome. Dr. Jackson repeatedly and expressly notified the agency that the conduct was unwelcome, including the following documented instances:

1. **September 30, 2019.** EEO intake about supervisor and then co-worker, Scott Davis.[314]  See *supra* SOF § I. B

2. **November 12, 2020.**  Dr. Jackson gave written notice to her supervisor, Larry Holmes, expressly identifying a "seemingly hostile working environment" and documenting exclusion from leave processes, solicitation of negative opinions, and public placement of disparaging materials for subordinate view.[315]

3. **February 2021.**  Initial EEO contact[316] *Supra* SOF § I. B

4. **April 23, 2021 -** Informal EEO claim filed.[317, 318] See *supra* SOF § II. *supra* Argument 1.

---

[314] App'x 6 at 1194

[315] Email, Pl to Holmes Hurtful Printer Issue (Nov. 12, 2020), App'x 9 at 1856

[316] App'x 9 at 1942-1943

[317] App'x 10 at 2087, 2089-2090 § G

[318] App'x 10 at 2125

5. **September 13, 2021** – EEO Claim[319]

6. **September 20, 2021 -** Provided explicit written notice objecting to the Chaplain's emails and safety concerns.[320] SOF § XV. A

7. **December 13, 2021** – EEO claim[321]

These successive complaints spanning from September 2019 through December 2021---covering over two years---constitute explicit, repeated notice that conduct was unwelcome. Under *Miller*, EEO complaints and written objections to leadership provide unequivocal notice. 277 F.3d at 1275.  Element 2 proven as matter of law.

### C.  Element 3 - Based on Protected Characteristic

Harassment must be based on a protected characteristic. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Retaliatory adverse

---

[319] EEO Accept Amend 2 (Sep. 13, 2021), App'x 13 at

[320] App'x 13 at 2904

[321] App'x 15 at

actions in response to protected EEO complaints about discrimination satisfy this element. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005); see GLS § Employment Defamation.

The coordinated institutional response was initiated around four hours of Dr. Jackson's race discrimination complaint. *See supra* Argument 1 and SOF § III.C. The multi-agency coordination involving IG, JAG, EEO, three levels of Command, and the named harasser himself occurred the same morning Dr. Jackson filed her EEO complaint objecting to Davis's explicit racial harassment. *See supra* Argument 1; SOF §§ I. B and XV. C

The district court erred by requiring Dr. Jackson to prove harassment was "based on race" *independent of* the retaliation.[322]  When harassment consists of retaliatory adverse actions taken *because of* protected EEO activity complaining of race discrimination, the "based on" element is satisfied as a matter of law. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir.

_____

[322] App'x 3 at 521

2005). The coordinated institutional response to Dr. Jackson's race discrimination complaint therefore satisfies Miller Element 3 without requiring proof that each retaliatory act independently reflected racial animus.

Retaliatory adverse actions satisfy *Miller* Elements 2 and 3 because: (1) EEO complaints constitute notice conduct is unwelcome, and (2) retaliation for protected activity complaining of discrimination is inherently based on that protected activity. The coordinated response to Dr. Jackson's race discrimination complaint satisfies these elements without requiring separate proof of race-based animus in each retaliatory act. *Galdamez*, 415 F.3d at 1023. Element 3 proven as matter of law.

### D. Element 4 – Severe or Pervasive Harassment Altering the Terms and Conditions of Employment

To satisfy Miller's fourth element, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create an abusive working environment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

This element is evaluated under the totality-of-the-circumstances framework articulated in *Harris v. Forklift Systems, Inc.*, which examines (1) frequency, (2) severity, (3) physical threat or humiliation, and (4) interference with work performance, 510 U.S. 17, 23, and requires all conduct be cumulatively rather than fragmented, *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17. The examination is limited to conduct experienced by the plaintiff during employment. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014). When Miller's fourth element is evaluated through *Harris*'s factors, applied cumulatively under *Morgan*, and constrained by *Adams*'s contemporaneous-awareness requirement, the undisputed record establishes severe and pervasive harassment as a matter of law.

### 1.    Harris Factor One – Frequency and Duration

The harassment here was continuous, escalating, and sustained over 285 days. Within around 4 hours of Dr. Jackson's April 23, 2021, EEO filing, EEO, IG, JAG, and LtCol Weed and Scott Davis, the named harasser—

initiated an investigative action despite the absence of any predicate allegations. See *Supra* Argument 1, § I. C and SOF § II.  The coordination triggered a sequence of events spanning April 23, 2021 and past February 2022.  See TLR:1-187. The full chronology—spanning retaliatory investigations, evidence solicitation, sham investigative processes, reputational accusations, targeted communications, continued harassment after written objection, false allegations, and escalation during protected FMLA leave —is set forth in *supra* SOF §§ II. Same-day through  XIII. CDI Investigation; XV. XVI. FMLA, and XVII. Health, also synthesized in SOF § XIV. *Chain-of-Record Creation and Consumption*. Further detailed in the following § and *infra* Argument 3 § Humiliation. Viewed cumulatively, under *Harris and Morgan*, the frequency and duration of this conduct is pervasive.

### 2.    Harris Factor Two – Objective Severity and Professional Humiliation

The harassment was objectively severe.  The severity of the harassment is established by the nature of the conduct, not merely its duration. As

detailed *supra* SOF §§ II. Anguish and Pleading Cries, IX. Division and Suicide Threat, X. Racial Animus, XI. Allegation Shifting, XII. through XVI.

Dr. Jackson was subjected to formal investigations and official findings falsely portraying her as "bullying," "racially biased," and professionally unfit—accusations embedded in formal investigations and circulated through the chain of command—strike at professional integrity and dignity and constitute severe harassment under *Harris.*

The humiliating character of these accusations is further magnified by their mirror-image nature and immediate institutional dissemination. At 6:53 a.m., Dr. Jackson filed an EEO complaint alleging race discrimination. *See* SOF § III.C. About four hour later LtCol Weed accused her of "potentially racially discriminatory" conduct and communicated that accusation to every trusted institutional actor charged with protecting

employees from discrimination—including the EEO Director, JAG attorneys, Inspector General officials, and Helping Agencies.[323]

Accusing a discrimination complainant committing the same type of discrimination she has just reported is a recognized retaliatory tactic designed to discredit the complaint and invert moral blame. *See EEOC v. Sundance Rehabilitation Corp.*, 466 F.3d 490, 500–01 (6th Cir. 2006); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).

The timing forecloses any innocent explanation. Weed claimed concerns  of "overbearing control, lack of trust/empowerment, potential racial discrimination and…restriction [ongoing] over the last months**."**[324] The timing forecloses any innocent explanation. Weed claimed concerns "overbearing control," "lack of trust," and "potential racial discrimination" supposedly **[ongoing] over the last months**" Yet no action was taken until the precise day—within hours—of Dr. Jackson's EEO filing.

---

[323] App'x 10 at 2131

[324] *Id.* at

The chronology concludes: the accusations did not exist until the complaint did. This retaliatory inversion, broadcast through official investigative channels, was not merely adverse—it was inherently humiliating, branding a Black senior federal employee as racially biased at the very moment she sought protection from racial discrimination. Under *Harris*, this conduct weighs heavily toward objective severity.

### 3. Harris Factor Three – Physically Threatening or Humiliating Conditions

The harassment escalated into objectively threatening conduct and persisted after explicit written notice, satisfying *Harris's* third factor. See *infra* Argument 3. On September 20, 2021, Dr. Jackson formally notified Deputy Director Willcox and the new 96CS Commander, who took turnover from LtCol Weed, that the chaplain's emails caused concern for her safety and that of her family and requested intervention. [325] *See* SOF § XV. A Written Notification. Rather than addressing the concern, leadership

---

[325] App'x 13 at 2904

took no corrective action, the emails continued. The very next day another

chaplain's message: "It's real life. And in real life, you can't always win."[326]

See *supra* SOF §§  VIII. Chaplain's Email and XVI. FMLA;   TLR: 32, 37, 39,

42, 44, 48, 55, 71, 76, 83, 126, 132, 135, 140, 141, 144)

During approved FMLA leave, Dr. Jackson was required to monitor

email[327]  while the chaplain's messages persisted and intensified,

culminating—after her return for out-processing—in a final message

invoking being "stabbed in the ribs," forced to "fight to the death," and

losing "position, power, and respect."[328] See SOF §§ VIII. XV.  FMLA, and

XVI. A Out-Processing.  Dr. Jackson objected in writing, describing the

imagery as threatening and asking, "When does this end?" stating her

concerns were "taken as a joke." [329]  Leadership trivialized the concern, and

---

[326] App'x 13 at 2923

[327] App'x 4 at 692, #12

[328] App'x 15 at 3556

[329] *Id.* at 355-3556

the emails ceased only immediately before her final separation. See SOF §§ XVI.

The threatening character of the chaplain's reflects tight temporal clustering between (1) Weed's NAV-1 crowdsourcing for Helping Agency (TLR: 29-31); (2) a documented suicide threat and its attribution to Dr. Jackson (TLR: 41–42; 97; 101); (3) Dr. Jackson's written notice expressing concern for her safety, and (4) the chaplain's continued messaging after notice. This sequencing establishes objective severity under *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23.

Under *Harris*, conduct need not involve physical contact to be physically threatening; intimidation and violent imagery that instill fear— particularly when continued after notice—satisfy this factor. Id. The record therefore establishes objective threat as a matter of law. The threatening environment interfered with Dr. Jackson's ability to perform core supervisory functions, persisted during protected FMLA leave, and rendered continued employment untenable. See SOF §§ XV. through XVI.

### 4. Harris Factor Four – Interference with Work Performance

Harassment interferes with work performance when conduct undermines supervisory authority and alters the conditions under which work must be performed. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Where that interference renders continued employment objectively untenable, constructive discharge follows. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).

### a. *Immediate and Structural Interference With Supervisory Authority*

From April 23, 2021 forward, Dr. Jackson was placed in a no-win supervisory environment that made effective management impossible: If she enforced professional standards or discipline, subordinates reacted emotionally, accused her of bullying or harassment, and leadership credited those accusations; If she refrained from enforcement, dysfunction escalated and was later cited as evidence of leadership failure; If she sought supervisory support, her concerns were dismissed while false allegations against her were validated and amplified. See SOF §§ X.

After MSgt Shull and 2Lt Nelson failed to report a suicide threat as required, Dr. Jackson issues corrective counseling. [330] That counseling was later reframed as bullying and harassment, and Shull submitted an EEO claim against her.[331] See *supra* SOF § IX. Suicide; TLR:40-1, 41-1

SSgt Rowbotham displayed visible hostility toward Dr. Jackson. When she addressed his conduct as a supervisor, the interaction was recast and harassment and bullying, used to support allegations against her. [332] Rowbotham filed an EEO claim against Jackson, which Rowbotham states caused the CDI investigation.[333] See *supra* SOF § X. E No-Win.

Dr. Jackson was expected to sign perfect annual appraisals who filed or supported accusations against her. When she declined, leadership treated the refusal as reprisal. In her pre-resignation statement, Dr. Jackson

---

[330] App'x 13 at 2802, para 4.24

[331] App'x 17 at 3863, Q3

[332] App'x 19 at 4200, lines 19-23

[333] App'x 16 at 3800, Q6.

explained. "If I sign, it's wrong, but I am falsely accused if I don't sign. These are examples of what has become my norm."[334] (See *supra* SOF § XV. C. Resignation).

These dynamics impaired Dr. Jackson's supervisory authority. Routine management decisions were converted into grounds for accusation and investigation, and authority could not be exercised without personal risk; resulting in interference with work performance under *Harris*. 510 U.S. at 23.

### b. *Contemporaneous Breakdown of Command Function*

The interference occurred **during employment**. In sworn testimony, Dr. Jackson explained that ongoing investigations, false narratives, and leadership responses impaired her ability to perform Branch Chief duties while the conduct was unfolding. [335] Dr. Jackson was excluded from meetings, bypassed in decision-making, denied access to work products

---

[334] App'x 15 at 3528, para 3; 3527-3536

[335] App'x 15 at 3539-3541

necessary to perform her role.[336]  These actions directly interfered with

supervision, staffing, and operational control. [337] TLR: 33-35.

### c. *Investigations as Instruments of Interference*

The investigations themselves consumed the work environment. False

narratives were inserted into performance documentation, authority was

undermined before subordinates, and management actions were reframed

as misconduct, See immediately preceding §§ a. and b. Interference under

*Harris* includes converting the workplace into a forum of accusation and

surveillance that impedes performance. 510 U.S. at 23.

### d. *Resulting Constructive Discharge*

This interference escalated into conditions no reasonable supervisor could

endure. Dr. Jackson was forced onto protected FMLA leave and ultimately

---

[336] Pl Jackson, Supplemental Declaration #2 Amendment (Sep. 17, 2021), App'x 13 at 2894, Q4

[337] Alpha Roster Info (Klus) (May 13, 2021), App'x 11 at 2252-2248; Alpha Roster Release Schedule Image(Klus) (May 13, 2021), App'x 11 at 2254; Email, Front Office Pl to See Klus for Alpha Rosters (Jun. 09, 2021), App'x 11 at 2242

resigned.[338] See *supra* SOF § XV. and XVI.  TLR: 139. Where official acts and structural interference make continued employment intolerable, constructive discharge is established as a matter of law. *Suders*, 542 U.S. at 141.

### 5. Adams Requirement – Contemporaneous Awareness During Employment

Consistent with *Adams v. Austal, U.S.A., L.L.C.*, the conduct supporting Element 4 was experienced, documented, and challenged by Dr. Jackson during her employment, satisfying *Adams*'s contemporaneous-awareness requirement. As established in **Element 2**, and  Dr. Jackson repeatedly documented the hostile conditions in sworn EEO declarations, during the Informal Inquiry process, within the CDI record, and through multiple EEO complaints and amendments—all submitted while she was actively employed.

---

[338] App'x 15 at 3527-3529; App'x 15 at 3538-3541

While on FMLA leave, Dr. Jackson formally resigned and expressly identified the hostile work environment as the cause. In her resignation letter, she described ongoing harassment, false accusations—including discriminatory hiring allegations—humiliation, reputational damage, and continued hostile communications, stating that conditions had become "intolerable" and that she was "forced to resign." See *supra* SOF § XV. and XVI.  TLR: 139.

### 6.    Harris Totality-of-the-Circumstances Synthesis

The district court concluded that Dr. Jackson suffered no adverse employment action, characterizing her resignation as non-constructive and dismissing the chaplain's emails, supervisory comments, and subordinate conduct as "trivial harms, petty slights, minor annoyances, and simple lack of good manners."[339]

---

[339] App'x 3 at 519

The conclusion reveals a fragmented analysis forbidden by *National Railroad Passenger Corp. v. Morgan*, which requires courts to assess interrelated conduct cumulatively rather than isolating and dismissing each component. 536 U.S. 101, 115–17 (2002). When months of coordinated conduct—violent-imagery emails, fabricated investigative accusations, stripping of supervisory authority, continuation after written safety objections, and harassment during protected FMLA leave—are evaluated together, the conduct cannot be deemed trivial as a matter of law.

Under *Miller v. Kenworth of Dothan, Inc.*, *Harris v. Forklift Systems, Inc.*, *Adams v. Austal, U.S.A., L.L.C.*, and *Morgan*, the undisputed record, viewed cumulatively, establishes severe and pervasive harassment altering the terms and conditions of Dr. Jackson's employment as a matter of law.

### E.  Element 5 – Employer Liability

Employer liability is established as a matter of law. The hostile environment was created by supervisory and management officials acting within the scope of their authority, rendering the Air Force vicariously

liable. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Liability is established here on both grounds.

Liability is independently established through negligence. On

September 20, 2021, Dr. Jackson provided explicit written notice that the

ongoing conduct was unwelcome, humiliating, and threatening of safety.

Despite actual notice, the Air Force took no remedial action.[340, 341] The

harassment instead continued for months—through continued chaplain

communications, work demands during protected FMLA leave, reliance on

tainted investigatory products, and escalation culminating in constructive

discharge. (See *supra* SOF §§ XV. FMLA, XVI. Out-Processing, Arguments 1

and herein, Argument 2). An employer's failure to act after actual notice

establishes liability as a matter of law. *Miller*, 277 F.3d at 1275. Because the

hostile environment was created by supervisors acting within the scope of

---

[340] App'x 13 at 2904

[341] App'x 15 at 3555

their authority and persisted after explicit notice without remediation, employer liability is established as a matter of law. *Miller*, 277 F.3d at 1275.

### F.   The District Court Ignored the Common Origin of the Harassment: the EEO Director's Unauthorized Disclosure

The district court's fragmentation error is dispositive because the record establishes a single, undisputed origin for the challenged conduct: the EEO Director's unauthorized same-day disclosure of Dr. Jackson's protected EEO activity. See SOF § III.C. That disclosure immediately exposed Dr. Jackson to the very officials and offices from which the EEO process is designed to shield complainants.

Within hours, supervisory officials, JAG attorneys, the Inspector General, and the named harasser coordinated action against her, triggering a continuous sequence of retaliatory conduct—NAV-1 coordination, after-the-fact evidence solicitation, chaplain messaging, tainted investigations, and continued harassment after written safety objections. Each act flowed from, and depended upon, the initial disclosure. Treating these events as isolated "petty slights," rather than as components of a single disclosure-

driven campaign, is precisely the analytical error *National Railroad Passenger Corp. v. Morgan* forbids. *536 U.S. 101, 115–16 (2002).* By severing later harassment from its unlawful point of origin, the district court erased the causal through-line that renders the conduct severe and pervasive when viewed cumulatively. That error alone requires reversal.

### G. Conclusion.

For the reasons set forth above, the Court should reverse the district court's judgment and render judgment as a matter of law in Appellant's favor, with relief to follow under the governing constitutional and statutory frameworks. *Weisgram v. Marley Co., 528 U.S. 440, 457 (2000); Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194 (11th Cir. 2004);  Babb v. Wilkie, 140 S. Ct. 1168, 1178 (2020); Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001).*

### III. Argument 3: Whether the District Court Erred in Granting Summary Judgment by Accepting Employer Justifications That Are Conclusively Contradicted by Record Evidence, Where Such Contradiction Mandates Judgment as a Matter of Law

All facts, evidence, and legal violations established in Arguments 1 and 2 are incorporated by reference. See *supra* Arguments 1–2. Under Federal Rule of Civil Procedure 56, summary judgment cannot be granted by crediting employer justifications that are conclusively contradicted by undisputed record evidence or derived from procedurally defective processes. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000); *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Where agency action rests on evidence generated in violation of mandatory procedures, that evidence cannot sustain judgment as a matter of law. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974). When the remaining admissible record is so one-sided that no reasonable juror could find for the employer, reversal with entry of judgment is required. *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52

(1986).  The district court committed multiple independent errors by accepting employer justifications that collapse under the undisputed record. Each error independently mandates reversal and judgment as a matter of law.

### A.  Baseless Investigation

Before April 23, 2021, Dr. Jackson's professional record spanned more than three decades of exemplary service. She is a retired Navy officer, a disabled veteran, and served over ten years as a federal civilian with the Air Force, including five years in her most recent leadership role. See *supra* § II. B Professional Background.  Her record includes "Civilian of the Year" (2019), three Civilian of the Quarter awards, and repeated commendations for leadership grounded in trust, empowerment, and service. [342] See *supra* SOF § I. Professional Background.

---

[342] App'x 5 at 953

Before EEO filing, LtCol Weed consistently praised Dr. Jackson and her team. On February 25, 2021, Weed wrote: "You guys are absolutely the front-line of the squadron, and you continue to represent us well every day. Keep crushing it."[343] No disciplinary actions, performance concerns, or complaints appear anywhere in the record before April 23, 2021.

That same leadership posture abruptly reversed on April 23, 2021. At 6:53 a.m., Dr. Jackson filed a protected EEO complaint. At 11:11 a.m.—just over four hours later—Weed accused Dr. Jackson of "racial discrimination" and initiated coordinated investigative action.[344] See NAV-1. Four days later, between April 27 and June 2021, command officials solicited twenty-one statements against Dr. Jackson alleging lack of

---

[343] Pl Branch Kudos (Feb. 25, 2021), App'x 9 at 1953-1954

[344] App'x 10 at 2131

empowerment, union-related issues, and failure to support junior personnel.[345] *Supra* SOF § IV.

The NAV-1 and solicited statement allegations directly contradict the contemporaneous documentary record. Dr. Jackson's 2020 annual appraisal—issued only months earlier—assigned the highest possible rating in all five performance elements, explicitly crediting her with empowering team leads, managing Executive Committee collaboration, and forging trusted relationships with Eglin AFB union leadership.[346]

The same record refutes any claim of racial bias. Before the EEO complaint, 96 CS leadership selected Dr. Jackson to address the entire squadron on race relations following the death of George Floyd.[347] Her DEIA materials received affirmative endorsement. LtCol Weed

---

[345] MFR Statements, Appx. 10 at 2146-2165; 2176-2196; 2294-2305; 2317-2325; Appx. 11 at 2460-2472

[346] App'x 8 at 1492-1494

[347] App'x 8 at 1714

documented Dr. Jackson was "respected and empowered by unit leadership" and entrusted to lead squadron-wide discussions on bias, racism, and discrimination, describing the presentation as the "gold standard" for the 96th Test Wing. [348]

Under oath, Lt. Col. Weed confirmed that throughout his tenure supervising Dr. Jackson, no disciplinary actions occurred, no management actions occurred, and no conduct warranted discipline of any kind. Weed testified that Dr. Jackson remained professional, calm, and composed in all interactions and that no firsthand observations supported allegations of bullying, intimidation, harassment, or misconduct. Weed further testified that later allegations did not arise from personal observation but were relayed through others or reflected in comment cards—materials the record establishes were solicited weeks after the EEO filing.[349] See *supra* SOF § X.F.4.

---

[348] App'x 16 at 3752, (second hyphen, second sub-bullet)

[349] App'x 21 at 4691- lines 5-24

The chronology is undisputed. At 6:53 a.m., protected activity occurred. At 11:11 a.m., investigative coordination began. The ROI confirms that Dr. Jackson had never been informed of any allegations before that moment. See ROI at 0280; Jackson Decl. (May 26, 2021) at 22 ¶ 8. No complaints existed before that morning. No misconduct had been alleged. No factual predicate supported investigation.

The narrative reversal—from documented commendation to accusations—occurred only after protected activity. The abrupt change establishes retaliatory pretext as a matter of law. When adverse treatment follows protected activity without a factual basis, summary judgment cannot stand. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Rule 56 does not permit an employer to invent a factual predicate after the fact. Because no complaints or misconduct existed before April 23, 2021, the investigative process lacked any legitimate basis and served solely to manufacture a record to justify retaliation. The EEO Director, IG, JAG, Weed, and command leaders manufactured allegations where none

existed and converted protected EEO activity into the trigger for

institutional retaliation. Every subsequent confidentiality breach, record

distortion, and timeline manipulation flowed from that initial retaliatory

act. Acceptance of such justification violates Rule 56 and requires reversal

with entry of judgment as a matter of law.

### B.   Procedurally Defective Investigatory Products

The district court relied on investigatory products that violate mandatory

Air Force regulations and lack authentication under Federal Rule of

Evidence 901. The Informal Inquiry was inadmissible.[350] See *supra* SOF §§

XII. The CDI ROI was inadmissible.[351] See SOF § XIII.   *United States v.*

*Caldwell*, 776 F.3d 1350, 1357–58 (11th Cir. 2015).

Those inadmissible materials formed the foundation of the EEO

investigation. The Informal Inquiry fed directly into the CDI, both of which

---

[350] App'x 13 at 2730-2751

[351] App'x 14, Part 2 at 2955-3352

were then incorporated into the EEO ROI (see SOF § XIV. ) an investigation

overseen by the same EEO Director who prematurely disclosed Dr.

Jackson's EEO complaint, collaborated with the named harasser Scott

Davis, and remained involved throughout the corrupted process.[352] *See*

SOF § XII; TLR Rows 93 & 106; SCR at 11 (cols. F, J, K, & N).

The agency then submitted the EEO ROI to the district court in support of

summary judgment. See *supra* SOF §§ XIV. and Arguments 1 and 2.

The district court **adopted the informal inquiry conclusions**

**verbatim** and mirrors statements about Plaintiff as a "micromanager,"

"known to exhibit bullying behavior," and "racial bias," and found

"evidence of workplace incivility," a "toxic workplace," racially

preferential hiring, and a military–civilian divide. Each finding mirrors the

Informal Inquiry opinion.[353] See SOF § XIV.

------------------------

[352] *Id.* at 2849; App'x 22 at 4836,4846, 4853 (Witness #9)

[353] App'x 3 at 486-521

By reproducing those conclusions as fact, the court accepted the employer's justification wholesale. That approach violates settled law. A court may not credit an employer's explanation when the underlying evidence is procedurally defective or contradicted by the record. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). Nor may a court adopt characterizations drawn from a tainted source without examining the actual evidence. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). The district court committed both errors.

Further, district court compounded the error by affording duplicative weight to the informal opinion. Throughout the Summary Judgment Order, the court alternated between citations to ECF No. 18-14 (pp. 7–29)[354] and ECF No. 23-19 [355] when describing the "Informal Inquiry," creating the appearance of reliance on multiple investigative sources. In fact, those

---

[354]App'x 22 at 4832-4854

[355] App'x 13 at 2730

entries are identical copies of the same.[356] See SOF § **Error! Reference source not found.** This duplication artificially inflated the agency's justification, violating Rule 56 and the Accardi principle that procedurally defective materials cannot sustain agency action.

The court further relied on what the investigator was authorized to do rather than what the record shows she actually did, citing ECF No. 18–16—Col. Kenneth Black's declaration, the individual who ordered the informal inquiry and CDI.[357] Authorization is not evidence. The informal inquiry summary contains no sworn statements, no framed allegations, and no legal sufficiency review. See SOF §§ XII.  XIV. , and **Error! Reference source not found.** Rule 56 does not permit courts to assume missing evidence into existence. *Scott*, 550 U.S. at 380–81; *Reeves*, 530 U.S. at 147–48. This requires reversal and entry of judgment.

---

[356] App'x 3 at 489, 503

[357] *Id.* at 503

## C. Exaggerated Characterizations and Temporal Impossibility

LtCol Weed asserted that undated comment cards justified investigating Dr. Jackson, characterizing those cards as reflecting "anguish," "pleading cries for help," and mental-health concerns. See SOF § V.  The district court accepted that premise, stating that "the informal climate inquiry was in direct response to complaints made via comment cards," and adopted Weed's characterization without examining the cards themselves.[358] Weed's description was exaggerated and unsupported by the contents of the cards themselves. [359, 360]  See SOF §§ V.

Further, in NAV-1, Weed claimed the comment cards accused Dr. Jackson of "overbearing control," lack of empowerment, potential racial

---

[358] *Id.* at 513 and 488).

[359] App'x 12 at 2605-2606 ¶11b

[360] Undated Comment Cards, Appx. 10 at 2167-2174

discrimination, and restrictive management "over the last months."[361]

Defense counsel represented that Weed received these complaints "in mid-April 2021,"[362] and the district court agreed, finding the complaints arose "in or around April 2021."[363]

That chronology is impossible. If Weed possessed urgent, anguish-driven complaints for weeks or months before April 23, 2021, no explanation exists for delaying action until the same day—four hours after Dr. Jackson filed her EEO complaint. The undisputed record resolves the inconsistency: the comment cards did not exist on or before April 23, 2021. Sworn testimony and document chronology establish the cards were solicited and created more than a week later, after April 29, 2021.

This violates Rule 56. A court errs when it "fails to acknowledge key evidence" or "credits the evidence of the moving party while ignoring

---

[361] App'x 10 at 2131

[362] App'x 1 at 198

[363] App'x 3 at

evidence offered by the nonmoving party." *Tolan v. Cotton*, 572 U.S. 650 (2014). When the cards themselves contain routine chain-of-command complaints, with no references to anguish, mental health, or requests for intervention. See SOF §§ V. B

The court compounded this error by crediting the agency's claim that the undated cards existed before April 23, 2021, and prompted same-day investigative action. The Defense falsely portrayed Plaintiff's EEO complaint as a preemptive effort to block an ongoing investigation. The Court adopted this narrative.[364]

Sworn testimony and contemporaneous evidence establish the chronology is impossible. [365,366]  See *supra* § V. D. When an employer's justification is defeated by undisputed evidence or temporal impossibility,

---

[364] App'x 1 at 199, para 3; App'x 3 at 490; App'x 12 at 2625, para 81

[365] App'x 21 at 4732, lines 4-5

[366] App'x 17 at 3842, A2, lines 4-5

judgment as a matter of law is required. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990).

### D. Altered Evidence

The district court relied on altered evidence demonstrating consciousness of guilt. Lt Col Weed created an altered version of NAV-1 (NAV-2) before submitting under penalty of perjury.[367] See SOF § III. A. The alterations removed references establishing coordination and absence of allegations, including timestamps, IG acknowledgments, and EEO timing. See *supra* Argument 1.  Both versions appear in the record, permitting direct comparison. Nevertheless, the district court relied on Weed's altered NAV-2 submission (ECF 23-44).[368]. This constitutes spoliation and consciousness

---

[367] Appx. 10 at 2131, 2133, 2135-2137; Appx. 16 at 3749 A2, 3757; and Appx. 21 at 4665: 8-22.

[368] App'x 3 at 502

of guilt. *Raad*, 323 F.3d at 1196; *Flury*, 427 F.3d at 944–45. Altered evidence

cannot support summary judgment. *Scott*, 550 U.S. at 380–81.

### E. Conclusion

For the reasons set forth above, the district court erred in granting

summary judgment by crediting employer justifications that are

conclusively contradicted by the record, leaving no legally sufficient basis

for judgment in Appellee's favor. The Court should therefore reverse the

district court's judgment and render judgment as a matter of law in

Appellant's favor, with relief to follow under the governing constitutional

and statutory frameworks. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 147–48 (2000); *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000);

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir.

2004).

**IV.    Argument 4. Whether the District Court Erred in Applying the Wrong Causation Standard to Plaintiff's Federal Claims, Where the Current Standard and Undisputed Evidence Require Judgment as a Matter of Law**

All facts, evidence, and legal standards established in Arguments 1–3 are incorporated by reference. See *supra* Arguments 1–3. Federal-sector Title VII liability does not turn on private-sector but-for causation or proof of a materially adverse employment action. The statute is violated whenever discrimination or retaliation plays **any part** in the decision-making process affecting a personnel action. Federal personnel actions must be **untainted** by impermissible considerations. *Babb v. Wilkie*, 140 S. Ct. 1168, 1173–76 (2020).

This appeal turns on a legal disconnect between what the district court said the law requires and how the court actually decided the case. Although the court accurately articulated *Babb*'s "untainted process" standard, the court resolved Plaintiff's claims under a materially-adverse-action framework drawn from private-sector precedent—precisely the approach *Babb v. Wilke* rejected.

Where a district court applies an incorrect causation standard, the error presents a **pure question of law**. And where, as here, the undisputed record permits only one outcome under the correct standard, reversal with entry of judgment is required. *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982); *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000).

The district court committed two fundamental legal errors requiring reversal and entry of judgment:

(1) failing to apply *Babb v. Wilkie*'s "untainted" standard for federal-sector discrimination, instead reverting to a private-sector materially-adverse-action requirement *Babb* expressly rejected; and

(2) failing to apply *Burlington Northern*'s materially adverse standard for retaliation, requiring instead that investigations result in termination or discipline.

These errors are legal, not factual. The undisputed record establishes coordination and procedural taint. Applying the correct standards compels judgment as a matter of law.

## A.  The Court Acknowledged and Failed to Apply *Babb v. Wilkie*

The district court correctly articulated the governing federal-sector

standard under *Babb*. Quoting Eleventh Circuit authority, the court

acknowledged that discrimination is established where "race played a part

in the way the decision was made, because an employment decision must

be 'untainted by… discrimination."[369] The court further recognized  "[t]he

fact that there may be non-pretextual reasons for an adverse employment

action doesn't cancel out the presence, and the taint, of discriminatory

reasons." [370]

Those statements accurately reflect *Babb's* holding: federal-sector

liability turns on whether discrimination tainted the decision-making

---

[369] *Id.* at 509-510 (quoting Malone v. U.S. Attorney General, 858 F. 296, 301 (11th Cir. 2021)))

[370] *Id.* at 510

process in **any part**, not on whether it independently determined the

outcome. See *Babb v. Wilke*, 140 S. Ct. at 1173–74.

Despite acknowledging that standard, the district court did not

apply. Instead, the court resolved Plaintiff's federal-sector claims under a

private-sector adverse-employment-action framework, holding that

"[p]roof of an adverse employment action is an indispensable element" and

requiring a "material or significant change in employment status."[371]

That standard is legally foreclosed. Under *Babb*, material adversity

bears on remedies, not liability. "If discrimination plays any part in the

way a decision is made, then the decision is not made in a way that is

untainted by discrimination," and "[t]he statute does not require proof that

an employment decision would have turned out differently if

discrimination had not been considered." *Babb v. Wilke*, 140 S. Ct. at 1174.

_____

[371] *Id.* at 510-511

Nevertheless, the district court treated the *purported* absence of a materially adverse action as dispositive, concluding that "none of the above could be considered adverse employment actions, except for potentially the constructive discharge."[372]  That conclusion rests on a demonstrably false premise. The record contains numerous materially adverse actions—including retaliatory investigations, formal and informal inquiries, evidence solicitation, altered records, reputational harm, and coercive process escalation—that would dissuade a reasonable employee from engaging in protected activity. The court did not weigh or resolve those actions; but ignored them.[373]

That two-step error—ignoring materially adverse actions established in the record and then applying the wrong legal standard to their supposed absence—constitutes reversible legal error as a matter of law; where a

───────────────────

[372] *Id.* at 511

[373] *See* Arguments I–III; SOF §§ II–XIX; TLR Rows 1–187; CLR at cols. A–O.

district court applies an incorrect legal standard and the undisputed record

compels liability under the correct one, reversal with entry of judgment is

required. See *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982); *Weisgram*

*v. Marley Co.*, 528 U.S. 440, 457 (2000).

### B.  Court Disposed of Claims on Legally Foreclosed Ground

Under *Babb v. Wilkie*, the dispositive question in a federal-sector Title VII

case is not whether the challenged conduct rose to the level of a "materially

adverse employment action," but whether discrimination or retaliation

"played any part in the way a decision was made," because federal

personnel actions must be "untainted by discrimination." 140 S. Ct. at 1174.

The district court nevertheless disposed of Plaintiff's claims on the

absence of materially adverse actions, concluding that "[o]n this record,

none of the above could be considered adverse employment actions, except

for potentially the constructive discharge."[374]   The court further stated:

"The Court rejects out of hand independently and collectively Jackson's

arguments that the alleged verbal abuse, criticism, informal reprimands,

and the denial of extra assistance constitute adverse employment

actions."[375]

Under *Babb*, that reasoning is legally irrelevant to liability. The

Supreme Court has made clear that "[t]he statute does not require proof

that an employment decision would have turned out differently if

discrimination had not been considered." 140 S. Ct. at 1174. Material

adversity bears on remedies, not on whether the statute was violated in the

first instance.

---

[374] App'x 3 at 511.

[375] *Id.* at 511

Here, the undisputed record establishes process taint as a matter of law. Protected activity was disclosed within hours; same-day multi-agency coordination followed; officials expressly acknowledged coordination ("piling onto this one"); materials were solicited post-EEO to justify an investigation; documents were altered to conceal that coordination; and the resulting investigations were procedurally defective. [376] See *supra* Arguments 1–3. By resolving the case on a materially-adverse-action requirement—effectively importing a private-sector causation framework into a federal-sector case—the district court applied a legally foreclosed standard. **See** Arguments 1–3; **see also** SOF §§ III–XX; Chronological Timeline Chart (TLR rows 1–187); Cross-Investigation Solicitation Chart (CLR cols. A–O).

---

[376] **Investigative Record and Source Materials**, including MFR Statements, App'x 10 at 2146–2165, 2176–2196, 2294–2305, 2317–2325; App'x 11 at 2460–2472; Undated Comment Cards, App'x 10 at 2167–2174; Informal Inquiry Summary Report (IO Lynn Wilson, Aug. 30, 2021), App'x 13 (TLR-259); CDI Report of Investigation Summary (Oct. 8, 2021), App'x 15 (TLR-290); NAV-1 Email (Apr. 23, 2021), App'x 10 (TLR-170).

Where a court applies the wrong legal test and the undisputed record compels liability under the correct one, reversal with entry of judgment is required. *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000); see also *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982).

Moreover, once the post-disclosure investigatory products are excised as tainted, the agency's justification collapses entirely. The remaining record—decades of exemplary performance with no prior discipline—establishes that Dr. Jackson would have been "better off" absent the retaliatory coordination, satisfying *Babb.* 140 S. Ct. at 1178.

### C. Misapplied Burlington Northern Retaliation Standard

Under *Burlington Northern & Santa Fe Railway Co. v. White*, Title VII's anti-retaliation provision is broader than its discrimination provision and is not limited to ultimate employment decisions or tangible economic harm. 548 U.S. 53, 64–68 (2006). The dispositive inquiry is whether the challenged conduct "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington* at 68.

The district court nonetheless concluded that the retaliatory investigations initiated after Dr. Jackson's protected activity were not actionable, stating: "However, Jackson has not shown how either the climate inquiry, or the CDI could be considered an adverse employment action."[377] The court further rejected "out of hand independently and collectively" Plaintiff's arguments that verbal abuse, criticism, informal reprimands, and denial of assistance constituted adverse actions. *Burlington.*

That reasoning is irreconcilable with *Burlington Northern*, which expressly holds that the anti-retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. at 67. As established *supra* Arguments 1–3 and *infra* Argument 5, the coordinated investigations, procedural defects, and

---

[377] App'x 3 at 520

reputational harm easily satisfy the materially-adverse standard.[378, 379] By requiring proof of termination, financial loss, or formal discipline—or treating constructive discharge as the sole pathway to adversity—the district court applied an impermissibly narrow standard foreclosed by controlling precedent. This independent legal error requires reversal and entry of judgment.

### D. Misapplication of Additional Controlling Standards

Separate from its failure to apply *Babb v. Wilkie*, the district court committed additional legal errors by importing private-sector frameworks that federal-sector Title VII expressly rejects.

---

[378] See SOF §§ III (Same-Day Events), VIII (EEO Disclosures), XIII (Informal Inquiry), XIV (CDI Investigation), XV (Chain of Record Creation and Consumption); **see also** Chronological Timeline Chart (TLR rows 1–187) and Cross-Investigation Solicitation Chart (CLR cols. A–O).

[379] **Investigative Record and Source Materials**, including **(1)** MFR Statements, App'x 10 at 2146–2165, 2176–2196, 2294–2305, 2317–2325; App'x 11 at 2460–2472; **(2)** Undated Comment Cards, App'x 10 at 2167–2174; **(3)** Informal Inquiry Summary Report (IO Lynn Wilson, Aug. 30, 2021), App'x 13 (TLR-259); **(4)** CDI Report of Investigation Summary (Oct. 8, 2021), App'x 15 (TLR-290); NAV-1 Email (Apr. 23, 2021), App'x 10 (TLR-170).

**Improper Reliance on McDonnell Dougla**s. First, the court improperly imposed a rigid *McDonnell Douglas* framework by treating proof of a materially adverse employment action as indispensable. The court stated: "Proof of an 'adverse employment action' is an indispensable element of a Title VII prima facie case of discrimination," defining such action as "a tangible employment action amounting to a material or 'significant change in employment status.'"[380] On that basis, it concluded that "none of the above could be considered adverse employment actions, except for potentially the constructive discharge." [381]

That analysis is foreclosed by *Babb*, which holds that federal-sector liability turns on whether discrimination "played any part in the way a decision was made," not on material adversity. 140 S. Ct. at 1174. The Supreme Court has further made clear that *McDonnell Douglas* is not

---

[380] App'x 3 at 510

[381] *Id.* at 511

mandatory and may not override statutory text. *United States Postal Service*

*Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

   **Second, the court collapsed liability and remedies**. *Babb*

distinguishes between whether a statutory violation occurred and the

scope of relief. 140 S. Ct. at 1177–78. Yet the district court disposed of

liability by stating that it "rejects out of hand independently and

collectively" Plaintiff's evidence of verbal abuse, criticism, informal

reprimands, and denial of extra assistance"[382] and that Plaintiff "has not

shown how either the climate inquiry or the CDI could be considered an

adverse employment action." [383]

   **Finally, the court impermissibly weighed evidence** at summary

judgment, concluding that "Jackson has not shown that any personnel

action taken by Defendant was tainted by discrimination,"[384] despite

_____

[382] *Id.* at

[383] *Id.* at 521

[384] *Id.* at 511

record evidence establishing coordination and process taint. At summary

judgment, courts may not resolve evidentiary conflicts or draw inferences

against the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  Because the judgment rests on application of incorrect legal

standards, reversal with entry of judgment is required. *Pullman-Standard v.*

*Swint*, 456 U.S. 273, 287 (1982).

### E.   Improper Fact-Weighing at Summary Judgment.

The district court improperly weighed evidence and drew inferences

against the non-movant. In concluding that Plaintiff failed to establish

discriminatory taint, the court stated: "Jackson has not shown that any

personnel action taken by Defendant was tainted by discrimination."[385] The

---

[385] *Id.* at 511.

court further "reject[ed] out of hand independently and collectively" Plaintiff's evidence. [386]

Those statements reflect the resolution of disputed factual issues— not the absence of evidence. As established *supra* Arguments 1–3, the record contains evidence of coordination, temporal impossibility, and process taint. At summary judgment, courts must draw all reasonable inferences in favor of the non-movant and may not weigh evidence or assess credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). By concluding that no discriminatory taint existed despite record evidence supporting Plaintiff's theory, the district court impermissibly resolved factual issues reserved for the trier of fact.

## F. CONCLUSION

Applying *Babb v. Wilkie*, rather than the private-sector but-for causation framework of *University of Texas Southwestern Medical Center v. Nassar*,

---

[386] *Id.* at 511

confirms liability on the undisputed record and entitles Dr. Jackson to full relief.

Here, the district court acknowledged *Babb v. Wilkie*'s "untainted" federal-sector standard but resolved the case under a materially adverse action requirement *Babb* eliminated, and misapplied *Burlington Northern & Santa Fe Railway Co. v. White* by holding retaliatory investigations non-actionable absent termination or discipline. Because the undisputed record satisfies the correct standards, no issues remain for remand. Judgment must be rendered for Dr. Jackson on liability, with full relief—including back pay and compensatory damages.

## V.    Argument 5.  Whether the District Court Erred by Failing to Adjudicate Plaintiff's Preserved Constitutional and Statutory Claims, Where the Undisputed Record Supports Judgment on Those Independent Causes of Action as a Matter of Law

All facts, evidence, and governing legal standards established in

Arguments 1–4 are incorporated by reference. See *supra* Arguments 1–4.

District courts must adjudicate every properly raised claim. Dr. Jackson's

Rule 59(e) motion preserved three independent, non-Title VII causes of

action: (1) Fifth Amendment stigma-plus; (2) Privacy Act violations; and (3)

FMLA interference. The summary-judgment order is silent as to all three.

The Rule 59(e) order likewise failed to address their elements, dismissing

the motion as merely "disput[ing] the Court's conclusion,"[387] despite a

detailed, evidence-based filing. That failure to adjudicate preserved claims

is itself reversible error. See *Danley v. Allen*.

Because Dr. Jackson proceeded pro se, her Rule 59(e) motion must be

liberally construed, and claims fairly presented in substance—though

_____

[387] 59e Denial (Nov. 06, 2024), App'x 4 at 747

imperfectly labeled—were preserved for adjudication. See *Haines v. Kerner;*

*Tannenbaum v. United States*.

The undisputed record—already established in Arguments 1–4—

satisfies each claim as a matter of law. The only remaining question is

remedy. Where a district court fails to adjudicate preserved claims and the

record permits only one outcome, remand is futile and judgment must be

rendered. See *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000).

These independent claims authorize relief beyond Title VII's caps,

including constitutional damages, Privacy Act damages under 5 U.S.C. §

552a(g)(4), and compensatory and liquidated damages under the FMLA.

The district court's failure to adjudicate them—and its refusal to correct

that error under Rule 59(e)—confirms that remand would be futile.

### A. Stigma-Plus (Fifth Amendment Due Process)

The Fifth Amendment prohibits the government from inflicting

reputational harm that alters a public employee's legal status. A stigma-

plus claim requires false statements, official publication, reputational

injury, and a change in legal status. *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1302–03 (11th Cir. 2001.

The record contains multiple government-authored statements falsely labeling Dr. Jackson as "overbearing," "controlling," "racially biased," and "a toxic leader," despite a distinguished career and no prior discipline. See SOF §§ III.C, III.K, III.M, III.N; *supra* Argument 1.  These accusations were officially disseminated through the investigative and personnel process and incorporated into Dr. Jackson's official record, including submission under her name to AF/CARO. SOF §§ III.M–O; *supra* Argument 1. The government further mischaracterized her EEO complaints, falsely alleging she accused military personnel of being "bigots"—a charge she never made.[388]

Such internal publication with legal consequence satisfies *Paul* and *Cannon*. The district court adopted the same defamatory framing.

---

[388] Def Rep to Plaintiff's 59e Motion (Nov. 01, 2024), App'x 4 at 736

As a result, Dr. Jackson relinquished her Women's Program Manager role and was constructively discharged on February 4, 2022, after command and AF/CARO relied on the tainted record. SOF §§ III.K, III.Q; *supra* Argument 2.

These official false statements altered Dr. Jackson's legal status and impaired her federal rehire prospects, satisfying the "plus" element. The district court's failure to adjudicate this preserved constitutional claim was legal error. Absent the unauthorized disclosure, no defamatory findings would exist in her personnel file and she would remain employed. Stigma-plus damages are not subject to Title VII caps. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971); *Paul*, 424 U.S. at 701.

## B. Privacy Act (5 U.S.C. § 552a)

A Privacy Act claim requires unauthorized disclosure or maintenance of inaccurate records, intentional or willful conduct, and adverse effect. *Edison v. Dep't of the Army*, 672 F.2d 840, 846–47 (11th Cir. 1982).

EEO Director Avance admitted disclosing Dr. Jackson's confidential EEO intake to command within hours of filing and conceded the disclosure "could be perceived as reprisal." Avance Dep., App'x 4531–32; SOF § III.C; *supra* Argument 1. The intake was confidential under 29 C.F.R. § 1614.105(g) and MD-110. False characterizations derived from post-EEO solicitation were then incorporated into Dr. Jackson's personnel records through the Informal Inquiry and CDI. SOF §§ III.M–N; *supra* Arguments 1, 3. Maintaining such records violates § 552a(e)(5). Avance's admission establishes willfulness; constructive discharge establishes adverse effect. SOF § III.Q; *supra* Argument 2. The but-for chain runs directly from the unauthorized disclosure to the adverse employment outcome. Dr. Jackson is entitled to actual damages, costs, and fees under § 552a(g)(4), uncapped and independent of Title VII. The district court's failure to adjudicate this preserved claim is reversible error.

### C. FMLA Interference (29 U.S.C. §§ 2615, 2617)

FMLA interference requires entitlement to leave, interference with FMLA rights, and resulting harm. *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008). Intent is not required. Dr. Jackson was on approved FMLA leave beginning October 14, 2021. SOF § III.Q. While on leave, leadership demanded she execute a subordinate's performance evaluation and continued work-related communications, including chaplain emails and persistent calls. *Id.*

Requiring supervisory action during protected leave—particularly involving a subordinate tied to the retaliatory record—undermined the restorative purpose of FMLA leave and constitutes interference under *Martin*. 543 F.3d at 1267. Dr. Jackson resigned on December 16, 2021, while still on FMLA leave, citing an untenable situation created by ongoing work demands during protected leave. SOF § III.Q. FMLA interference is established as a matter of law and authorizes compensatory and liquidated damages, independent of Title VII caps. 29 U.S.C. § 2617(a)(1). The district court's failure to adjudicate this preserved claim requires entry of judgment.

242

## D. Constructive Discharge

Each preserved claim—stigma-plus, Privacy Act, and FMLA interference—

converges on the same undisputed adverse action: Dr. Jackson's

constructive discharge.[389, 390]  See Arguments 1–4; **also** SOF §§ III–XX;

TLR:1–187; CLR cols. A–O.

A constructive discharge occurs when an employer's discriminatory

or retaliatory conduct makes working conditions so intolerable that a

reasonable person in the employee's position would feel compelled to

resign, and the employee actually resigns. *Green v. Brennan*, 578 U.S. ___

(2016).  Because each of Dr. Jackson's preserved claims independently

resulted in objectively intolerable and unlawful conditions culminating in

---

[389] App'x 4 at 682-727

[390] **Investigative Record and Source Materials**, including MFR Statements, App'x 10 at 2146–2165, 2176–2196, 2294–2305, 2317–2325; App'x 11 at 2460–2472; Undated Comment Cards, App'x 10 at 2167–2174; Informal Inquiry Summary Report (IO Lynn Wilson, Aug. 30, 2021), App'x 13 (TLR-259); CDI Report of Investigation Summary (Oct. 8, 2021), App'x 15 (TLR-290); NAV-1 Email (Apr. 23, 2021), App'x 10 (TLR-170).

her constructive discharge, the district court's failure to adjudicate these claims was reversible legal error. Entry of judgment is required.

### E. Conclusion

For the reasons set forth above, the district court committed reversible error by failing to adjudicate Appellant's properly preserved constitutional and statutory claims. Because the undisputed record establishes liability on those independent causes of action as a matter of law, the Court should reverse the district court's judgment and render judgment in Appellant's favor, with relief to follow under the governing constitutional and statutory frameworks. *See Danley v. Allen*, 540 F.3d 1298, 1304–05 (11th Cir. 2008); *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004).

## VI. Argument 6. Whether the District Court Erred in Failing to Recognize That Fundamental Procedural Violations Rendered the Administrative Process Void, Making Remand Futile and Requiring Judgment as a Matter of Law

All facts, evidence, and governing legal standards established in Arguments 1–5 are incorporated by reference. See *supra* Arguments 1–5. When a fully developed record, viewed under the correct legal standards, permits only one lawful outcome, this Court should reverse and direct entry of judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–49 (2000); *Weisgram v. Marley Co.*, 528 U.S. 440, 447–48 (2000); *EEOC v. Neptune Orient Lines, Ltd.*, 834 F.3d 1263, 1273–74 (11th Cir. 2016). This appeal presents that circumstance.

### A. Foundational Judicial Error: Reliance on a Tainted Process

Argument 6 rests on a single, dispositive premise: once the EEO Director breached mandatory neutrality and confidentiality on April 23, 2021, the district court could not lawfully rely on any investigative product, justification, or evidentiary record that flowed from or was reinforced by that breach. The undisputed record establishes that within hours of

protected EEO activity, the EEO Director departed from a neutral role and participated in same-day coordination with command, legal, investigative actors, and the named harasser—before any defined allegations existed. See *supra* Argument 1. That breach rendered the EEO process invalid at inception.

Under *Accardi* and *Babb*, a process tainted at inception cannot be cured by downstream investigations that merely replicate or legitimize the original defect. See *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020). Once neutrality was lost, all derivative actions were necessarily compromised as a matter of law. The district court nonetheless accepted and relied upon those derivative materials as if they were independent and lawfully generated. That was a threshold legal error.

**B.  Consequence of the Error: Remand Is Futile**

Because the district court treated a compromised process as neutral, it necessarily committed multiple downstream legal errors documented in Arguments 1–5. See *supra* Arguments 1–5.

The multiple legal errors are the predictable consequence of a single analytical failure—crediting evidence generated after a mandatory procedural breach. Where the record is complete and the errors are legal and structural, remand serves no corrective purpose and would only delay inevitable judgment. *Chapman v. AI Transp.*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004).

### C.  The Record Permits Only One Outcome

Once tainted, inadmissible, and conclusively contradicted materials are excluded under *Reeves*, *Scott*, *Caldwell*, and *Accardi*, the remaining undisputed documentary record establishes liability as a matter of law on all preserved theories.  As shown *supra* in Arguments 1–5, the operative facts are timestamps, admissions, document alterations, missing signatures,

and undisputed content of emails and reports—not credibility disputes. No further fact-finding is required. Under *Reeves*, *Weisgram*, *Neptune*, and *Chapman*, reversal with entry of judgment is required.

## D. Conclusion

For the reasons set forth above, the district court erred by failing to recognize that fundamental procedural violations rendered the administrative process void as a matter of law. Because those violations fatally compromised the integrity of the proceedings, remand would be futile. The Court should therefore reverse the district court's judgment and render judgment in Appellant's favor, with relief to follow under the governing constitutional and statutory frameworks. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Mincey v. U.S. Postal Serv.*, 206 F. App'x 872, 875–76 (11th Cir. 2006); *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004).

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court reverse the district court's grant of summary judgment and render judgment as a matter of law in her favor, with relief to follow under the governing constitutional and statutory frameworks.

**CERTIFICATE OF COMPLIANCE**

**1. Type-Volume**

This document complies with the word limit of Fed. R. App. P. 27(d)(2)

because, excluding the parts of the document, exempted by Fed. R. App.

P. 32(f), the document contains ~ 36,319 words.

**2. Typeface and Style**

This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because

the document has been prepared in a proportionally spaced typeface using

Microsoft Word 365 in 14-point Palatino Linotype.


Respectfully submitted,


January 13, 2026          */s/ Cecile Jackson*
                          Cecile Jackson
                          Plaintiff, *Pro Se*
                          2551 Salamanca Street
                          Navarre, FL 32566
                          email: jacksonLegalCase@gmail.com
                          Telephone: (850) 341-9285

250

# CERTIFICATE OF SERVICE

Plaintiff-Appellant, *pro se*, hereby certifies that a copy of the foregoing

Plaintiff-Appellant's Corrected Opening Brief was served electronically

through the Court's CM/ECF system on all parties of record.

                        Respectfully submitted,


January 13, 2026                **/s/ Cecile Jackson**
                        Cecile Jackson
                        Plaintiff, **Pro Se**
                        2551 Salamanca Street
                        Navarre, FL 32566
                        email: jacksonLegalCase@gmail.com
                        Telephone: (850) 341-9285